UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1235 (JNE/TNL)

**Abdifitah Jama Adan,**

Plaintiff,

v.

**Heather Weyker,** *et al.*,

Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1758 (JNE/TNL)

**Abdullahi Sade Afyare**,

Plaintiff,

v.

**Heather Weyker,** *et al.*,

Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1902 (JNE/TNL)

**Ahmad Abnulnasir Ahmad**,

Plaintiff,

v.

**Heather Weyker,** *et al.*,

Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1241 (JNE/TNL)

**Musse Ahmed Ali**,

      Plaintiff,

      v.

**Heather Weyker**, *et al.*,

      Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1898 (JNE/TNL)

**Mohamed Amalle**,

      Plaintiff,

      v.

**Heather Weyker**, *et al.*,

      Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1865 (JNE/TNL)

**Dahir Nor Ibrahim**,

      Plaintiff,

      v.

**Heather Weyker**, *et al.*,

      Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1146 (JNE/TNL)

**Idris Ibrahim Fahra**,

      Plaintiff,

      v.

**Heather Weyker,** *et al.*,

      Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

---

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1175 (JNE/TNL)

**Faduma M. Farah**,

      Plaintiff,

      v.

**Heather Weyker,** *et al.*,

      Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

---

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1289 (JNE/TNL)

**Yasin Ahmed Farah**,

      Plaintiff,

      v.

**Heather Weyker,** *et al.*,

      Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1911 (JNE/TNL)

**Muhiyadin Hussein Hassan**,

     Plaintiff,

     v.

      **MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

**Heather Weyker,** *et al.*,

     Defendants.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-3714 (JNE/TNL)

**Abdirahman Abdirzak Hersi,**

     Plaintiff,

     v.

      **MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

**Heather Weyker,** *et al.*,

     Defendants.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1230 (JNE/TNL)

**Abdifatah Bashir Jama**,

     Plaintiff,

     v.

      **MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

**Heather Weyker,** *et al.*,

     Defendants.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1237 (JNE/TNL)

**Abdigadir Ahmed Khalif**,

Plaintiff,

v.

**Heather Weyker**, *et al.*,

Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1894 (JNE/TNL)

**Bashir Yasin Mohamud**,

Plaintiff,

v.

**Heather Weyker**, *et al.*,

Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1243 (JNE/TNL)

**Abdifatah Sharif Omar**,

Plaintiff,

v.

**Heather Weyker**, *et al.*,

Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1113 (JNE/TNL)

**Liban Sharif Omar**,

      Plaintiff,

      v.

**Heather Weyker**, *et al.*,

      Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1166 (JNE/TNL)

**Mohamed Sharif Omar**,

      Plaintiff,

      v.

**Heather Weyker**, *et al.*,

      Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-0908 (JNE/TNL)

**Hamdi Ali Osman**,

      Plaintiff,

      v.

**Heather Weyker**, *et al.*,

      Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1242 (JNE/TNL)

**Haji Osman Salad**,

       Plaintiff,

       v.

**Heather Weyker,** *et al.*,

       Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-2580 (JNE/TNL)

**Ifrah Yassin,**

       Plaintiff,

       v.

**Heather Weyker,** *et al.*,

       Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1012 (JNE/TNL)

**Yassin Abdirahman Yusuf**,

       Plaintiff,

       v.

**Heather Weyker,** *et al.*,

       Defendants.

**MEMORANDUM IN SUPPORT OF INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................viii

TABLE OF EXHIBITS ...................................................................xi

TABLE OF AUTHORITIES ............................................................xii

INTRODUCTION...........................................................................1

BACKGROUND .............................................................................3

    A.  Federal Child Sex-Trafficking Prosecution ..................................3

    B.  Witness Tampering Prosecution...............................................8

    C.  Plaintiffs' Core Allegations...................................................10

    D.  Legal Claims......................................................................12

STANDARD OF REVIEW .............................................................13

ARGUMENT ...............................................................................14

I.   PLAINTIFFS CANNOT SUE OFFICERS BANDEMER AND WEYKER
    UNDER 42 U.S.C. § 1983 ..........................................................14

II.  PLAINTIFFS CANNOT SUE OFFICERS WEYKER AND BANDEMER
    UNDER *BIVENS* ......................................................................18

    A.  Plaintiffs Seek To Expand *Bivens* Into A New Context .............19

    B.  Congress Has Made Deliberate Choices About How To Protect And
        Compensate The Victims Of Unjustified Prosecutions...........21

    C.  No *Bivens* Remedy Is Available To Supplement The Carefully-Crafted
        Procedures And Compensatory Scheme Designed By Congress To
        Protect And Remedy The Wrongly Accused Or Convicted .....30

III. ABSOLUTE IMMUNITY REQUIRES DISMISSAL OF ALL CLAIMS
    BASED UPON OFFICER WEYKER'S ALLEGED FALSE TESTIMONY 35

IV. QUALIFIED IMMUNITY REQUIRES DISMISSAL OF
    ALL REMAINING CLAIMS AGAINST
    OFFICERS WEYKER AND BANDEMER......................................37

    A.  Plaintiffs' Claims Against Officer Bandemer For Supervisory Liability
        Fail As A Matter Of Law ...................................................38

1.    Plaintiffs' Allegations Do Not Establish Officer Bandemer's Personal Liability For Any Constitutional Violation.......................................38

2.    The Eighth Circuit Has Never Recognized The 42 U.S.C. § 1983 "Failure To Intervene" Claim Asserted By Plaintiffs .......................44

**B.  Plaintiffs' *Brady* And Sixth Amendment Claims Based On The Alleged Failure To Disclose Evidence Fail As A Matter Of Law** ..........................45

1.    No Plaintiff May Assert A *Brady* Claim Because None Were Convicted ......................................................................................45

2.    Plaintiffs' Allegations Concerning Officer Weyker's Interview Notes Fail To State A *Brady* Claim ...........................................47

3.    Plaintiffs Fail To State A Sixth Amendment Claim Based On The Failure To Disclose Evidence ........................................................48

**C.  Plaintiffs' Due Process Claims Under The Fifth And Fourteenth Amendment Fail As A Matter Of Law** ....................................................51

1.    Plaintiffs' Due Process Claims For The Alleged Fabrication Of Evidence Are Barred By *Parratt v. Taylor* ..........................................51

2.    Even If Not Barred By *Parratt*, Plaintiffs' Evidence-Fabrication Claims Are Not Cognizable Under The Due Process Clause.......................54

**D.  Plaintiffs' Malicious-Prosecution Claims Under 42 U.S.C § 1983 And *Bivens* Fail As Matter Of Law** .................................................58

1.    The Section 1983 Claims For Malicious Prosecution.......................58

2.    The Section 1983 And *Bivens* Claims For Fourth Amendment Violations ....................................................................................62

**E.  Plaintiffs' Fourth Amendment Claims Fail As A Matter Of Law** ...........63

**F.  Plaintiffs' Factual Allegations Fail To Plausibly Allege A Violation Of Any Clearly Established Constitutional Right** .........................................68

1.    Plaintiffs' Acquittals Or Assertions Of Innocence ...........................70

2.    The Sixth Circuit's Opinion ............................................................71

3.    Officer Weyker's Meetings With The Victims ...................................73

4.     The Victims' Conflicting Statements ................................................74

5.     Jane Doe Four's Alleged Rape ..........................................................78

6.     Jane Doe Two's Forged Birth Certificate .........................................81

7.     The Nashville Statement By Jane Doe Two To Officer Weyker........82

8.     Jane Doe Two's Victim Compensation Form....................................84

9.     Officer Weyker's Rough Notes And Reports ....................................85

10.    Ifrah Yassin's Arrest .......................................................................86

**G.  Plaintiffs Fail To Show A Clearly Established Violation On Any
Claim**..............................................................................................**89**

**V.  PLAINTIFFS' STATE LAW MALICIOUS-PROSECUTION CLAIMS FAIL
AS A MATTER OF LAW ............................................................. 92**

**CONCLUSION .............................................................................. 94**

## TABLE OF EXHIBITS

A. Chart Summarizing Plaintiffs' Causes of Action

B. *United States v. Adan, et al.*, No. 3:10-cr-260, (M.D. Tenn.) ("*Adan*"), Dkt. No. 591, Second Superseding Indictment

C. *Adan,* Dkt. No. 960, Order on Motion to Dismiss

D. *Adan,* Dkt. No. 1006, Order on Motion for Detention

E. *Adan,* Dkt. No. 1392, Order on Motion to Reconsider Detention Order and Motion to Suppress

F. *Adan,* Dkt. No. 1749, Order on Bill of Particulars

G. *Adan,* Dkt. No. 1768, Order on Motion to Dismiss

H. *Adan,* Dkt. No. 2554, Order on Motions to Reconsider

I. *Adan,* Dkt. No. 2560, Order on Motion to be Released from Detention

J. *Adan*, Dkt. No. 2625, Excerpted Trial Transcript Vol. VI

K. *Adan,* Dkt. No. 2626, Excerpted Trial Transcript Vol. VII

L. *Adan,* Dkt. No. 2627, Excerpted Trial Transcript Vol. VIII

M. *Adan,* Dkt. No. 2629, Excerpted Trial Transcript Vol. IX

N. *Adan,* Dkt. No. 2958, Order on Motions to Acquit

O. *United States v. Fahra*, 643 F. App'x 480 (6th Cir. 2016), Order Affirming Acquittals

P. *Adan*, Dkt. No. 3798, Order of Dismissal

Q. *United States v. Ahmed, et al.*, No. 3:11-cr-132 (M.D. Tenn.) ("*Yassin*"), Dkt. No. 1, Affidavit

R. *Yassin*, Dkt No. 5, Indictment

S. *Yassin*, Dkt. No. 220, Joint Motion in Limine No. 5

T. *Yassin*, Dkt. No. 233, Exhibit and Witness List

# TABLE OF AUTHORITIES

## Cases

*Albright v. Oliver,*
    510 U.S. 266 (1994) ................................................................................passim

*Albright v. Oliver,*
    975 F.2d 343 (7th Cir.1992)........................................................................60

*Alvarez v. ICE,*
    818 F.3d 1194 (11th Cir. 2016) ...........................................................32, 33

*Anderson v. Genuine Parts Co., Inc.,*
    128 F.3d 1267 (8th Cir. 1997) .................................................................69

*Andrews v. Fowler,*
    98 F.3d 1069 (8th Cir. 1996)....................................................................40

*Arar v. Ashcroft,*
    585 F.3d 559 (2d Cir. 2009) .....................................................................19

*Ashanti v. City of Golden Valley,*
    666 F.3d 1148 (8th Cir.2012) ..................................................................13

*Ashcroft v. al-Kidd,*
    131 S. Ct. 2074 (2011)........................................................................38, 73

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..........................................................................passim

*Bates v. Hadden,*
    576 F. App'x 636 (8th Cir. 2014) ......................................................59, 60

*Beauchamp v. City of Noblesville, Ind.,*
    320 F.3d 733 (7th Cir. 2003) ...........................................................69, 74

*Bell Atlantic v.* Twombly,
    550 U.S. 544 (2007).................................................................................67

*Berman v. United States,*
    302 U.S. 211 (1937).................................................................................45

*Berrisford v. Wood,*
   826 F.2d 747 (8th Cir. 1987) ................................................................ 48

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
   403 U.S. 388 (1971) ............................................................... 12, 20, 21

*Board of Regents of State Colleges v. Roth,*
   408 U.S. 564 (1972) ............................................................................ 55

*Borgman v. Kedley,*
   646 F.3d 518 (8th Cir. 2011) ............................................................... 75

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ............................................................................ 27

*Brady v. Maryland,*
   373 U.S. 84 (1963) .............................................................................. 44

*Brockinton v. City of Sherwood, Ark.,*
   503 F.3d 667 (8th Cir. 2007) ............................................................... 75

*Brown v. Armstrong,*
   949 F.2d 1007 (8th Cir. 1991) ............................................................. 15

*Brown v. Medtronic, Inc.,*
   628 F.3d 451 (8th Cir. 2010) ............................................................... 14

*Bush v. Lucas,*
   462 U.S. 367 (1983) ...................................................................... 23, 30

*C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347,*
   591 F.3d 624 (8th Cir. 2010) ............................................................... 67

*Carlson v. Green,*
   446 U.S. 14 (1980) ........................................................................ 19, 30

*Carlson v. Roetzel & Andress,*
   552 F.3d 648 (8th Cir. 2008) ............................................................... 15

*Carter v. Huterson,*
   831 F.3d 1104 (8th Cir. 2016) ............................................................. 13

*Castellano v. Fragozo,*
    352 F.3d 939 (5th Cir. 2003) .................................................................58

*Collins v. City of Harker Heights,*
    503 U.S. 115 (1992) ...............................................................................58

*Conley v. Office of Pub. Def., Sixth Judicial Dist. of Arkansas, Pulaski & Perry,*
    *Ctys.*, 653 F.2d 1241 (8th Cir. 1981) ..............................................36, 78

*Corr. Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ............................................................................19, 34

*Crooker v. United States,*
    119 Fed. Cl. 641 (Fed. Cl. 2014) ..........................................................30

*Cty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998) ........................................................................49, 54

*Daniels v. Williams,*
    474 U.S. 327 (1986) ...............................................................................50

*Davis v. Billington,*
    681 F.3d 377 (D.C. Cir. 2012) ..............................................................31

*Davis v. Passman,*
    442 U.S. 228 (1979) ...............................................................................19

*Davis v. United States,*
    417 U.S. 333 (1974) ...............................................................................26

*De La Paz v. Coy,*
    786 F.3d 367 (5th Cir. 2015),
    *pet. for cert. filed*, No, 15-888, 84 USLW 3417 (Jan. 12, 2016) .........32, 33

*Deaver v. Seymour,*
    822 F.2d 66 (D.C. Cir. 1987) ................................................................23

*Devenpeck v. Alford,*
    543 U.S. 146, (2004) ..............................................................................66

*Dunham v. Roer,*
    708 N.W.2d 552 (Minn. Ct. App. 2006) ..........................................91, 92

*Ellis v. Ficano,*
  No. 94–1039, 1995 WL 764127 (6th Cir. Dec. 27, 1995) .....................................16

*Ester v. Faflak,*
  No. CIV.05-0049(PJS/JSM),
  2006 WL 2700288 (D. Minn. Sept. 18, 2006)...................................73, 76, 77, 87

*FDIC v. Meyer,*
  510 U.S. 471 (1994)....................................................................................20, 34

*Federer v. Gephardt,*
  363 F.3d 754 (8th Cir. 2004) ...............................................................................15

*Flores v. Satz,*
  137 F.3d 1275 (11th Cir.1998) .............................................................................49

*Fox v. Hayes,*
  600 F.3d 819 (7th Cir. 2010) ................................................................................53

*Franks* v. Delaware,
  438 U.S. 154 (1978)..................................................................................63, 64

*Gerstein v. Pugh,*
  420 U.S. 103 (1975)............................................................................................62

*Gettimier v. Burse,*
  No. 2:13CV44 HEA, 2015 WL 75224 (E.D. Mo. Jan. 6, 2015) ..........................43

*Gilmore v. City of Minneapolis,*
  837 F.3d 827 (8th Cir. 2016).......................................................................passim

*Gordon v. Hansen,*
  168 F.3d 1109 (8th Cir. 1999) .......................................................................21, 58

*Gorman v. Bartch,*
  152 F.3d 907 (8th Cir. 1998)................................................................................18

*Greene v. United States,*
  358 U.S. 326 (1959)............................................................................................45

*Greenman v. Jessen,*
  787 F.3d 882 (8th Cir. 2015)........................................................................passim

*Hamilton v. Palm,*
    621 F.3d 816 (8th Cir. 2010) ................................................................68

*Harrington v. City of Council Bluffs, Iowa,*
    678 F.3d 676 (8th Cir. 2012) .........................................................passim

*Harris v. Gadd,*
    No. 4:06CV01510 SWW, 2008 WL 176384 n.7 (E.D. Ark. Jan. 16, 2008) ..........16

*Hawkins v. Gage Cty., Neb.,*
    759 F.3d 951 (8th Cir. 2014) .........................................................passim

*Hays v. U.S. Marshal's Serv.,*
    No. CIV. 06-5134, 2006 WL 3431876 (W.D. Ark. Nov. 29, 2006) ......................52

*Heck v. Humphrey,*
    512 U.S. 477 (1994) .........................................................................61

*Heien v. N. Carolina,*
    135 S. Ct. 530 (2014) ................................................................. 63, 64

*Helmig v. Fowler,*
    828 F.3d 755 (8th Cir. 2016) ...............................................................47

*Hensley v. Carey,*
    818 F.2d 646 (7th Cir.1987) ...............................................................49

*Horde v. City of Apple Valley,*
    No. CIV. 13-3107 PJS/JJG, 2014 WL 3577310 (D. Minn. July 18, 2014) ...........49

*Houser v. United States,*
    508 F.2d 509 (8th Cir. 1974) .........................................................26, 27

*Hudson v. Palmer,*
    468 U.S. 517 (1984) .........................................................................51

*Hunter v. Bryant,*
    502 U.S. 224 (1991) ................................................................... 37, 90

*Jacobson v. Mott,*
    Civ. No. 07-4420, 2009 WL 113379 (D. Minn. Jan. 16, 2009) ...........................92

*Johnson v. Gov't of D.C.*,
   734 F.3d 1194 (D.C. Cir. 2013) ........................................................................40

*Jones v. Cannon*,
   174 F.3d 1271 (11th Cir. 1999) ......................................................................44

*Jones v. Frost*,
   No. 4:11CV00889, 2013 WL 12109476 (E.D. Ark. Sept. 10, 2013) ....................45

*Jones v. Frost*,
   770 F.3d 1183 (8th Cir. 2014) ......................................................................46

*Joseph v. Allen*,
   712 F.3d 1222 (8th Cir. 2013) ......................................................................60

*Kellar v. VonHoltum*,
   568 N.W.2d 186 (Minn. Ct. App. 1997) ...........................................................52

*Kohl v. Casson*,
   5 F.3d 1141 (8th Cir. 1993)..........................................................................58

*Kurtz v. City of Shrewsbury*,
   245 F.3d 753 (8th Cir.2001)...................................................................58, 60

*Landrigan v. City of Warwick*,
   628 F.2d 736 (1st Cir. 1980) ........................................................................85

*Lawrence v. City of St. Paul*,
   740 F. Supp. 2d 1026 (D. Minn. 2010)...................................................14, 85, 90

*Livers v. Schenck*,
   700 F.3d 340 (8th Cir. 2012)....................................................................passim

*Lowe Bey v. Hamon*,
   977 F.2d 586 (8th Cir. 1992).........................................................................69

*Malady v. Crunk*,
   902 F.2d 10 (8th Cir. 1990)..........................................................................66

*Malley v. Briggs*,
   475 U.S. 335 (1986)..............................................................................56, 90

*Mangino v. Inc. Vill. of Patchogue,*
   808 F.3d 951 (2d Cir. 2015) ................................................................56

*Marcilis v. Twp. of Redford,*
   693 F.3d 589 (6th Cir. 2012) ..............................................................39

*McCune v. City of Grand Rapids,*
   842 F.2d 903 (6th Cir. 1988) ..............................................................49

*McIntosh v. Turner,*
   861 F.2d 524 (8th Cir. 1988) ..................................................... 19, 31

*Meehan v. Town of Plymouth,*
   167 F.3d 85 (1st Cir. 1999) ................................................................51

*Meshal v. Higgenbotham,*
   804 F.3d 417 (D.C. Cir. 2015) ...........................................................19

*Meyer v. Nebraska,*
   262 U.S. 390 (1923) ............................................................................55

*Minneci v. Pollard,*
   132 S. Ct. 617 (2012) .........................................................................19

*Mirmehdi v. United States,*
   689 F.3d 975 (9th Cir. 2012) ...................................................... 32, 33

*Monell v. New York City Dept. of Social Services,*
   436 U.S. 658 (1978) ............................................................................18

*Montgomery v. City of Ames,*
   829 F.3d 968 (8th Cir. 2016) ...................................................... 38, 86

*Moran v. Clarke,*
   296 F.3d 638 (8th Cir. 2002) ...................................................... 55, 57

*Moran v. Clarke,*
   359 F.3d 1058 (8th Cir. 2004) ...........................................................57

*Morgan v. Gertz,*
   166 F.3d 1307 (10th Cir. 1999) .............................................. 45, 46, 49

*Myers v. Bull,*
   599 F.2d 863 (8th Cir. 1979) ........................................................36

*Myers v. Koopman,*
   738 F.3d 1190 (10th Cir. 2013) ...................................................53

*Nebraska Beef, Ltd. v. Greening,*
   398 F.3d 1080 (8th Cir. 2005) ................................................19, 31

*Nelson v. Greiner,*
   No. CIV. 13-279 DWF/LIB, 2014 WL 5704004 (D. Minn. Nov. 5, 2014) .... 33, 51

*New v. Denver,*
   787 F.3d 895 (8th Cir. 2015) ..................................................69, 70

*Nieves v. McSweeney,*
   241 F.3d 46 (1st Cir. 2001) ...................................................61, 62

*Ordnance, Inc. v. United States,*
   244 F.3d 641 (8th Cir. 2001) ......................................................77

*Osborn v. United States,*
   322 F.2d 835 (5th Cir. 1963) ......................................................28

*Pace v. City of Des Moines,*
   201 F.3d 1050 (8th Cir. 2000) ........................................49, 63, 70, 76

*Parker v. Chard,*
   777 F.3d 977 (8th Cir. 2015) ..................................................37, 38

*Parratt v. Taylor,*
   451 U.S. 527 (1981) ...........................................................50, 51

*Parrish v. Ball,*
   594 F.3d 993 (8th Cir. 2010) ......................................................40

*Payne v. Britten,*
   749 F.3d 697 (8th Cir. 2014) ......................................................37

*Pearson v. Callahan,*
   555 U.S. 223 (2009) ...........................................................37, 56

*Petty v. United States*,
  80 F. App'x 986 (6th Cir. 2003) ........................................................... 16

*Plumhoff v. Rickard*,
  134 S. Ct. 2012 (2014) ...................................................................... 37

*Porous Media Corp. v. Pall Corp.*,
  186 F.3d 1077 (8th Cir. 1999) ...................................................... 14, 89

*Putnam v. Gerloff*,
  639 F.2d 415 (8th Cir. 1981) .............................................................. 43

*Randall v. Prince George's Cnty.*, Md.,
  302 F.3d 188 (4th Cir. 2002) .............................................................. 44

*Rehberg v. Paulk*,
  132 S. Ct. 1497 (2012) ................................................................ 35, 36

*Richardson v. Selsky*,
  5 F.3d 616 (2d Cir. 1993) .................................................................. 56

*Ritchie v. St. Louis Jewish Light*,
  630 F.3d 713 (8th Cir. 2011) .............................................................. 68

*Robbins v. Oklahoma*,
  519 F.3d 1242 (10th Cir. 2008) .......................................................... 39

*Roberts v. Fed. Exp. Corp.*,
  842 S.W.2d 246 (Tenn. 1992) ............................................................ 52

*Rodriguez-Mora v. Baker*,
  792 F.2d 1524 (11th Cir. 1986) .......................................................... 52

*Royster v. Nichols*,
  698 F.3d 681 (8th Cir. 2012) ........................................................ 73, 87

*Russell v. Hennepin Cty.*,
  420 F.3d 841 (8th Cir. 2005) ............................................................. 41

*S.M. v. Krigbaum*,
  808 F.3d 335 (8th Cir. 2015) ........................................................ 39, 41

*Santamorena v. Georgia Military Coll.*,
  147 F.3d 1337 (11th Cir.1998) ........................................................................56

*Santiago v. Warminster Twp.*,
  629 F.3d 121 (3d Cir. 2010) ............................................................................40

*Schaffer v. Beringer*,
  No. 15-3438, 2016 WL 6832976 (8th Cir. Nov. 21, 2016)...................................84

*Schultz v. Thomas*,
  832 F.2d 108 (7th Cir. 1987) ..........................................................................71

*Schweiker v. Chilicky*,
  487 U.S. 412 (1988)................................................................................ 23, 31

*Seenyur v. Hammer*,
  No. CIV. 14-4250 MJD/BRT, 2015 WL 1815858 (D. Minn. Apr. 22, 2015) .......42

*Singleton v. Cecil*,
  176 F.3d 419 (8th Cir. 1999) ..........................................................................53

*Stai v. Deshane*,
  No. CV 14-4152 (RHK/LIB),
  183 F. Supp. 3d 937, 2016 WL 1706094 (D. Minn. Apr. 28, 2016).....................40

*State ex rel. Nixon v. Coeur D'Alene Tribe*,
  164 F.3d 1102 (8th Cir. 1999) ........................................................................13

*Stewart v. Wagner*,
  836 F.3d 978 (8th Cir. 2016)....................................................................passim

*Strickland v. Washington*,
  466 U.S. 668 (1984)......................................................................................48

*Suggs v. Mobley*,
  No. 2:05CV00281 JMM-JWC, 2008 WL 5483348 (E.D. Ark. Dec. 12, 2008) .....87

*Taylor v. Barkes*,
  135 S. Ct. 2042 (2015) ..................................................................................37

*Taylor v. Waters*,
  81 F.3d 429 (4th Cir. 1996)............................................................................47

*United States v. Adan*,
   913 F. Supp. 2d 555 (M.D. Tenn. 2012)......................................................passim

*United States v. Bagley*,
   473 U.S. 667 (1985)........................................................................................45

*United States v. Brunner*,
   200 F.2d 276 (6th Cir.1952)............................................................................29

*United States v. Calandra*,
   414 U.S. 338 (1974)........................................................................................24

*United States v. Evans*,
   272 F.3d 1069 (8th Cir. 2001) .........................................................................76

*United States v. Fahra*,
   643 F. App'x 480 (6th Cir. 2016) ...............................................................passim

*United States v. Gaudin*,
   515 U.S. 506 (1995)........................................................................................24

*United States v. Gilbert*,
   198 F.3d 1293 (11th Cir. 1999) ........................................................... 27, 28, 34

*United States v. Gonzales*,
   90 F.3d 1363 (8th Cir. 1996)...........................................................................46

*United States v. Graham*,
   608 F.3d 164 (4th Cir. 2010)...........................................................................29

*United States v. Greatwalker*,
   356 F.3d 908 (8th Cir. 2004)...........................................................................47

*United States v. Jacobs,*
   986 F.2d 1231 (8th Cir.1993)..........................................................................64

*United States v. Manthei*,
   979 F.2d 124 (8th Cir. 1992)...........................................................................46

*United States v. Mechanik*,
   475 U.S. 66 (1986).........................................................................................24

*United States v. Racing Servs.*, Inc.,
580 F.3d 710 (8th Cir. 2009).......................................................................29

*United States v. Redding,*
16 F.3d 298 (8th Cir. 1994).........................................................................84

*United States v. Salerno,*
481 U.S. 739 (1987).............................................................................25, 26

*United States v. Sharpe,*
470 U.S. 675 (1985)....................................................................................70

*United States v. Virginia Erection Corp.,*
335 F.2d 868 (4th Cir. 1964).......................................................................25

*United States v. Word,*
806 F.2d 658 (6th Cir. 1986).......................................................................46

*Vennes v. An Unknown Number of Unidentified Agents,*
26 F.3d 1448 (8th Cir. 1994)................................................................passim

*Villasana v. Wilhoit,*
368 F.3d 976 (8th Cir. 2004).......................................................................45

*Wallace v. Kato,*
549 U.S. 384 (2007)........................................................................ 17, 58, 61

*Wedemeier v. City of Ballwin,*
931 F.2d 24 (8th Cir. 1991).........................................................................41

*Weimer v. Amen,*
870 F.2d 1400 (8th Cir. 1989) ....................................................................53

*West v. Atkins,*
487 U.S. 42 (1988)......................................................................................15

*White v. Simmons,*
No. 5:07CV00079JWC, 2009 WL 735249 (E.D. Ark. Mar. 18, 2009) ................42

*White v. Simmons,*
387 F. App'x 652 (8th Cir. 2010) ...............................................................42

*Whitlock v. Brueggemann*,
   682 F.3d 567 (7th Cir. 2012)......................................................................17

*Wilkie v. Robbins*,
   551 U.S. 537 (2007)...........................................................................passim

*Wilson v. Layne*,
   526 U.S. 603 (1999)..................................................................................44

*Wilson v. Libby*,
   498 F. Supp. 2d 74 (D.D.C. 2007) .........................................................19

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) ...............................................................19

*Winslow v. Smith*,
   696 F.3d 716 (8th Cir. 2012).............................................17, 56, 57, 90

*Wood v. Georgia*,
   370 U.S. 375 (1962)..................................................................................24

*Yang v. Hardin*,
   37 F.3d 282 (7th Cir. 1994).....................................................................44

*Ex parte Yerger*,
   75 U.S. 85 (1868) .....................................................................................27

## Statutes

18 U.S.C. § 3006A.............................................................................................27

18 U.S.C. § 3142(f)............................................................................................25

18 U.S.C. § 3142(f)(1).......................................................................................25

18 U.S.C. § 3142(f)(2)(B) .................................................................................26

18 U.S.C. §§ 3141-51 ........................................................................................25

28 U.S.C. § 1346(b) ...........................................................................................52

28 U.S.C. § 2241................................................................................................26

28 U.S.C. § 2513.................................................................28

28 U.S.C. § 2513(b) ...........................................................29

28 U.S.C. § 2513(e) ...........................................................29

28 U.S.C. § 2679(b)(1) .......................................................91

28 U.S.C. § 2680(h) ...........................................................52

28 U.S.C. §§ 2073 ..............................................................23

42 U.S.C. § 1983.........................................................passim

Pub. L. No. 108–405.........................................................29

Pub. L. No. 105-119 .........................................................27

**INTRODUCTION**

Plaintiffs in these twenty-one matters seek to re-litigate the United States' decision to prosecute thirty Somali gang members or associates on charges "relating to the alleged operation of a large-scale sex-trafficking ring, spanning nine cities in four states over ten years." *United States v. Fahra*, 643 F. App'x 480, 481 (6th Cir. 2016). The prosecution began in 2010, when a federal grand jury indicted the individuals on one or more of twenty different federal offenses, some relating to sex trafficking and some related to other criminal enterprises. During pretrial proceedings, the government identified tens of thousands of pages of documents and hundreds of witnesses to support the charges. A grand jury also charged three other individuals in a separate case with tampering with witnesses and obstructing justice in the underlying case. In the end, some of the criminal defendants pleaded guilty, some had the charges dismissed by the government, and some were acquitted.

Twenty-one of the former criminal defendants (twenty from the sex-trafficking prosecution and one from the witness-tampering case) have now filed separate lawsuits seeking compensation for their prior prosecutions. Because they cannot sue the federal prosecutors who made the independent decision to bring criminal charges against them, they seek damages from St. Paul Police Officers Heather Weyker and John Bandemer. Officers Weyker and Bandemer are former federal task force officers who worked on the underlying sex-trafficking investigation. Plaintiffs claim that Officers Weyker and Bandemer engaged in a host of wrongful conduct which led to

Plaintiffs' indictment and arrest, and in the case of nine plaintiffs, their trial on sex-trafficking or witness-tampering charges.

To support their claims, Plaintiffs primarily rely on the Sixth Circuit's opinion affirming the district court's acquittal of three criminal defendants found guilty by the jury. All Plaintiffs selectively cite passages from the Sixth Circuit's opinion that harshly criticize the investigation, the credibility of some of the witnesses, and certain conduct by Officer Weyker. But what Plaintiffs do not mention is that none of the criminal defendants was acquitted based on investigative misconduct. Rather, as the district court concluded, and the Sixth Circuit affirmed, there was an improper variance between the charges in the indictment and the proof at trial:

> [T]he evidence produced at trial, even viewed in the light most favorable to the prosecution (and the guilty verdicts), proved only that different and unconnected groups acted with different females at different times in different cities and states. The prosecution did not prove a single, unified conspiracy as it had charged in the indictment, but proved at best multiple separate conspiracies.

*Fahra*, 643 F. App'x at 493.

In the current lawsuits, Plaintiffs again raise the same allegations about Officer Weyker that they raised in the prior criminal proceedings, and they also now try to recover damages against her supervisor, Officer Bandemer, for failing to prevent the alleged misconduct. These claims fail as a matter of law for several reasons. First, no causes of action exists under Section 1983 or under *Bivens* to sue Officers Weyker and Bandemer in their personal capacities. Second, the claims against Officer Bandemer fail because neither Section 1983 nor *Bivens* allows for supervisory

liability. Third, Officer Weyker is entitled to absolute immunity for any claim alleging false testimony in the criminal proceedings. Finally, qualified immunity protects Officers Weyker and Bandemer from any remaining claims because Plaintiffs fail to plausibly allege that these officers violated any clearly established constitutional right. Therefore, as detailed below, all claims in all suits should be dismissed with prejudice.

## BACKGROUND

### A.   Federal Child Sex-Trafficking Prosecution

Beginning in November 2010, most Plaintiffs in the above-captioned cases were indicted and arrested for an array of federal crimes relating to a decade-long, child sex-trafficking ring. *See United States v. Adan*, 3:10-cr-260 (M.D. Tenn.) (*"Adan"*), Dkt. No. 591, attached as Exhibit B.[1] In a 58-page indictment, the grand jury detailed its findings that Plaintiffs (along with other alleged gang members or associates) committed numerous crimes, including conspiracy to commit sex trafficking, obstruction of justice, interstate transportation of stolen goods, and credit card fraud. Prosecutors subsequently disclosed 35,000 pages of documents and 175 hours of phone calls to defense counsel, *Fahra*, 643 F. App'x at 483, and also

---

[1] The original indictment was filed on October 20, 2010 (Dkt. No. 3), but no Plaintiff was arrested until after the first superseding indictment was filed on November 3, 2010 (Dkt. No. 36). The second superseding indictment added Plaintiff Amalle to the case but otherwise is the same as the first superseding indictment.

identified more than 600 exhibits and 200 witnesses for trial, *Adan*, Dkt. No. 1749 at 7, attached as Exhibit F.

Most Plaintiffs waived detention hearings or were ordered detained through trial, although some were released (subject to conditions) before trial, in some cases within a few weeks of arrest. *See, e.g.*, Faduma Farah Compl. ¶¶ 1, 27; Yassin Compl. ¶ 32; Yasin Farah Compl. ¶¶ 23, 24; Afyare Compl. ¶ 80. In addition, some plaintiffs filed motions to dismiss the indictment (or individual counts thereof). *See*, *e.g.*, *Adan*, Dkt. Nos. 741-42, 931, 1432-33, 1476-77, 1518, 1526, 1543, 1568.

The court decided to hold separate trials for certain charges in the indictment, and the first trial began in March 2012 on certain sex-trafficking charges against Plaintiffs Ahmad Ahmad, Musse Ali, Faduma Farah, Idris Fahra, Dahir Ibrahim, Yassin Yusuf, Mohamed Amalle, and Amdirahman Hersi.[2] *Fahra*, 643 F. App'x at 483. During the three-week trial, prosecutors called 49 witnesses, including two principle victims—Jane Doe Two and Jane Doe Five. *Id.* at 484. Officer Weyker did not testify. *Id.* at 489.

Jane Doe Two testified that she had been sold for sex on multiple occasions over several years. *Id.* at 484. This included a weekend in April 2009 where she went from Minnesota to Nashville and had "sex with at least 10 different men for money,"

---

[2] In the middle of trial, the court declared a mistrial without prejudice as to Plaintiff Hersi; the court later granted his motion to dismiss for being a juvenile at the time of the offenses. *Adan*, Dkt. No. 2554, attached as Exhibit H.

followed by sex that night with three more men, followed the next morning by "sex for money" five more times. *Id.* at 484-85. Jane Doe Two also "authenticated a recorded telephone conversation" she had after she was arrested in Nashville with the alleged perpetrators during which she told Officer Weyker "that her sex acts over the past few days had been prostitution and sex trafficking." *Id.* at 485. The jury heard this recording:

> Q (by Officer Weyker): Do you think—why do you think you were brought along for the joy ride?
>
> A (by Jane Doe Two): To give them company.
>
> Q: What does that mean?
>
> A: To have somebody to fuck.
>
> Q: To what?
>
> A: To have somebody to have sex with.
>
> Q: All of the guys?
>
> A: Yeah.

*Adan*, Dkt. No. 2626 at PageID 14716:7-15, attached as Exhibit K. Jane Doe Two also authenticated her handwriting on an application to the Tennessee victim's compensation fund, wherein she claimed that she was "abducted" to Nashville and had been "prostituted in Minnesota and told to do it in Nashville." *Adan*, Dkt. No. 2629 at PageID 15500:18-22, attached as Exhibit M.

Jane Doe Five, another government witness, "identified eight defendants by name and accused six of sex trafficking crimes," including Plaintiffs (and brothers)

Abdifatah, Liban, and Mohamed Omar. *Fahra*, 643 F. App'x at 486. Jane Doe Five had "been diagnosed as insane and was off of her medication at trial." *Id.*

The government also introduced recorded telephone calls made by some of the defendants while they were in jail. *Id.* at 486-87. This included one conversation in which Plaintiff Salad (aka "Hollywood") told Plaintiffs Liban Omar ("Sunderra") and Abdifatah Omar ("British") about "the need to deter [Jane Doe Two's] family from pressing charges." *Id.* at 487.

After deliberating for five days, the jury acquitted Plaintiffs Ahmad, Ali, Faduma Farah, Ibrahim, and Amalle. *Id.* at 488. The jury, however, returned guilty verdicts for Plaintiffs Idris Fahra and Yusuf (and for Andrew Kayachith, who is not a Plaintiff here). *Id.*

Plaintiffs Fahra and Yusuf, along with Kayachith, moved for post-verdict judgments of acquittal and raised arguments that implicate the *same* allegations of investigatory misconduct being raised here, namely that the government introduced:

(1) fabricated evidence that Jane Doe Two was a minor;[3]

(2) manipulated Jane Doe Two to falsely testify at trial; and[4]

(3) fabricated evidence of sex trafficking (as evidenced by a difference in the number of times sex trafficking is referenced in Officer Weyker's

---

[3] *Compare, e.g.*, Idris Fahra Compl. ¶ 36 *with Adan*, 913 F. Supp. 2d at 561 (addressing "the insufficiency of the Government's proof on Jane Doe Two's actual age").

[4] *Compare, e.g.*, Idris Fahra Compl. ¶¶ 32-35, 40-42 *with Adan*, 913 F. Supp. 2d at 561 (addressing "presentation of the false testimony of Jane Doe Two").

final report of witness interviews and the number of times it is mentioned in "rough notes" of those interviews).[5]

The district judge granted the motion for acquittal, but the court's decision was not based on any finding that Officer Weyker fabricated or manipulated evidence presented to the grand or petit jury. To the contrary, the trial court held there was "admissible" evidence (*e.g.*, classmate testimony and yearbook photos) to show that Jane Doe Two was a minor at the time of the offenses. *See United States v. Adan*, 913 F. Supp. 2d 555, 564 (M.D. Tenn. 2012), attached as Exhibit N. The court also concluded that Jane Doe Two's trial testimony was not "indisputably false," and observed that Officer Weyker's "rough" notes of interviews she conducted with Jane Doe Two actually lent "credence to Jane Doe Two's trial testimony." *Id.* at 570.[6] In the end, the court acquitted these three defendants because prosecutors proved, at best, the existence of multiple sex-trafficking conspiracies rather than the single sex-trafficking conspiracy that was charged in the indictment. *Id.* at 579. The Sixth Circuit affirmed the district court's decision:

---

[5] *Compare, e.g.*, Idris Fahra Compl. ¶¶ 43-46 *with Adan*, 913 F. Supp. 2d at 570 (addressing claim that "the lead agent's notes were not produced until after trial started").

[6] In the alternative, the court conditionally granted defendants' motion for a new trial based on discovery violations by federal prosecutors. *Adan*, 913 F. Supp. 2d at 589-90. The court concluded that the prosecution's late disclosure (during trial) of certain Jencks Act materials prejudiced defendants from obtaining conflicting evidence regarding Jane Doe Two's actual age. *Id.* The court also noted that expert testimony would be needed to prove Jane Doe Two's age at a subsequent retrial. *Id.* at 563 n.6.

> [E]xtensive evidence presented about these multiple conspiracies, and the large number of improperly joined co-defendants, likely misled the jury into assuming a union of criminal intent, an agreement to cooperate, and an increased degree of culpability, thereby causing significant prejudice to these defendants.

*Fahra*, 643 F. App'x at 493. Following the Sixth Circuit's affirmance of the trial court's ruling, federal prosecutors voluntarily dismissed the charges against all of the remaining defendants—including Plaintiffs Afyare, Yasin Farah, Hassan, Jama, Khalif, Mahamud, Abdifatah Omar, Liban Omar, Mohamed Omar, Osman, and Salad—who had not yet been tried. *Adan*, Dkt. No. 3798, attached as Exhibit P.[7]

### B.   Witness Tampering Prosecution

In June 2011, Plaintiff Ifrah Yassin and two other individuals (Hawo Ahmed and Hamdi Mohamud) were indicted on five counts of witness tampering and obstruction of justice related to the underlying sex-trafficking prosecution. *See* Yassin Compl. ¶ 1; *United States v. Ahmed, et al.*, No. 3:11-cr-132 (M.D. Tenn.) ("*Yassin*"), Dkt. No. 5, attached as Exhibit R. Yassin admits there was a physical altercation between Yassin, her friends (Ahmed and Mohamud), and Muna Abdulkadir. *See* Yassin Compl. ¶¶ 8-14. It started when "Ahmed confronted Abdulkadir and told her that she wanted to fight." *Id.* ¶¶ 9-10. After the incident, Yassin called 911, *id.* ¶ 15, and Abdulkadir called Officer Weyker, *id.* ¶ 16.

---

[7] While the motions for acquittal were on appeal, Plaintiff Adan (who had not yet been tried) pled guilty to making false statements on an immigration document; as part of the plea, the sex-trafficking charges were dismissed. Adan Compl. ¶¶ 46-47.

In response to Yassin's 911 call, Minneapolis Police Officer Anthijuan Beeks arrived at the scene and subsequently spoke to Officer Weyker by phone. *Id.* ¶ 17. Officer Weyker told Officer Beeks she had "information and documentation" that Yassin and her friends were "actively seeking out Abdulkadir" because she was a witness in the human-trafficking case. *Id.* ¶ 18. As Yassin explained in her criminal-defense filings, Officer Beeks then "'formulated a plan to speak to these individuals separately and again to gather further information.'" *Yassin*, Dkt. No. 220 at 2 (quoting Officer Beeks's police report), attached as Exhibit S. Officer Beeks "separated" Yassin and her friends and "interviewed them individually." *Id.* He obtained "statements" from Yassin and her friends. *Id.* Ultimately, "Officer Beeks and his supervisors decided to arrest Yassin." Yassin Compl. ¶ 20. Officer Weyker filed a criminal complaint the next day with a detailed probable-cause affidavit. *See Yassin*, Dkt. No. 1 at 2, attached as Exhibit Q. Yassin was indicted two weeks later. Yassin Compl. ¶ 25.

According to Officer Weyker's probable-cause affidavit, Abdulkadir told Officer Weyker (and other federal officers who were also on the phone) how the altercation began: Yassin and Mohamud were standing with Ahmed as Ahmed "pound[ed] on the outside window" to Abdulkadir's apartment building. Ex. Q at 7. Ahmed "pointed at" Abdulkadir and asked why Abdulkadir "was talking about her to other people." *Id.* Ahmed said she wanted to fight Abdulkadir. *Id.* Yassin also agreed to fight and interjected: "you locked all my ni***z up," referring to "[t]he SOL" (Somali gang members) and "ChiTown" (Plaintiff Idris Fahra). *Id.*

During a four-day jury trial, the government called nine witnesses (including Abdulkadir and Officers Beeks, Weyker, and Bandemer) and introduced twenty exhibits. *See Yassin*, Dkt. No. 233, attached as Exhibit T. This included "video surveillance cameras of the fight" and Yassin's "911 call." *Id.* Yassin was ultimately acquitted. Yassin Compl. ¶ 34.

### C.   Plaintiffs' Core Allegations

Each of the twenty-one complaints generally alleges that Officer Weyker fabricated evidence, lied during court proceedings, and committed other misconduct that led Plaintiffs to be prosecuted in the underlying criminal cases. Plaintiffs all generally rely on the following alleged circumstances to support their claims:

1.   Officer Weyker gave false testimony to the grand jury that ultimately indicted the Plaintiffs.[8]

2.   Officer Weyker gave false testimony during Plaintiff Abtifatah Omar's and Plaintiff Bashir Yasin Mohamud's detention hearings.[9]

3.   Officer Weyker maintained improperly manipulative or coercive relationships with some of the females who were allegedly trafficked by Plaintiffs. For example, after Jane Doe Two was arrested in Nashville in April 2009 while in the company of some of the defendants, she allegedly gave the Nashville officers one explanation for why she was traveling with that group of men, and gave a different explanation for her presence

---

[8] *See, e.g.,* Ali Compl. ¶ 54c; Afyare Compl. ¶ 50; Yasin Farah Compl. ¶ 41b.

[9] *See*, *e.g.*, Afyare Compl. ¶ 68; Abdifatah Omar Compl. 54c; Mohamed Omar Compl. ¶ 49; Bashir Yasin Mohamud Compl. ¶ 35.

among those men when the officers put her on the phone with Officer Weyker.[10]

4.    Officer Weyker knew that Jane Doe Two was not a minor at the time she was trafficked but relied on or endorsed false documents to the contrary (including a forged birth certificate).[11]

5.    Officer Weyker's rough notes of her interviews with some witnesses contradicted final reports of those interviews.[12]

6.    In preparing a request for Jane Doe Two to receive compensation from the State of Tennessee as the victim of a crime, Officer Weyker represented that Jane Doe Two had been "abducted" knowing that she had not been.[13]

7.    Officer Weyker improperly relied on and credited Jane Doe Five's claim to have been a victim of sex trafficking by Plaintiffs despite the untrustworthiness inherent in Jane Doe Five's apparent mental status.[14]

8.    Officer Bandemer was aware of Officer Weyker's alleged misconduct with respect to the sex-trafficking investigation and prosecution no later

---

[10] *See, e.g.,* Ali Compl. ¶ 18 (alleging that Jane Doe Two "was a habitual runaway who did not want to talk to Weyker"); Afyare Compl. ¶ 43 ("Weyker cultivated a deep and manipulative relationship with Jane Doe Two and the other Jane Doe witnesses"); Yasin Farah Compl. ¶ 32 ("Weyker met secretly with Jane Doe 2"); *see also*, *e.g.*, Ali Compl. ¶ 26; Afyare Compl. ¶ 44; Yasin Farah Compl. ¶ 41e.

[11] *See*, *e.g.*, Ali Compl. ¶¶ 15-17; *see also id.* ¶ 39 ("Weyker even went so far as to fabricate and/or endorse documents falsifying the ages of certain alleged Jane Doe victims); Afyare Compl. ¶¶ 51-53 ("The FBI declared Jane Doe Two's birth certificate was forged"); Yasin Farah Compl. ¶ 27 (Weyker knowingly presented a "forged birth certificate").

[12] *See*, *e.g.*, Ali Compl. ¶ 54a; Afyare Compl. ¶ 50; Yasin Farah Compl. ¶ 33.

[13] *See, e.g.,* Ali Compl. ¶ 54d; Yasin Farah Compl. ¶ 41c.

[14] *See*, *e.g.*, Adan Compl. ¶¶ 21-23; Faduma Farah Compl. ¶ 57; Yasin Farah Compl. ¶ 41f.

than February 2012 (when the district court expressed concerns about her grand jury testimony) but failed to take remedial action.[15]

Although Yassin was not indicted in the sex-trafficking case, she similarly alleges that Officer Weyker fabricated probable cause leading to her arrest and prosecution on witness-tampering charges. Yassin claims that Officer Weyker lied to Officer Beeks about having "information and documentation" that Yassin "had been actively seeking out Abdulkadir to intimidate her and cause bodily harm." *Id.* ¶¶ 18, 21. Yassin claims that Officer Weyker lied because "Abdulkadir was a lynchpin of Weyker's manufactured human-trafficking case" and thus "sought to assist Abdulkadir in avoiding criminal charges." *Id.* ¶ 24. Yassin alleges this despite acknowledging that her friends "wanted to fight" Abdulkadir and admitting that they "confronted" Abdulkadir first. *Id.* ¶¶ 9-10.

### D.    Legal Claims

All twenty-one complaints seek damages against Officer Weyker and the City of Saint Paul, and nineteen seek damages against Officer Bandemer.[16] *See* Civil Case Chart, attached as Exhibit A. The individual complaints generally raise constitutional claims against Officers Weyker and Bandemer under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (including

---

[15] *See, e.g.,* Ali Compl. ¶¶ 56-57; Afyare Compl. ¶¶ 68-71.

[16] Plaintiffs Yassin Farah and Ifrah Yassin do not sue Officer Bandemer.

Fourth, Fifth, and Sixth Amendment claims) and 42 U.S.C. § 1983 (including Fourth and Fourteenth Amendment claims, malicious prosecution, and failure to intervene). Plaintiffs also assert common-law claims against Officers Weyker and Bandemer for malicious prosecution.[17]

## STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *See Carter v. Huterson*, 831 F.3d 1104, 1107 (8th Cir. 2016). "Rule 12(b)(6) motions are not automatically converted into motions for summary judgment simply because one party submits additional matters in support of or opposition to the motion." *State ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999). Although matters outside the pleadings ordinarily convert a motion to dismiss into one for summary judgment, "documents necessarily embraced by the complaint are not matters outside the pleading." *Ashanti v. City of Golden Valley,* 666 F.3d 1148, 1151 (8th Cir.2012) (quotations omitted). Documents necessarily embraced by the pleadings include documents whose contents are alleged in a complaint and whose authenticity no party questions. *See id.*

In the current matters, all complaints either attach or reference documents in the underlying criminal proceedings. When documents are attached to or

---

[17] The United States has concurrently filed a motion to substitute itself as the proper defendant for the common-law claims against Officers Weyker and Bandemer.

incorporated by a complaint, courts may look to the documents for "for all purposes," including to determine whether a plaintiff has stated a claim. *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459–60 (8th Cir. 2010) (quoting Fed.R.Civ.P. 10(c)). In addition, courts may consider "matters of public record" when reviewing a motion to dismiss, including rulings and other filings in prior judicial proceedings. *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015). Especially when a claim depends on conduct related to prior judicial proceedings, courts may rely on rulings and transcripts in the prior suit when evaluating the merits of a claim in a motion to dismiss. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999); *Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026, 1035 (D. Minn. 2010). Several such documents are attached to this motion, though to the extent the Court concludes certain documents may not be considered in a motion to dismiss, Defendants request that those documents be ignored.

## ARGUMENT

### I.   PLAINTIFFS CANNOT SUE OFFICERS BANDEMER AND WEYKER UNDER 42 U.S.C. § 1983

All of Plaintiffs' Section 1983 claims against Officers Bandemer and Weyker are based upon the initiation of an alleged wrongful prosecution brought by the federal government, Plaintiffs' arrest and subsequent detention pending the disposition of the federal criminal charges brought against them, and for some Plaintiffs, trials in federal court at which the charges were adjudicated. Against both Officers Bandemer and Weyker, Plaintiffs assert Section 1983 claims for violations of

their rights under the Fourth, Sixth, and Fourteenth Amendments, as well as a claim for malicious prosecution. Plaintiffs also assert Section 1983 claims for supervisory liability and failure to intervene against Bandemer.

Plaintiffs do not dispute that Officers Bandemer and Weyker were deputized federal officers for at least some portion of the underlying criminal investigation that produced the federal prosecution noted above. *See, e.g.*, Afyare Compl. ¶¶ 6-8; Ali Compl. ¶ 25; Yasin Farah Compl. ¶ 1; *see also Fahra*, 643 F. App'x at 481("Heather Weyker was a St. Paul police officer and member of an FBI task force on sex trafficking."). In a separate filing submitted concurrently with this motion, the United States has certified that at the time federal criminal proceedings were initiated against Plaintiffs, Officers Bandemer and Weyker were acting as designated or deputized federal law enforcement officers. In the absence of a successful challenge to that certification, Officers Weyker and Bandemer were acting within the scope of their federal employment at the time Plaintiffs were indicted, arrested, detained, and tried. *Brown v. Armstrong*, 949 F.2d 1007, 1012 (8th Cir. 1991).

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). It is well settled that a federal actor cannot be held liable under § 1983, as the statute is limited to the actions of state actors. *See Federer v. Gephardt*, 363 F.3d 754, 758 (8th Cir. 2004) (citation omitted); *Carlson v. Roetzel & Andress*, 552 F.3d 648, 650 (8th Cir. 2008) ("Only state actors can

be held liable under Section 1983."). Cross-deputized local law enforcement officers such as Officers Bandemer and Weyker are not subject to liability under Section 1983 because they act under color of federal law. *See Harris v. Gadd*, No. 4:06CV01510 SWW, 2008 WL 176384, at *3 n.7 (E.D. Ark. Jan. 16, 2008) (dismissing section 1983 claim because state police officers committed alleged constitutional deprivations while acting within the scope of their employment as federal agents); *cf. Petty v. United States*, 80 F. App'x 986, 989 (6th Cir. 2003) (noting that cross-deputized local employees are considered federal employees for purposes of the Federal Tort Claims Act); *Ellis v. Ficano*, No. 94–1039, 1995 WL 764127, at *6 (6th Cir. Dec. 27, 1995) (affirming that federal officers are subject to a claim under *Bivens* for alleged constitutional deprivations).

The key elements of Plaintiffs' Section 1983 claims are that federal criminal proceedings were initiated against them based upon fabricated evidence, and that they were subjected to arrest and detention (and in some cases trial) as a result of those criminal proceedings. Federal criminal proceedings were initiated in the sex-trafficking case when the initial indictments were returned in October and November 2010. Plaintiffs' arrests occurred after those indictments were returned, as did their detentions, and the trial that was conducted. "Under the traditional rule of accrual . . . the tort cause of action accrues . . . when the wrongful act or omission results in damages. The cause of action accrues even though the full extent of the injury is not then known or predictable." 1 C. Corman, Limitation of Actions § 7.4.1, pp. 526–527 (1991).

Accordingly, the earliest Plaintiffs could have a due process claim for the alleged misconduct by Officer Weyker was after they were indicted on federal charges. *See Winslow v. Smith*, 696 F.3d 716, 735 (8th Cir. 2012) ("False evidence or evidence derived from a reckless investigation only violates a criminal defendants' due process rights if it is 'used to deprive the defendant of her liberty in some way.'") (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). Plaintiffs likewise could not have a Fourth Amendment claim for false arrest or false imprisonment until after they were arrested and detained on those federal charges. *See Wallace v. Kato*, 549 U.S. 384, 390 (2007) ("If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment.") (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 119, p. 888 (5th ed. 1984)). And there was no *Brady* or Sixth Amendment trial-related claim until a trial was held. *See Livers v. Schenck*, 700 F.3d 340, 359 (8th Cir. 2012) (noting that there can be no violation of the rule of *Brady v. Maryland* unless the defendant was actually convicted).

All of the Section 1983 claims against Officers Bandemer and Weyker are thus barred because they were federal actors at the time federal criminal proceedings were initiated.[18]

## II.   PLAINTIFFS CANNOT SUE OFFICERS WEYKER AND BANDEMER UNDER *BIVENS*

Plaintiffs likewise have no cause of action under *Bivens* because the "freestanding" remedy they seek from the financial assets of two former federal investigators personally is "not an automatic entitlement." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). To the contrary, the Eighth Circuit has expressly warned judges *not* to extend this extra-statutory remedy to former "criminal defendants"—like Plaintiffs—"who leave the criminal process convinced that they have been prosecuted and convicted unfairly." *Vennes v. An Unknown Number of Unidentified Agents*, 26 F.3d 1448, 1452 (8th Cir. 1994).

Since the Supreme Court's landmark *Bivens* decision in 1971, the Court has been reluctant to imply a *Bivens* remedy in other circumstances, doing so just twice and only after observing the absence of "special factors counseling hesitation." *See*

---

[18] Plaintiffs assert a Section 1983 claim against Bandemer in his official capacity for civil rights violations recognized under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). A claim against an individual in his official capacity is a claim against the entity for which he works. *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998). There is no basis for a *Monell* claim against the United States because *Monell* held only that "local governments" could be sued under Section 1983. 436 U.S. at 690 & n.55. To the extent that Bandemer is not considered a federal employee, any *Monell* claim would be asserted against the City of St. Paul.

*Carlson v. Green*, 446 U.S. 14, 18-19 (1980); *Davis v. Passman*, 442 U.S. 228, 245

(1979). In fact, for thirty-five years and counting, the Court has in every case where

the issue was before it "refused to extend *Bivens* liability to any new context or new

category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *see also*

*Minneci v. Pollard*, 132 S. Ct. 617, 622-23 (2012) (recapping the Court's three-decade

history declining to extend *Bivens*) (collecting cases); *Ashcroft v. Iqbal*, 556 U.S. 662,

675 (2009) ("[I]mplied causes of action" under *Bivens* are "disfavored"). There is

simply a "'presumption against judicial recognition of direct actions for violations of

the Constitution by federal officials.'" *Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080,

1084 (8th Cir. 2005) (quoting *McIntosh v. Turner*, 861 F.2d 524, 526 (8th Cir. 1988)).

## A.    Plaintiffs Seek To Expand *Bivens* Into A New Context

A "*Bivens* remedy is an extraordinary thing that should rarely if ever be applied

in 'new contexts.'" *Arar v. Ashcroft*, 585 F.3d 559, 571 (2d Cir. 2009) (en banc)

(quoting *Malesko*, 534 U.S. at 69). It is therefore necessary to identify, from the

outset, the *particular* "context" of Plaintiffs' proposed *Bivens* claims. *Id.* at 572

(context is not defined at a "high level of generality" but rather as "it is commonly

used in law: to reflect a potentially recurring scenario that has similar legal and

factual components"); *see also Wilson v. Libby*, 498 F. Supp. 2d 74, 86 (D.D.C. 2007),

*aff'd*, 535 F.3d 697 (D.C. Cir. 2008) ("*Bivens* actions are not recognized Amendment

by Amendment in a wholesale fashion. Rather, they are context-specific."); *Meshal v.*

*Higgenbotham*, 804 F.3d 417, 423 (D.C. Cir. 2015) ("[E]ven if the plaintiff alleges the

same type of constitutional violation, it does not automatically invoke the same context for *Bivens* purposes.").

Plaintiffs claim that they were federally prosecuted and arrested based on allegedly fabricated evidence in violation of their Fourth, Fifth, and Sixth Amendment rights. Although the Supreme Court in *Bivens* itself recognized that a damages remedy might be available "upon a violation of the Fourth Amendment by federal officials," *Bivens*, 403 U.S. at 389, the Court did not authorize—nor has it ever authorized—any such remedy for alleged injustices arising from federal *prosecution. Cf. FDIC v. Meyer*, 510 U.S. 471, 484 n.9 (1994) ("[A] *Bivens* action alleging a violation of the Due Process Clause of the Fifth Amendment may be appropriate in some contexts, but not in others.").

Indeed, the facts and legal claims that were alleged in *Bivens* are materially distinguishable from those alleged in this case. Webster Bivens claimed that FBI agents illegally entered his home, searched it, and arrested him. *Bivens*, 403 U.S. at 389. They "manacled" him in front of his wife and children and "threatened to arrest the entire family." *Id*. He was "interrogated, booked, and subjected to a visual strip search." *Id*. Bivens filed suit alleging the search was "without a warrant" and that "unreasonable force was employed." *Id*. The Court for the first time recognized a Fourth Amendment damages remedy for *excessive force*, *unlawful search*, and arrest with *no warrant* or other legal process; the Court however did *not*—as Plaintiffs seek here—authorize a Fourth, Fifth, or Sixth Amendment remedy for a federal

*prosecution* based on allegedly fabricated evidence. *See Bivens*, 403 U.S. at 397. In short, Plaintiffs are seeking to "[e]xpand[]" *Bivens* from its original purpose to a wide-variety of injustices that may arise from the alleged wrongful institution of federal criminal proceedings. *Vennes*, 26 F.3d at 1448.

### B.   Congress Has Made Deliberate Choices About How To Protect And Compensate The Victims Of Unjustified Prosecutions

Although any extension of *Bivens* is rare (and becomes more so each passing year), the test for potentially minting a new *Bivens* remedy in a new context remains two-fold: The first question is whether there is "any alternative, existing process for protecting the interest" that counsels against "providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550. The second step, if necessary, looks to a range of "special factors" counseling judicial restraint. *Id.* at 550. Plaintiffs' *Bivens* claims fail primarily at prong one because there is a cluster of judicial processes and compensatory schemes—crafted by Congress—barring the extension of *Bivens* into the criminal-justice context in the manner Plaintiffs seek. *See Vennes*, 26 F.3d at 1452 (identifying a "number of factors" precluding *Bivens* in the criminal-justice context).[19]

---

[19] That is not to say courts have never adjudicated wrongdoing by government officials in criminal prosecutions under the *Bivens* rubric, but by and large those courts—unlike the Eighth Circuit in *Vennes*—have not wrestled with the threshold issue of whether an implied right of action should exist (merely *assuming* it should). *See, e.g., Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th Cir. 1999) (dismissing *Bivens* malicious-prosecution claims on qualified-immunity grounds).

When the Supreme Court modernized the "special factors" test less than a decade ago in *Wilkie*, the Court suggested that the criminal-justice system, by virtue of its procedural safeguards and remedies, is a context in which *Bivens* plays no role at all. The plaintiff in *Wilkie* (Robbins) sought a *Bivens* remedy after federal officials retaliated against him over a six-year period in various ways, including "torts or tort-like injuries," criminal charges, unfavorable agency actions, and other "offensive behavior." *Wilkie*, 551 U.S. at 551, 555. The Court declined to extend a *Bivens* remedy, observing that Robbins had "some procedure to defend and make good on his position. He took advantage of some opportunities, and let others pass; although he had mixed success, he had the means to be heard." *Id.* at 552. Quite simply, Robbins "suffered no charges of wrongdoing on his own part without an opportunity to defend himself (and, in the case of the criminal charges, to recoup the consequent expense, though a judge found his claim wanting)." *Id.* at 553.[20]

---

[20] The Supreme Court ultimately rejected Robbins's *Bivens* claim at step two of the special-factors test, *Wilkie*, 551 U.S. at 555-62, but only because his complaint alleged more than a discrete wrong. Robbins relied on a novel theory that looked "at the course of dealing as a whole, not simply as so many individual incidents." *Id.* at 555; *see also id.* ("It is one thing to be threatened with the loss of grazing rights, or to be *prosecuted*, or to have one's lodge broken into, but something else to be subjected to this in combination over a period of six years, by a series of public officials bent on making life difficult.") (emphasis added). In contrast, Plaintiffs seek a *Bivens* remedy for specific wrongs stemming from their criminal proceedings. Those are exactly the claims *Wilkie* says are redressed by existing remedies, including the criminal process, and can be disposed of at *Wilkie* step one. *Id.* at 550.

The Supreme Court's suggestion in *Wilkie* was hardly novel. The Court has long taught that a *Bivens* remedy is inappropriate when "the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations." *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988); *see also Bush v. Lucas*, 462 U.S. 367, 388 (1983) (a *Bivens* remedy is inappropriate when Congress has created "an elaborate remedial system"). As detailed below, Congress has provided numerous procedures to protect a criminal defendant's constitutional rights, including the grand-jury requirement, probable-cause hearings, preliminary hearings, bond hearings, dismissal motions, jury trials, judgments of acquittal, direct appeal, habeas corpus, and even compensatory schemes. Congress did so after making critical policy choices about the best balance to protect robust prosecution and protect against wrongful conviction.

The starting point is the Federal Rules of Criminal Procedure. *See* Fed. R. Crim P. 1-60. These are not merely court rules in the lay sense; they are statutorily enacted by Congress. 28 U.S.C. §§ 2073, 2074; *see also Deaver v. Seymour*, 822 F.2d 66, 70 n.9 (D.C. Cir. 1987) ("The Federal Rules of Criminal Procedure are a comprehensive set of rules of pleading, practice, and procedure for federal criminal prosecutions" that "have the force of law."). The Rules contain avenues for initiating prosecution that protect the accused from unjustified prosecution. A felony defendant, for example, may not be tried absent grand jury indictment. Fed. R. Crim. P. 6-7. The Rules thus preserve the "grand jury's historic functions" to prosecute on "probable cause" and to protect the innocent "against unfounded

criminal prosecutions." *United States v. Calandra*, 414 U.S. 338, 343 (1974) (citation omitted); *see also Wood v. Georgia*, 370 U.S. 375, 390 (1962). In short, prosecutors are bound by "clear rules" of procedure that "were carefully drafted and approved by [the] Court and by Congress to ensure the integrity of the grand jury's functions." *United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'Connor, J., concurring).[21]

Congress also ensured that the accused can challenge defects in prosecution. If the government does not adhere to the Criminal Rules, the accused may file a motion raising the violation as a defense, an objection, or as a basis for relief. Fed. R. Crim P. 12(b)(3). Rule 12 affords relief from "selective or vindictive prosecution," Fed. R. Crim. P. 12(b)(3)(A)(iv), an "error in the grand-jury proceeding or preliminary hearing," Fed. R. Crim. P. 12(B)(3)(a)(v), as well as the use of evidence illegally obtained by investigators, Fed. R. Crim. P. 12 (b)(C)(3). "[C]ourts have consistently employed the remedy of dismissal of the indictment for deviations" from these rules. *Mechanik*, 475 U.S. at 75 (citation omitted) (O'Connor, J., concurring).

The Criminal Rules, of course, enshrine the most sacred procedural guarantee against wrongful prosecution: trial by jury. Fed. R. Crim. P. 23-31. Jury trials are a necessary protection "against a spirit of oppression" and the "great bulwark of [citizens'] civil and political liberties." *United States v. Gaudin*, 515 U.S. 506, 510–11

---

[21] In felony cases that are initiated by complaint (before grand jury indictment), Fed. R. Crim. P. 3, the criminal defendant is entitled to a timely preliminary hearing, Fed. R. Crim. P. 5.1. Absent a finding of probable cause, the "judge *must* dismiss the complaint and discharge the defendant." Fed. R. Crim. P. 5.1(f) (emphasis added).

(1995) (quotations and citations omitted). But the letter of the law captures more than the spirit. Indeed, Congress inserted procedures that allow for a mistrial if the defendant was substantially prejudiced during the trial, Fed. R. Crim. P. 23, permit acquittal at the close of the government's case or notwithstanding a guilty verdict, Fed. R. Crim. P. 26.3, and establish post-verdict remedies, Fed. R. Crim. P. 32-39, including a new trial if the "interest of justice so requires," Fed. R. Crim. P. 33. Congress also decided that justice requires a slew of appellate remedies to challenge unlawful detention. Fed. R. App. P. 4(b), Fed. R. App. P. 9. In the end, the robust procedural safeguards that Congress chose to afford criminal defendants were no accident, having been "formulated after prolonged, careful and scholarly research." *United States v. Virginia Erection Corp.*, 335 F.2d 868, 870 (4th Cir. 1964).

But the Criminal Rules themselves are just the beginning. There are a variety of other statues that reflect Congress's deliberate choice with respect to how criminal proceedings should be run and the remedies criminal defendants should have. The Bail Reform Act is a detailed scheme governing detention in federal criminal cases. 18 U.S.C. §§ 3141-51. It carries a presumption against confinement and only permits the government to seek detention in certain cases. 18 U.S.C. § 3142(f)(1) & (2). Indeed, detention is imposed only after "a full-blown adversary hearing." *United States v. Salerno*, 481 U.S. 739, 750 (1987).[22] The government must first "demonstrate

---

[22] The accused has a right to counsel (and is provided counsel if indigent) and may testify, present, and cross-examine witnesses. 18 U.S.C. § 3142(f).

probable cause to believe that the charged crime has been committed by the arrestee, but that is not enough." *Id.* Then it must prove "by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Id.* The Bail Act offers an extensive opportunity for review or appeal, including the opportunity to reopen a hearing at any time prior to trial if there is new evidence. 18 U.S.C. § 3142(f)(2)(B).

The Bail Act, like the Criminal Rules, was the product of careful legislative deliberation. The Senate Judiciary Committee determined that the Act's procedure and probable cause standard were "constitutionally sufficient in the context of ordering pretrial detention," notwithstanding "the possibility of [detaining] defendants who are ultimately acquitted." S. Rep. No. 98-225, at 18 (1983). The Supreme Court later agreed that the Act was constitutional, noting its "extensive procedural safeguards," Congress's "careful delineation" of circumstances for detention, and the Government's regulatory interest. *Salerno*, 481 U.S. at 751-52.

Relatedly, the federal habeas statutes, 28 U.S.C. § 2241, *et seq.*, establish critical post-conviction procedures for prisoners who claim they are illegally detained. Section 2255 provides "federal prisoners a remedy identical in scope to federal habeas corpus." *Davis v. United States*, 417 U.S. 333, 343 (1974). A prisoner may move to vacate his sentence based on constitutional violations or abuses for which "the claimed error was 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Houser v. United States*, 508 F.2d 509, 512 (8th Cir. 1974) (quoting *Davis*, 417 U.S. at 346). This includes "[c]laims of a coerced

confession, suppression of helpful evidence by the prosecutor, the Government's knowing use of perjured testimony, or the falsification of a transcript by a prosecutor." *Id.* at 517-518. Habeas has long been considered "the best and only sufficient defence of personal freedom." *Ex parte Yerger*, 75 U.S. 85, 95 (1868); *see also Boumediene v. Bush*, 553 U.S. 723, 739 (2008).

The Criminal Rules, the Bail Act, and the habeas provisions provide many avenues for challenging unconstitutional conduct in connection with criminal proceedings. But Congress has also decided that compensation may be awarded in certain circumstances to individuals who were unjustly prosecuted or convicted on federal charges. The Hyde Amendment, passed in 1988, authorizes a federal court to award a criminal defendant "a reasonable attorney's fee and other litigation expenses" if he is the "prevailing party" in a federal case and "the position of the United States was vexatious, frivolous, or in bad faith." Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (codified at 18 U.S.C. § 3006A, historical and statutory notes). Chairman Hyde explained that the bill was intended to remedy the many variations of prosecutorial misconduct that can violate one's constitutional rights:

> What if Uncle Sam sues you, charges you with a criminal violation, even gets an indictment and proceeds, but they are wrong. They are not just wrong, they are willfully wrong, they are frivolously wrong. They keep information from you that the law says they must disclose. They hide information. They do not disclose exculpatory information to which you are entitled. They suborn perjury.

143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997) (statement of Rep. Hyde); *see also United States v. Gilbert*, 198 F.3d 1293, 1304 (11th Cir. 1999) ("[T]he Hyde

Amendment was targeted at prosecutorial misconduct, not prosecutorial mistake."). Chairman Hyde also acknowledged that his proposed remedy (*i.e.*, fees reimbursed by the *government*) would strike "the proper balance" of "deter[ing] unjustifiable governmental conduct" without "inhibit[ing] the aggressive prosecution of justifiable cases." Statement of Honorable Henry J. Hyde Before House Rules Committee on Amendment to H.R. 2267, 1997 WL 545756 (Sept. 5, 1997).[23] Congress therefore deliberately chose *not* to authorize personal liability. As Chairman Hyde observed, Congress "has [ ] declined to impose personal liability on prosecutors for negligence" and "made federal prosecutors immune from the tort of malicious prosecution." *Id.* Although the bill faced opposition—namely because of its "potential 'chilling effect' on federal prosecutions, especially in regard to crimes [as in *this* case] where the government has to rely on witnesses who often are reluctant to testify, such as child abuse and pornography"—it passed (with revisions ensuring federal prosecutions would remain vigorous). *Gilbert*, 198 F.3d at 1300-01 (citation omitted).

That same Congressional judgment is reflected in the Unjust Conviction and Imprisonment statute, 28 U.S.C. § 2513, which is a "remedial act designed by a fair-minded government" to compensate an "irreparable wrong" caused by "an error on the part of [the] government." *Osborn v. United States*, 322 F.2d 835, 839 (5th Cir.

---

[23] Some members were concerned that the bill would deter difficult prosecutions, such as "rape cases, child molestation cases, in which one runs into reluctant witnesses and all sorts of difficulty in evidentiary and proof matters." 143 Cong. Rec. H7786-04, H7792 (statement of Rep. Skaggs).

1963). A person seeking compensation must present to the Court of Federal Claims a "certificate of innocence" issued by the court that heard the facts leading to the wrongful conviction. 28 U.S.C. § 2513(b); *see also United States v. Graham*, 608 F.3d 164, 169 (4th Cir. 2010); *see also United States v. Racing Servs., Inc.*, 580 F.3d 710 (8th Cir. 2009). After receiving the "certificate of innocence," the Court of Federal Claims may award up to $50,000 per year of incarceration (or $100,000 per year in capital cases). 28 U.S.C. § 2513(e). The unjust-conviction statute thus affords a process for wrongly-convicted individuals to demonstrate unconstitutional misconduct in connection with their criminal proceedings.

The unjust-conviction statute is yet another "intricate statutory scheme" that was the product of careful congressional deliberation and purposeful choice. *United States v. Graham*, 608 F.3d 164, 171 (4th Cir. 2010). "[T]he phrasing of the Act and its legislative history proclaim the care with which its framers guarded against opening wide the door through which the treasury may be assailed by persons erroneously convicted." *Id.* (quoting *United States v. Brunner*, 200 F.2d 276, 280 (6th Cir.1952)), citing H.R. Rep. No. 75–2299, at 2 (1938). Although enacted in 1938, the statute received substantial attention in recent years when the compensatory cap was raised as part of a broader legislative effort (the "Justice for All Act of 2004," PL 108–405, October 30, 2004, 118 Stat 2260) to protect the innocent and to "repair the lives that are shattered by wrongful convictions." S. Rep. 107-315, 37 (2002). Apart from the cap increase, Congress enacted a host of "meaningful reforms" to address "police misconduct," "prosecutorial misconduct," and other "root causes of wrongful

convictions." *Id.* at 20-21. In short, § 2513 (like the Hyde Amendment) was not devised in a vacuum: it reflects Congress's deliberate judgment about *who* should be compensated for injustices arising in federal criminal cases and *how*. *See Crooker v. United States*, 119 Fed. Cl. 641, 652-53 (Fed. Cl. 2014) (legislative history).

### C. No *Bivens* Remedy Is Available To Supplement The Carefully-Crafted Procedures And Compensatory Scheme Designed By Congress To Protect And Remedy The Wrongly Accused Or Convicted

In a case like this—where Plaintiffs allege they were indicted by the grand jury absent probable cause, unlawfully arrested, and, in some instances, found guilty based on fabricated evidence (though ultimately acquitted by the judge on other grounds)—*Bivens* is unavailable because the criminal-justice system is an "alternative, existing process," *Wilkie*, 551 U.S. at 550, containing "procedural and substantive provisions" that are as "comprehensive" as it gets, *Bush*, 462 U.S. at 368.

Congress's deliberate choice to limit compensation to the particular circumstances authorized by the Hyde Amendment and the unjust-conviction statute underscores why this Court should not supplement a carefully-designed statutory scheme with a *Bivens* remedy: "The question is not what remedy the court should provide for a wrong that would otherwise go unredressed." *Bush*, 462 U.S. at 388. The question "is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy." *Id.*

A "scheme's failure to provide a remedy to a particular plaintiff for the particular claim he or she wishes to pursue does not make the scheme any less 'comprehensive' for purposes of determining whether it is a special factor." *Davis v. Billington*, 681 F.3d 377, 387 (D.C. Cir. 2012) (quotations and citations omitted). Quite the opposite, these compensatory statutes (and their legislative histories) indicate Congress's judgment not to graft a damages remedy against investigators was deliberate and not "inadvertent." *Schweiker*, 487 U.S. at 423. While Plaintiffs may disagree with the remedies Congress chose (or chose not) to provide them, the question is for Congress—not Plaintiffs. *Nebraska Beef, Ltd.*, 398 F.3d at 1084 ("[I]f Congress has not explicitly created such a right of action, and if it has created other remedies to vindicate (though less completely) the particular rights being asserted in a given case, the chances are that the courts will leave the parties to the remedies Congress has expressly created for them.") (quoting *McIntosh*, 861 F.2d at 526).

That is why the Eighth Circuit declined to extend a *Bivens* remedy in a wrongful-conviction case arising from "outrageous" police conduct. *Vennes*, 26 F.3d at 1451. In *Vennes*, a DEA agent threatened Vennes that the mafia would kill him (and his family) if he did not commit various crimes. *Id.* at 1451. Vennes committed the crimes and was prosecuted. *Id.* He pled guilty and served five years. *Id.* Vennes then brought a *Bivens* suit alleging the agent violated his constitutional rights "by coercing and entrapping him into committing the charged crimes, thereby causing 'an illegal indictment' to issue." *Id.* at 1449. Foreshadowing *Wilkie*, the Eighth

Circuit rejected a *Bivens* remedy, finding it "significant" that Vennes could have

vindicated his substantive due-process rights in the criminal process. *Id.* at 1452

("Vennes elected to forego the post-deprivation process best suited to determining

whether the agents in fact violated his due process rights—the criminal trial.").

Instead of filing a *Bivens* suit, Vennes should have litigated "allegations of outrageous

coercive conduct in the most timely and relevant proceeding, his criminal trial." *Id.*

at 1453. The Eighth Circuit warned that "[e]xpanding *Bivens*" to the criminal-justice

context in the manner Vennes sought "would have a chilling effect on law

enforcement officers and would flood the federal courts with constitutional damage

claims by the many criminal defendants who leave the criminal process convinced

that they have been prosecuted and convicted unfairly." *Id.* at 1452.

That same reasoning explains, in major part, why the Fifth, Ninth, and

Eleventh Circuits have rejected extending *Bivens* to a similar law-enforcement

context in which Congress has acted extensively: immigration-removal proceedings.

*See Alvarez v. ICE*, 818 F.3d 1194, 1196 (11th Cir. 2016) (no *Bivens* remedy even

though plaintiff claimed he was detained for nearly a year based on "false

statements" by officials); *De La Paz v. Coy*, 786 F.3d 367, 378 (5th Cir. 2015) (no

*Bivens* remedy even though officials stopped and arrested plaintiffs because they were

Hispanic), *pet. for cert. filed*, No, 15-888, 84 USLW 3417 (Jan. 12, 2016); *Mirmehdi v.*

*United States*, 689 F.3d 975, 979 (9th Cir. 2012) (no *Bivens* remedy even though

plaintiffs were allegedly detained for *four years* after officials "knowingly lied to

convince the [immigration judge] to revoke their bond"). Notwithstanding the gravity of those violations, the circuits agreed that *Bivens* was inappropriate because "Congress has established a substantial, comprehensive, and intricate remedial scheme in the context of immigration." *Mirmehdi*, 689 F.3d at 982 (quotations and citations omitted); *accord De La Paz*, 786 F.3d at 378; *Alvarez*, 818 F.3d at 1208.

As in the criminal-justice system, "Congress has provided for a host of review procedures tailored to the differently situated groups," including "numerous avenues . . . to obtain review" of government decisions by an immigration judge or federal court, "as well as opportunities . . . to seek discretionary relief." *Alvarez*, 818 F.3d at 1208 (citing statutory provisions). And an alien, like a criminal defendant, can "challenge his detention" through habeas. *Id*. In short, "the availability of habeas relief when paired with a detailed regulatory scheme" like the Immigration and Nationality Act—or the Criminal Rules—"constitutes a special factor counseling against recognizing a new *Bivens* cause of action" for wrongful detention. *Id*. at 1209; *Mirmehdi*, 689 F.3d 975 at 982 (observing plaintiffs "could—and did—challenge their detention through not one but two different remedial systems").

Yet this lawsuit seeks to ignore the extraordinary amount of process afforded to federal criminal defendants and do just what the Eighth Circuit has forbidden— expand *Bivens* to twenty-one individuals who left the criminal process "convinced that they have been prosecuted and convicted unfairly." *Vennes*, 26 F.3d at 1452*; cf. Nelson v. Greiner*, No. CIV. 13-279 DWF/LIB, 2014 WL 5704004, at *9 (D. Minn.

Nov. 5, 2014) (citing *Vennes* 26 F.3d at 1452). Just like Robbins, Vennes, and the Mirmehdis, Plaintiffs had a cluster of procedures and remedies to vindicate their rights. And they did. Plaintiffs contested their detentions at bail hearings—and many were released before trial. Others filed motions to dismiss. Twelve were dismissed before trial. Seven were acquitted. And Plaintiffs Fahra and Yusuf moved successfully for post-verdict judgments of acquittal—implicating some of the same allegations of misconduct (*e.g.*, evidence Jane Doe Two's age was fabricated) that are now being re-litigated here.

At its core, Plaintiffs' complaint is that the United States Attorney's Office improperly charged them, maintained prosecution despite allegedly flimsy evidence (*e.g.*, Jane Doe Two's age), and violated discovery orders. But a *Bivens* action is an inappropriate "vehicle" for challenging these *prosecutorial* decisions. *Malesko* 534 U.S. at 74; *see also Meyer*, 510 U.S. at 484-85 (*Bivens* claim may not challenge agency action). It is particularly inappropriate given Congress's concerns about "chilling" the vigorous prosecution of difficult cases concerning "child abuse" victims "who are reluctant to testify." *Gilbert*, 198 F.3d at 1300-01. Extending a *Bivens* damages remedy here would directly undermine Congress's deliberate judgment to place a "daunting obstacle" in front of individuals who seek financial recovery "following a successful defense of criminal charges." *Id.* at 1302-03; *cf. Wilkie* 551 U.S. at 561 (courts may reject *Bivens* when the "cure would be worse than the disease").

Plaintiffs had more than just "some procedure to defend and make good on [their] position" that the government violated their constitutional rights. *Wilkie*, 551

U.S. at 552. The federal criminal-justice system afforded them a robust process to contest their charges, challenge their detentions, and secure their freedom. They also had a congressionally-authorized—yet deliberately circumscribed—means to recoup their defense expenses (though we are aware of no Plaintiff doing so). Where, as here, Plaintiffs "had many opportunities to seek redress" in the criminal-justice system, a "*Bivens* damage action will not lie." *Vennes*, 26 F.3d at 1453.

## III.   ABSOLUTE IMMUNITY REQUIRES DISMISSAL OF ALL CLAIMS BASED UPON OFFICER WEYKER'S ALLEGED FALSE TESTIMONY

Even if Plaintiffs have a cause of action under Section 1983 or *Bivens,* as discussed in this and later sections, they still fail to state a claim for any violation of a constitutional right. As a threshold matter, all Plaintiffs support their claims against Officer Weyker primarily by alleging she testified falsely during their criminal pretrial proceedings. Even accepting these allegations as true, Plaintiffs would be barred from proceeding on any claim relying on her testimony because Officer Weyker is entitled to absolute immunity for such testimony. *See Rehberg v. Paulk*, 132 S. Ct. 1497 (2012).

In *Rehberg,* the Supreme Court held that a police officer has absolute immunity with respect to any claim based on the officer's grand jury testimony. The Court explained that when a witness is sued because of her testimony, "the claims of the individual must yield to the dictates of public policy." *Id.* at 1505 (quotations and citations omitted). Specifically, the Court noted that without absolute immunity, witnesses might be reluctant to testify or might be inclined to shade their testimony for fear of subsequent liability. *See id.* The Court noted that this concern was

especially present in the grand jury context, as a witness's fear of retaliatory litigation could deprive the tribunal of critical evidence. *See id.* Although there was an equally strong public interest in preventing false testimony, the Court concluded that criminal prosecutions for perjury provided a sufficient deterrent. *See id.*

*Rehberg* reinforced longstanding precedent in the Eighth Circuit that protects witnesses—including law enforcement officers—from liability based on their testimony in criminal proceedings. *See, e.g., Myers v. Bull*, 599 F.2d 863, 866 (8th Cir. 1979) (holding that witnesses are "immune from civil rights suits alleging perjurious testimony"); *Conley v. Office of Pub. Def., Sixth Judicial Dist. of Arkansas, Pulaski & Perry Ctys.*, 653 F.2d 1241, 1242 (8th Cir. 1981) ("Witnesses are absolutely immune from section 1983 remedy actions arising from their testimony in judicial proceedings."). Moreover, "this rule may not be circumvented . . . by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." *Rehberg*, 132 S. Ct. at 1506. Consequently, even if Plaintiffs have plausibly pleaded that Officer Weyker presented false testimony to the grand jury or to the district court, absolute immunity would extinguish any claim based on that testimony. Likewise, none of Plaintiffs' allegations concerning Officer Weyker's alleged false testimony in a judicial proceeding can be used to support *any* of Plaintiffs' claims.

## IV. QUALIFIED IMMUNITY REQUIRES DISMISSAL OF ALL REMAINING CLAIMS AGAINST OFFICERS WEYKER AND BANDEMER

Qualified immunity provides government officials "ample room for mistaken judgment" by shielding from suit "'all but the plainly incompetent or those who knowingly violate the law.'" *Stewart v. Wagner*, 836 F.3d 978, 984 (8th Cir. 2016) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotations omitted)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," it must be resolved "at the earliest possible stage in litigation." *Payne v. Britten*, 749 F.3d 697, 700, 703 (8th Cir. 2014) (citations omitted). Indeed, a Section 1983 or *Bivens* claim cannot survive a threshold qualified-immunity motion unless (1) "the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and (2) "the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Greenman*, 787 F.3d at 887 (citation omitted).[24]

Officers Bandemer and Weyker are thus entitled to qualified immunity unless there was "controlling authority or a robust consensus of cases of persuasive authority" that put them on notice that their *particular* conduct violated clearly established rights. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quotations and citations omitted); *accord Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015); *see also Parker*

---

[24] The Court has "'discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

*v. Chard*, 777 F.3d 977, 980 (8th Cir. 2015) ("Clearly established law is not defined 'at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'") (quoting *Plumhoff*, 134 S. Ct. at 2023). Here, qualified immunity requires the dismissal of Plaintiffs' claims because, at a minimum, then-existing precedent did not place the illegality of Officer Bandemer and Weyker's alleged conduct "'beyond debate.'" *Id.* at 980 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)).

## A. Plaintiffs' Claims Against Officer Bandemer For Supervisory Liability Fail As A Matter Of Law

### 1. Plaintiffs' Allegations Do Not Establish Officer Bandemer's Personal Liability For Any Constitutional Violation

The bulk of Plaintiffs' constitutional claims against Officer Bandemer seek to hold him personally liable for Officer Weyker's alleged actions on a theory of "supervisory liability." *E.g.*, Adan Compl., Count Five; Afyare Compl., Count Three. But supervisory or vicarious liability is inapplicable to *Bivens* and Section 1983 suits, and Plaintiffs must plead that Officer Bandemer, through his own individual actions, violated the Constitution. *Iqbal*, 556 U.S. at 676; *Montgomery v. City of Ames*, 829 F.3d 968, 972 (8th Cir. 2016) ("[Supervisors] cannot be held liable under § 1983 for constitutional violations of a subordinate based on a respondeat superior theory."). Plaintiffs have not met this burden.

Some Plaintiffs allege that Officer Bandemer fabricated or withheld evidence himself. *See, e.g.*, Afyare Compl. ¶¶ 86-90. But these allegations are not entitled to any presumption of truth because they are wholly conclusory. Plaintiffs offer no

specific *factual* allegations that Officer Bandemer engaged in any of the alleged acts

Plaintiffs characterize as misconduct—*i.e.*, that Officer Bandemer coached victims or

witnesses to lie; gave misleading testimony to the grand jury or to the trial court;

fabricated reports; or failed to disclose interview notes. Indeed, the district court

rulings and Sixth Circuit opinion—which all Plaintiffs rely upon heavily as support

for their allegations of misconduct—make *no mention* at all of Officer Bandemer.

Some Plaintiffs instead offer the conclusory allegation that Officer Bandemer

and the other "supervisory defendants" "approved" or "ratified" Officer Weyker's

alleged misconduct simply by virtue of their "superior position" over her. Afyare

Compl. ¶ 69; Ahmad Compl. ¶ 49 (same). The Eighth Circuit, though, has

recognized that a law-enforcement supervisor cannot be liable for "ratif[y]ing" a

subordinate's "fabrication of evidence after it occurred." *Livers*, 700 F.3d at 357.

Moreover, Officer Bandemer cannot be lumped together with other "supervisory

defendants" without specifying the particular action each defendant was aware of

and then approved or ratified. *See S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015)

("[Q]ualified immunity requires an *individualized* analysis of *each* officer's alleged

conduct.") (quotations and citations omitted).[25] Plaintiffs' sheer conclusory

conjecture about Officer Bandemer's alleged approval of Officer Weyker's alleged

misconduct cannot overcome Officer Bandemer's entitlement to qualified immunity.

*See Iqbal*, 556 U.S. at 677 ("[E]ach Government official, *his or her title notwithstanding,*

is only liable for his or her own misconduct.") (emphasis added); *Livers*, 700 F.3d at

357 ("[M]ere speculation and argument . . . is not a basis for denying qualified

immunity"); *Stai v. Deshane*, No. CV 14-4152 (RHK/LIB), --- F. Supp. 3d ----, 2016

WL 1706094, at *5 (D. Minn. Apr. 28, 2016) (rejecting claim that "the Individual

Defendants are liable simply because they are supervisory Jail officials, tasked with

overall responsibility for safety").

Nor does the allegation that Officer Bandemer was deliberately indifferent to

Officer Weyker's conduct, *see, e.g.*, Adan Compl. ¶ 91; Ali Compl. ¶ 97, save

Plaintiffs' claims against Officer Bandemer. To the extent that deliberate indifference

---

[25] *Accord Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) ("[It] is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state."); *Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (rejecting *Bivens* complaint "because it is a generalized pleading that refers to all defendants generally and categorically").

is a viable basis for imposing supervisory liability after *Iqbal*,[26] it requires proof that a supervisor "(1) had 'notice of a pattern of unconstitutional acts committed by subordinates'; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take 'sufficient remedial action'; (4) proximately causing injury to [the plaintiff]." *Livers*, 700 F.3d at 355 (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)). Plaintiffs' formulaic recitation of these elements does not make their case. *See, e.g.*, Adan Compl. ¶¶ 90-93; Ali Compl. ¶¶ 96-98.

The only *factual* allegation relating to any notice Officer Bandemer allegedly received of Officer Weyker's purported misconduct is a district court's criticism of Officer Weyker in a February 15, 2012 court memorandum. Adan Compl. ¶¶ 53-54; Ali Compl. ¶¶ 55-58. But this allegation, if anything, proves why Officer Bandemer is not subject to supervisory liability. First, the February 2012 "notice" occurred only one month before trial and thus after the bulk of Officer Weyker's alleged misconduct, which Plaintiffs claim led to their indictment and arrest, had occurred. In *Livers*, the Eighth Circuit rejected supervisory liability where there was no evidence that the supervisory official had received notice of the alleged misconduct

---

[26] *See Parrish v. Ball*, 594 F.3d 993, 1001 n.1 (8th Cir. 2010) (noting that "*Iqbal* may further restrict the incidents in which the failure to supervise will result in [§ 1983] liability") (quotations omitted); *see also, e.g., Santiago v. Warminster Twp.*, 629 F.3d 121, 130 n.8 (3d Cir. 2010) ("Numerous courts . . . have expressed uncertainty as to the viability and scope of supervisory liability after *Iqbal*.") (collecting cases) (citing *Parrish*); *Johnson v. Gov't of D.C.*, 734 F.3d 1194, 1204 (D.C. Cir. 2013).

in time for his alleged failure to act to have injured the plaintiff. 700 F.3d at 357.[27]

Second, the district court's memorandum expresses concern about *one* issue with

Officer Weyker's grand-jury testimony. *See, e.g.*, Adan Compl. ¶ 54. This hardly

constitutes notice of a "*pattern*" of conduct by Officer Weyker. *Livers*, 700 F.3d at

355; *Kringbaum*, 808 F.3d at 340.[28]

      Third, the government's decision to take the case to trial notwithstanding any

concerns expressed by the judge were all *prosecutorial* decisions over which Officer

Bandemer exercised no control—and Plaintiffs do not allege otherwise. Officer

Bandemer cannot be held personally liable for failing to take remedial action—

assuming any such action was necessary—when he did not control the prosecution.

*Cf. White v. Simmons*, No. 5:07CV00079JWC, 2009 WL 735249, at *3 (E.D. Ark.

---

[27] For this reason, Plaintiffs cannot rely upon district court opinions issued on December 19, 2012, and May 9, 2013, as providing notice to Officer Bandemer of Officer Weyker's alleged misconduct. *See, e.g.*, Adan Compl. ¶ 54. Both of these opinions were issued *after* the criminal trial was over.

[28] *Cf. Russell v. Hennepin Cty.*, 420 F.3d 841, 849 (8th Cir. 2005*)* ("[A] single instance of failing to follow official policy is insufficient to establish a custom of violating the policy.") (citing *Wedemeier v. City of Ballwin*, 931 F.2d 24, 26 (8th Cir. 1991)).

Mar. 18, 2009) (rejecting deliberate-indifference claims because conduct "was not the proximate cause of any damages"), *aff'd*, 387 F. App'x 652 (8th Cir. 2010).[29]

In sum, all claims against Officer Bandemer should be dismissed because Plaintiffs have not plausibly alleged "sufficient factual matter" that Officer Bandemer directly violated Plaintiffs' rights or was indirectly responsible for causing their alleged injuries. *Iqbal*, 556 U.S. at 677; *cf. Seenyur v. Hammer*, No. CIV. 14-4250 MJD/BRT, 2015 WL 1815858, at *4 (D. Minn. Apr. 22, 2015) ("Neither the averments in this motion, nor the exhibits to which he cites in that motion . . . are sufficient non-conclusory factual statements that indicate Warden Hammer's personal responsibility or involvement in the events forming the basis of Plaintiff's claims to show that Warden Hammer was deliberately indifferent to or tacitly authorized the alleged discriminatory acts of Director Coolidge.") (collecting cases); *Gettimier v. Burse*, No. 2:13CV44 HEA, 2015 WL 75224, at *4 (E.D. Mo. Jan. 6, 2015) ("Plaintiff has not alleged facts which put Defendants on notice of the pattern,

---

[29] Officer Bandemer's qualified immunity is similarly bolstered by the fact that the district judge himself did not take further protective measures (*e.g.,* releasing all Plaintiffs from detention) in the wake of the February 2012 memorandum. *See, e.g.*, *Adan*, Dkt. No. 1392 at 3, attached as Exhibit E) (affirming Omar's detention order despite concern regarding Officer Weyker); *cf. Stewart*, 836 F.3d at 987 (no violation of clearly-established law if trial court previously denied motion by criminal defendant raising constitutional issue). In fact, the judge continued detaining many Plaintiffs—even after five other Plaintiffs were acquitted by a jury (and notwithstanding the multiple judgments of acquittal he granted). *See, e.g.*, Yusuf Compl. ¶¶ 59-63.

the actions taken by subordinates, Korte's authorization of the acts, or the failure to take remedial action.").

### 2. The Eighth Circuit Has Never Recognized The 42 U.S.C. § 1983 "Failure To Intervene" Claim Asserted By Plaintiffs

In addition to a supervisory liability claim, several Plaintiffs seek to hold defendant Bandemer personally liable under Section 1983 for his purported failure to intervene to prevent Officer Weyker's alleged unconstitutional conduct. *See*, *e.g.*, Adan Compl., Count Four; Afyare Compl., Count Two. But the only circumstance in which the Eighth Circuit has recognized Section 1983 liability for the "failure to intervene" to prevent a constitutional violation is where the violation in question was the use of excessive force by a law enforcement officer. *Livers*, 700 F.3d at, 360; *Putnam v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981). The Eighth Circuit has refused to extend the "failure to intervene" doctrine to other contexts. *Livers*, 700 F.3d at 362.

Plaintiffs have not stated a "failure to intervene" claim here because none of the claims asserted by Plaintiffs is based upon an alleged unconstitutional use of force by Officer Weyker. And even assuming Officer Bandemer had a constitutional duty to intervene outside of the excessive force context, it cannot be said that such a duty was clearly established at the time of the events alleged in the complaints. To this day, the Eighth Circuit has never addressed the question, and other circuits are split. *Compare Randall v. Prince George's Cnty.*, *Md.*, 302 F.3d 188, 204 (4th Cir. 2002) (recognizing duty to intervene outside of excessive force context) and *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (same) *with Jones v. Cannon*, 174 F.3d 1271, 1286

(11th Cir. 1999) ("There is no controlling authority clearly establishing that once a police officer knows another officer has fabricated a confession in a police report for a warrantless arrest, that police officer has a constitutional duty to intervene to stop the other officer's conduct."). As the Eighth Circuit recognized in *Livers*,

> Where, as here, the federal circuits disagree on whether conduct violates the Constitution, and our court has not addressed the question, that conduct does not violate clearly established law because "it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999).

700 F.3d at 360.

### B. Plaintiffs' *Brady* And Sixth Amendment Claims Based On The Alleged Failure To Disclose Evidence Fail As A Matter Of Law

#### 1. No Plaintiff May Assert A *Brady* Claim Because None Were Convicted

Plaintiffs claim that Officers Weyker and Bandemer withheld exculpatory evidence in violation of their rights under *Brady v. Maryland*, 373 U.S. 84 (1963). "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. But evidence is "material" under *Brady* only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). That means there can be no *Brady* violation unless the defendant was actually convicted. *Livers*, 700 F.3d at 359 ("[T]here was no *Brady* violation because Livers and Sampson were not convicted.") (collecting cases); *see also Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004) ("*Brady* ensures that the defendant will

obtain *relief from a conviction* tainted by the State's nondisclosure of materially favorable evidence, regardless of fault, but the recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair trial.") (emphasis added); *accord Stewart*, 836 F.3d at 982.

Of the twenty-one Plaintiffs here, only nine (Ahmad, Ali, Amalle, Idris Fahra, Faduma Farah, Hersi, Ibrahim, Yassin, and Yusuf) went to trial. All were acquitted (either by judge or jury). Although the jury returned guilty verdicts for Idris Fahra and Yusuf, Fahra Compl. ¶ 39; Yusuf Compl. ¶ 40, the trial judge granted their post-verdict motions for judgment of *acquittal*, Fahra Compl. ¶ 58; Yusuf Compl. ¶ 59, and they were never convicted.[30] Therefore, all *Brady* claims should be dismissed. *See Jones v. Frost*, No. 4:11CV00889, 2013 WL 12109476, at *2 (E.D. Ark. Sept. 10, 2013) ("Because Jones was acquitted of the charges against him, he has no *Brady* violation claim."), *aff'd*, 770 F.3d 1183 (8th Cir. 2014); *see also Gertz*, 166 F.3d at 1310 ("The only judgment the court entered was a judgment of acquittal. Regardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial.").

---

[30] Conviction does not occur until judgment is entered, and that does not occur until after sentencing. *See Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999); Fed. R. Crim. P. 32(k)(1) ("In the judgment of conviction, the court must set forth the plea, the jury verdict or the court's findings, the adjudication, and the *sentence*.") (emphasis added); *see also Greene v. United States*, 358 U.S. 326, 329 (1959) ("The only sentence known to the law is the sentence or judgment entered upon the records of the court.") (quotations and citations omitted); *Berman v. United States*, 302 U.S. 211, 212 (1937) ("Final judgment in a criminal case means sentence.") (collecting cases).

### 2.    Plaintiffs' Allegations Concerning Officer Weyker's Interview Notes Fail To State A *Brady* Claim

Even if the Court concludes that Plaintiffs' *Brady* claims are not barred by their acquittals or lack of convictions, Plaintiffs' *Brady* claims fail for other fundamental reasons. The crux of their chief grievance is that "Weyker's rough notes" were "not produced" until "'the eve of trial.'" Fahra Compl. ¶¶ 43-47 (quoting *Adan*, 913 F. Supp. 2d 555). But belated disclosure of evidence at the beginning of trial—even during trial—does not violate *Brady*. *United States v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996) ("[T]he rule of *Brady* is limited only to the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.") (citing *United States v. Manthei*, 979 F.2d 124, 127 (8th Cir. 1992)); *see also United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986) ("In general, the principles announced in *Brady* do not apply to a tardy disclosure of exculpatory information, but to a complete failure to disclose."). "Because the Government disclosed [Officer

Weyker's] handwritten notes at trial, *Brady* was not violated." *United States v. Greatwalker*, 356 F.3d 908, 912 (8th Cir. 2004) (citation omitted).[31]

Assuming, nonetheless, that there was a clearly-established obligation to disclose Officer Weyker's rough notes well before trial, Plaintiffs merely allege that Officer Weyker's notes were not timely "produced" by "the Government." Fahra Compl. ¶¶ 43-44; Yusuf Compl. ¶¶ 44-45. There is "nothing" in the complaint indicating that *Officer Weyker* "failed to turn over exculpatory evidence to the prosecution, which normally discharges the duty of law enforcement officers under *Brady*." *Helmig v. Fowler*, 828 F.3d 755, 762 (8th Cir. 2016) (collecting cases). To the extent there was a *Brady* violation for failing to timely disclose the notes, the error would rest with federal prosecutors—not Officer Weyker.

### 3.    Plaintiffs Fail To State A Sixth Amendment Claim Based On The Failure To Disclose Evidence

Some Plaintiffs also allege that the "fabrication of evidence and withholding of exculpatory evidence" violated their Sixth Amendment "right to a fair trial." *E.g., Ali*

---

[31] To the extent Plaintiffs suggest that failing to produce notes "one year before trial" violated their *Brady* due-process rights, Fahra Compl. ¶ 44; Yusuf Compl. ¶ 45, that claim fails because there is no clearly established right to the *pretrial* disclosure of exculpatory evidence. *See Livers*, 700 F.3d at 360 ("Given the split of authority, we cannot say a pretrial right to disclosure of exculpatory evidence, if it exists, was clearly established in 2006."); *see also, e.g., Taylor v. Waters*, 81 F.3d 429, 435–37 (4th Cir. 1996) (an investigator's failure "to disclose exculpatory evidence after a determination of probable cause has been made by a neutral detached magistrate" neither violates due process nor "render[s] the continuing pretrial seizure of a criminal suspect unreasonable under the Fourth Amendment").

Compl. ¶ 73. But these "fair trial" claims are simply a repeat of their malicious-prosecution and *Brady* claims masquerading under a different label. And that label affords them no additional protection for the rights allegedly violated.

> To be sure, the Sixth Amendment provides the accused with many rights:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 685 (1984) (observing that the Constitution "defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause").

> But Plaintiffs do not claim (nor could they) that Officers Weyker or Bandemer obtained coerced confessions from them, denied them counsel, prevented them from cross-examining witnesses, or violated any of the other enumerated Sixth Amendment guarantees. *Cf. Berrisford v. Wood*, 826 F.2d 747 (8th Cir. 1987) (admission of testimony regarding conversation between defendant and accomplice who was unavailable for trial did not violate Confrontation Cluse); *Stewart*, 836 F.3d at 984-87 (admission of confession elicited by jailhouse informant did not violate defendant's right to counsel). To the extent Plaintiffs' "fair trial" claims are based upon Officer Weyker's alleged fabrication or withholding of evidence, the claims are merely duplicative of Plaintiffs' Fourth and Fifth Amendment claims and do not state a clearly-established Sixth Amendment violation. *Cf. Stewart*, 836 F.3d at 983

49

(the amendment providing the "'explicit textual source of constitutional protections against a particular sort of government behavior . . . must be the guide for analyzing those claims'") (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998)).

In any event, every Plaintiff who went to trial was acquitted. Thus, they "cannot be said to have been deprived of the right to a fair trial." *Gertz*, 166 F.3d at 1310; *see also Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir.1998) (refusing to find a *Brady* violation where the criminal defendant "was never convicted and, therefore, did not suffer the effects of an unfair trial"); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988) ("Because the underlying criminal proceeding terminated in appellant's favor, he has not been injured by the act of wrongful suppression of exculpatory evidence."); *Horde v. City of Apple Valley*, No. CIV. 13-3107 PJS/JJG, 2014 WL 3577310, at *9 (D. Minn. July 18, 2014) (citing *Gertz*).[32]

---

[32] That also explains why Officer Weyker's alleged use of an "'unduly suggestive'" photo array with Jane Doe One, Faduma Farah Compl. ¶¶ 44-45 (quoting *Farah*, Dkt. No. 1392-1), is irrelevant and supports no constitutional claim. "In the context of unduly suggestive lineups, only a violation of the core right—the right to a *fair trial*—is actionable under § 1983." *Pace v. City of Des Moines*, 201 F.3d 1050, 1055 (8th Cir. 2000) (citing *Hensley v. Carey*, 818 F.2d 646, 648–49 (7th Cir.1987)) (emphasis added). There is simply *no* freestanding "constitutional right to be free of suggestive lineups." *Id.* Here, there was no violation of Farah's core trial right because Jane Doe One did not testify at trial, Compl. ¶ 46, and Farah was acquitted by the jury, *id.* ¶ 56. In any case, Farah fails to acknowledge what the district court actually held in *denying* her suppression motion: "Jane Doe One's identification of Farah ha[d] sufficient characteristics of reliability to be admissible." Ex. E at 5.

**C.    Plaintiffs' Due Process Claims Under The Fifth And Fourteenth Amendment Fail As A Matter Of Law**

> **1.    Plaintiffs' Due Process Claims For The Alleged Fabrication Of Evidence Are Barred By *Parratt v. Taylor***

Apart from their *Brady* claims, Plaintiffs assert a variety of claims under *Bivens* and Section 1983 for alleged violations of their due process rights as guaranteed by the Fifth and Fourteenth Amendments. The bulk of these claims are based on the allegation that Officer Weyker fabricated evidence to create probable cause for Plaintiffs' indictments and ensuing arrests. While it is unclear whether Plaintiffs are asserting procedural or substantive due process claims (or both), ultimately, it makes no difference: *any* due process claim predicated on the alleged fabrication of probable cause or other evidence is barred by *Parratt v. Taylor*, 451 U.S. 527 (1981) (overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)).

    a.  Procedural Due Process

To the extent Plaintiffs' evidence-fabrication claims are based upon procedural due process, the claims are barred by the Eighth Circuit's application of the *Parratt* doctrine. In *Parratt*, the Supreme Court held that a procedural due process claim for the alleged tortious deprivation of a protected interest is precluded where the state provides an adequate "post-deprivation remedy." *Harrington v. City of Council Bluffs, Iowa*, 678 F.3d 676, 680 n.4 (8th Cir. 2012) (quoting *Parratt*, 451 U.S. at 540–41);

accord *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).[33] While *Parratt* addressed claims

under Section 1983, the Eighth Circuit has held that the same principle applies in

*Bivens* actions. *Vennes*, 26 F.3d at 1452 (applying *Parratt* to bar *Bivens* action).

The Eighth Circuit has identified two post-deprivation processes that preclude

procedural due process claims in cases like this one. The first process is "the criminal

trial"—"the post-deprivation process best suited" to determine whether criminal

investigators have violated due process rights. *Vennes*, 26 F.3d at 1452 (barring *Bivens*

procedural due-process claim that plaintiff was prosecuted and convicted pursuant to

"an illegal indictment" and due to "outrageous police conduct") (citing *Parratt*);

accord *Nelson v. Greiner*, No. CIV. 13-279 DWF/LIB, 2014 WL 5704004, at *9 (D.

Minn. Nov. 5, 2014) ("[T]he criminal trial is the forum best suited to provide the

opportunity to be heard regarding procedural due process violations that are alleged

to have occurred in the course of a criminal investigation.") (citing *Vennes* 26 F.3d at

1452). The second process that precludes a procedural due process claim is a state

"tort remedy for malicious prosecution." *Harrington*, 678 F.3d at 680 n.4 (holding

that Iowa's malicious-prosecution remedy barred procedural due process claim); *see*

also *Meehan v. Town of Plymouth*, 167 F.3d 85, 88 (1st Cir. 1999) ("A § 1983 claim for

malicious prosecution as a deprivation of procedural due process is barred where, as

---

[33] The Supreme Court cautioned that permitting a due process claim in such
circumstances "would almost necessarily result in turning every alleged injury which
may have been inflicted by a state official acting under 'color of law' into a violation
of the Fourteenth Amendment cognizable under § 1983." *Parratt*, 451 U.S. at 544.

here, the state's tort law recognizes a malicious-prosecution cause of action."). Both of these post-deprivation processes were available to Plaintiffs in this case.

Every plaintiff had the opportunity in criminal proceedings to challenge his or her prosecution and to raise allegations of underlying misconduct. Moreover, in a case such as this, where it is the conduct of federal law enforcement officers that is being challenged, the FTCA provides Plaintiffs with a potential post-deprivation remedy in the form of a state law claim for malicious prosecution—a tort directed to the wrongful initiation of criminal proceedings. 28 U.S.C. § 2680(h).[34] The "availability" of that tort remedy satisfies due process. *Harrington*, 678 F.3d at 680 n.4; *see also Rodriguez-Mora v. Baker*, 792 F.2d 1524, 1527 (11th Cir. 1986) ("[T]he existence of a postdeprivation remedy under the FTCA will preclude the Fifth Amendment challenge."); *Hays v. U.S. Marshal's Serv.*, No. CIV. 06-5134, 2006 WL 3431876, at *2 (W.D. Ark. Nov. 29, 2006) (collecting cases).

Plaintiffs have received all the process they are due and cannot maintain a procedural due process clam for alleged evidence fabrication.

  b. Substantive Due Process

To the extent Plaintiffs invoke substantive due process as the basis for their Fifth or Fourteenth Amendment claims, they are still unable to save their claims

---

[34] The FTCA relies on the substantive tort law of the state in which the claim arose. 28 U.S.C. § 1346(b). Here, both Minnesota and Tennessee provide state tort remedies for malicious prosecution. *See Kellar v. VonHoltum*, 568 N.W.2d 186, 192 (Minn. Ct. App. 1997) (Minnesota elements); *Roberts v. Fed. Exp. Corp.*, 842 S.W.2d 246, 247–48 (Tenn. 1992) (Tennessee elements).

from the reach of the *Parratt* doctrine. In *Albright v. Oliver*, 510 U.S. 266 (1994),

Justice Kennedy warned courts not to allow plaintiffs to evade "the outer limits of

*Parratt*" through a "mere pleading exercise" that "attach[es] a substantive rather than

procedural label to due process claims (a distinction that if accepted in this context

could render *Parratt* a dead letter)." *Id.* at 285 (suggesting that substantive due-

process claim was barred by state law remedy for malicious prosecution) (Kennedy,

J., concurring, joined by Thomas, J.). Accordingly, the Eighth Circuit has held that

when procedural due process claims are barred by *Parratt*, "claims based on the same

actions but alleging denial of substantive due process should be barred as well."

*Vennes*, 26 F.3d at 1452 (quoting *Weimer v. Amen*, 870 F.2d 1400, 1406 (8th Cir.

1989)); *see also Singleton v. Cecil*, 176 F.3d 419, 422 (8th Cir. 1999) (collecting cases).

"To hold otherwise would be directly contrary to the concerns leading to the *Parratt*

rule in the first place." *Weimer*, 870 F.2d at 1406. Other courts have agreed.[35]

## 2.   Even If Not Barred By *Parratt*, Plaintiffs' Evidence-Fabrication Claims Are Not Cognizable Under The Due Process Clause

Even if *Parratt* does not bar any substantive due process claims asserted by

Plaintiffs, these claims fail nonetheless because the Eighth Circuit has recognized

---

[35] *See, e.g., Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010) (holding that *Parratt* barred substantive due-process claims alleging that the defendants "'provided false allegations' and 'withheld exculpatory evidence'"); *Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2013), as amended on denial of reh'g (Jan. 8, 2014) (citing *Parratt* and dismissing evidence-fabrication claims under the Fourteenth Amendment because a "post-deprivation malicious-prosecution claim serves as an effective antidote").

that a claim that law enforcement officers fabricated evidence to create probable cause must be considered under the Fourth Amendment, not the more generalized notion of substantive due process. *Stewart*, 836 F.3d at 983-84.

In *Stewart*, the Eighth Circuit rejected the argument that the alleged fabrication of evidence to charge the plaintiff with murder violated his right to substantive due process. *Id.* at 983.[36] The Eighth Circuit began its reasoning with the general principle that "where a particular Amendment provides an explicit textual source of constitutional protections against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing those claims." *Id.* (quoting *Cty. of Sacramento*, 523 U.S. at 842). It is for this reason, the *Stewart* panel noted, that a claim based upon an alleged arrest or prosecution without probable cause, even if labeled a claim of "malicious prosecution," "must be judged" under the Fourth Amendment, not substantive due process. *Id.* (quoting *Albright*, 510 U.S. at 270-71 & n.4 (plurality opinion)); *see also Greenman*, 787 F.3d at 890–91 (holding that a due process claim that alleges an arrest and prosecution without probable cause "is properly addressed under a Fourth Amendment analysis").

---

[36] Specifically, the plaintiff claimed that investigators prepared an affidavit or statement of probable cause that relied on a witness's statement implicating the plaintiff in the murder without mentioning that the witness gave earlier statements that implicated two other persons and not the plaintiff. *Stewart*, 836 F.3d at 982-83.

The Eighth Circuit noted that in a previous case, *Moran v. Clarke*, it found that a fabricated evidence claim stated a violation of substantive due process rights. *Id.* (citing *Moran v. Clarke*, 296 F.3d 638 (8th Cir. 2002) (*en banc*)). However, the *Stewart* panel differentiated *Moran* as presenting "additional considerations," apart from the alleged fabrication, which supported recognition of a substantive due process claim. *Id.* at 983 (citing *Moran*, 296 F.3d at 645). Those additional considerations—the effect that "falsely-created evidence and other defamatory actions" had on the plaintiff's career as a public employee, and the possibility that the plaintiff might have been singled out for investigation or punishment because of his race—were not present in *Stewart*. *Id.* at 983.[37] Nor are these additional considerations present here.

Although *Stewart* would seem to settle the issue that fabrication of evidence claims are not actionable under the Due Process Clause, at least not without additional considerations, two older cases in the Eighth Circuit held that such claims

---

[37] The plaintiff in *Moran* was a police officer who alleged that he had been unlawfully investigated, prosecuted, suspended without pay, demoted and stigmatized by falsely-created evidence and other defamatory actions designed to implicate him in the beating of an arrestee—an action he did not commit. 296 F.3d at 645. The *Moran* panel determined that the actions allegedly taken against the plaintiff implicated his right as an employee to be free from an employer's stigmatizing conduct, at least without an opportunity for a name-clearing response, *id*. (*citing Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972)), and implicated the plaintiff's right to engage, without unreasonable interference and harassment, in any of the common occupations of life, *id*. (*citing Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). The panel also determined that the defendants might have taken adverse actions against the plaintiff because of his race, which would implicate the plaintiff's right to equal protection under the law. *Id.*

could violate due process. *See Livers,* 700 F.3d at 354 (holding that the law was clearly established in 2006 that fabrication of evidence to establish probable cause can violate due process); *Winslow*, 696 F.3d at 731. *Stewart,* which involved conduct that occurred in 2007, did not cite *Livers* or *Winslow* in its opinion. However, this Court need not resolve this apparent conflict because the very existence of the conflict establishes that Officers Weyker and Bandemer are entitled to qualified immunity for Plaintiffs' due process claims.

It is possible for law, which may have once been clear for purposes of qualified immunity, to become unclear later. *See Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 959 & n.10 (2d Cir. 2015) (*citing Santamorena v. Georgia Military Coll.*, 147 F.3d 1337, 1342 n.11 (11th Cir. 1998)). As the Second Circuit observed in *Mangino*,

> "[T]he nature of the law is not always to move from unsettled to settled. Although one of our decisions may not be expressly overruled, later cases . . . may bring its reasoning or holding into such doubt that the elements set out in the case are no longer clearly established . . . ."

*Id.* (quoting *Santamorena*, 147 F.3d at 1342 n.11).

Qualified immunity is appropriate when "officers of reasonable competence" can disagree on an issue. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It is also appropriate when federal judges disagree. *See Pearson*, 555 U.S. at 244–45 ("[O]fficers are entitled to rely on existing lower court cases without facing personal liability for their actions."); *see Richardson v. Selsky*, 5 F.3d 616, 623 (2d Cir. 1993) ("If the district judges in the Southern District of New York, who are charged with ascertaining and applying the law, could not determine the state of the law with reasonable certainty,

it seems unwarranted to hold . . . officials to a standard that was not even clear to the judges . . . .").

*Stewart* is the Eighth Circuit's most recent decision on the issue of whether a fabrication of evidence claim is properly asserted as a violation of substantive due process rights. *Stewart* specifically references and explains *Moran*, which both *Livers* and *Winslow* rely upon. *See Livers,* 700 F.3d at 354 (*citing Moran*, 296 F.3d at 646, and *Moran v. Clarke*, 359 F.3d 1058, 1060–61 (8th Cir. 2004)); *Winslow*, 696 F.3d at 732 (citing *Moran* as "denying qualified immunity where substantive due process claim was based on evidence that investigators 'purposely ignored' exculpatory evidence, placed pressures on witnesses to incriminate a specific person, and manufactured evidence"). If *Stewart* conflicts with *Livers* and *Winslow*, and/or *Moran*, Defendants cannot have been on notice that their alleged conduct would run afoul of Plaintiffs' clearly established due process rights.

## D.   Plaintiffs' Malicious-Prosecution Claims Under 42 U.S.C § 1983 And *Bivens* Fail As Matter Of Law

### 1.   The Section 1983 Claims For Malicious Prosecution

Plaintiffs base their Section 1983 malicious-prosecution claims on (1) their being prosecuted without probable cause, which Plaintiffs claim violated their rights under the Fourth Amendment, and (2) alleged misconduct by Officers Weyker and Bandemer, which Plaintiffs claim violated their right to due process under the Fourteenth Amendment. *E.g.*, Fahra Compl., Count Four; Afyare Compl., Count Four. The Fourteenth Amendment clearly provides no support for Plaintiffs'

malicious-prosecution claim. In *Albright v. Oliver*, the Supreme Court held that substantive due process, with its "scarce and open-ended" "guideposts," cannot be the basis for a claim alleging violation of the right to be free from prosecution except upon probable cause—*i.e.*, malicious prosecution. 510 U.S. 266, 275 (1994) (plurality opinion) (*quoting Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).[38]

Plaintiffs' attempt to ground their malicious-prosecution claim in the Fourth Amendment fares no better. The Supreme Court has "never explored the contours of a Fourth Amendment malicious-prosecution suit." *Wallace*, 549 U.S. at 390 n.2 (citations omitted). Federal courts of appeals have employed a range of approaches to handling malicious-prosecution claims that are based upon an alleged violation of a constitutional right. *See Castellano v. Fragozo*, 352 F.3d 939, 949–53 (5th Cir. 2003) (surveying circuits' approaches). But the Eighth Circuit has uniformly held that a malicious-prosecution claim is not punishable under Section 1983 or *Bivens* because it does not allege a constitutional injury. *Gordon*, 168 F.3d at 1114; *see also Kurtz v. City of Shrewsbury*, 245 F.3d 753, 758 (8th Cir.2001) ("The Constitution does not mention malicious prosecution. . ."); *Kohl v. Casson*, 5 F.3d 1141, 1145 (8th Cir. 1993) (allegations of malicious prosecution without more do not state a civil rights claim).

---

[38] The Supreme Court has used the terms "prosecution without probable cause" and "malicious prosecution" to refer to the same claim. *Harrington*, 678 F.3d at 679 (citing *Albright*, 510 U.S. at 271 & n. 4 (plurality opinion)).

In *Harrington v. City of Council Bluffs, Iowa*, the Eighth Circuit observed that "[i]f malicious prosecution is a constitutional violation, it *probably* arises under the Fourth Amendment." 678 F.3d 676, 680 (8th Cir. 2012) (emphasis added)) (citing *Albright*, 510 U.S. at 271, 275). The Eighth Circuit, however, has never specifically recognized a Fourth Amendment protection against malicious prosecution. The plaintiffs in *Harrington* alleged that officers investigated them without probable cause to suspect them of a murder, knew the main prosecution witness had lied, coerced witnesses into lying in order to frame them for murder and concealed this fact, and hid exculpatory evidence. *Id*. at 678. Addressing the viability of a Fourth Amendment malicious-prosecution claim to seek redress for these alleged actions, the *Harrington* panel observed that in *Albright*, the Supreme Court declined to decide whether there is a Fourth Amendment right which protects against malicious prosecution, and that other circuits had taken a variety of approaches on the issue. *Id*. at 680. In light of this, the Eighth Circuit held that even if it was assumed that a Fourth Amendment right against malicious prosecution existed, that right was not clearly established at the time of the events at issue. *Id*.

This principle was recently reaffirmed in *Bates v. Hadden*, 576 F. App'x 636 (8th Cir. 2014). The plaintiff in *Bates* alleged that a law-enforcement officer's false criminal complaint led to his incarceration. *Id*. at 639 (quotations omitted). The plaintiff cited the Supreme Court's decision in *Albright* for the proposition that "[m]alicious prosecution is a constitutional tort actionable under § 1983 and the

Fourth Amendment, where it is accompanied by incarceration or other palpable consequence." *Id.* at 639. The plaintiff also argued that malicious prosecution was recognized as a cognizable Fourth Amendment claim in *Harrington*. *Id.* (citing *Harrington*, 678 F.3d at 679). But the Eighth Circuit rejected both of these arguments.

First, the Eighth Circuit noted that the plurality opinion in *Albright* expressly disagreed with the Seventh Circuit's reasoning in the ruling below that "prosecution without probable cause is a constitutional tort actionable under § 1983 only if accompanied by incarceration or loss of employment or some other palpable consequence." *Albright*, 510 U.S. at 270–71 (plurality opinion) (*citing Albright v. Oliver*, 975 F.2d 343, 346–47 (7th Cir.1992)). Second, the Eighth Circuit noted that it had specifically "declined to decide" in *Harrington* whether a Fourth Amendment right against malicious prosecution exists. *Bates*, 576 App'x at 639 (*citing Harrington*, 678 F.3d at 680). In light of this, the Eighth Circuit found that the defendant officer in *Bates* was entitled to qualified immunity as to the malicious-prosecution claim because no reasonable officer would have understood in August 2010 that he was violating a constitutional right against malicious prosecution when no such right was clearly established. *Id.* (citing *Harrington*, 678 F.3d at 680).[39]

---

[39] *See also Joseph v. Allen*, 712 F.3d 1222, 1228 (8th Cir. 2013) (rejecting Fourth Amendment malicious prosecution claim because it failed to state a constitutional claim) (citing *Kurtz*, 245 F.3d at 758).

The defendants are entitled to qualified immunity for Plaintiffs' Section 1983 malicious-prosecutions claims because it is not clearly established law in the Eighth Circuit that malicious prosecution is a violation of *any* constitutional right.

## 2. The Section 1983 And *Bivens* Claims For Fourth Amendment Violations

Plaintiffs assert that the same alleged misconduct by Officers Weyker and Bandemer which supports the Section 1983 malicious-prosecution claim also supports claims under *Bivens* and Section 1983 for the violation of Plaintiffs' Fourth Amendment rights. *E.g.*, Fahra Compl., Counts One and Five; Afyare Compl. Counts One and Five. Specifically, Plaintiffs assert Fourth Amendment claims for unreasonable search and seizure, false arrest, and false imprisonment. However, these Fourth Amendment claims are really claims for malicious prosecution under a different name, and fail as such.

The Supreme Court has observed that the tort of malicious prosecution "remedies detention accompanied, not by absence of legal process, but by wrongful institution of legal process." *Wallace*, 549 U.S. at 389-90 (citations omitted). "[U]nlike the related cause of action for false arrest or imprisonment, [malicious prosecution] permits damages for confinement imposed pursuant to legal process." *Heck v. Humphrey*, 512 U.S. 477, 484 (1994); *Wallace*, 549 U.S. at 389 ("The sort of unlawful detention remediable by the tort of false imprisonment is detention without legal process . . .") (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 11, p. 54, § 119, pp. 885–886 (5th ed.1984)); *Nieves v.*

*McSweeney*, 241 F.3d 46, 54 (1st Cir. 2001) ("The tort of malicious prosecution permits damages for a deprivation of liberty—a seizure—pursuant to legal process."). Thus, when an arrest has occurred pursuant to legal process, any Fourth Amendment claim premised upon the alleged lack of probable cause for that arrest is really a claim for malicious prosecution, not false arrest or false imprisonment.

All of the Plaintiffs except for Yassin were arrested pursuant to an indictment returned by a grand jury—*i.e.*, legal process. *See* Background. The detention that forms the basis for any nominal Fourth Amendment claim—whether characterized as a seizure, an arrest, or imprisonment—followed, and was a direct result of the initiation of that legal process. The Eighth Circuit has recognized that in situations like this, where the relevant seizure for a Fourth Amendment claim is identified as the "sum of post-arraignment deprivations" suffered by the plaintiff, the claim is for malicious prosecution. *Harrington*, 678 F.3d at 679 (citing *Nieves*, 241 F.3d at 54).

As shown above, it is not clearly established in the Eighth Circuit that malicious prosecution is a violation of any constitutional right, including the Fourth Amendment. Even though they are not named as such, Plaintiffs' Fourth Amendment claims fail because they are, in essence and effect, claims for malicious prosecution.

### E.    Plaintiffs' Fourth Amendment Claims Fail As A Matter Of Law

The Fourth Amendment does not apply where a defendant is "merely charged" because "the accused is not 'entitled to judicial oversight or review of the decision to prosecute.'" *Albright,* 510 U.S. at 226 (quoting *Gerstein v. Pugh*, 420 U.S.

103, 118-119 (1975)). Accordingly, to the extent Plaintiffs have any Fourth

Amendment claim, it cannot be based on a decision to pursue criminal charges but

must instead rest on a detention without valid probable cause. *See Stewart*, 836 F.3d

at 983-84. Probable cause exists when the totality of the circumstances at the time of

the arrest are sufficient to lead a reasonable officer to believe that someone has

committed a crime. *See Greenman*, 787 F.3d at 888. In addition, when a plaintiff

seeks to recover damages for a Fourth Amendment violation, the plaintiff must show

that the law enforcement officer not only lacked probable cause to support an arrest,

but that *arguable* probable cause was lacking as well. *See Stewart,* 836 F.3d at 984.

"Arguable probable cause" is an objectively reasonable belief that probable

cause existed. *Pace*, 201 F.3d at 1055. As the Eighth Circuit has explained, "the

probable-cause standard allows room for reasonable mistakes by a reasonable

person," while the arguable probable cause standard "protect[s] all but the plainly

incompetent or those who knowingly violate the law." *Greenman*, 787 F.3d at 888

(alteration in original, quotation omitted). *See also Heien v. N. Carolina*, 135 S. Ct. 530,

539 (2014) (noting that the qualified immunity analysis is more "forgiving" than the

probable cause analysis).

To proceed on a Fourth Amendment damages claim that is based on the

alleged submission of false evidence—the claim Plaintiffs assert here—the Eighth

Circuit also requires plaintiffs to satisfy the standard articulated in *Franks v. Delaware*,

438 U.S. 154 (1978). *See Hawkins v. Gage Cty., Neb.*, 759 F.3d 951, 958 (8th Cir.

2014). In *Franks*, the Supreme Court held that a criminal defendant moving to

suppress evidence must show that the supporting affidavit contained deliberate or reckless falsehoods essential to the finding of probable cause. 438 U.S. at 171-172.

As the Supreme Court explained, if "material that is the subject of the alleged falsity or reckless disregard is set to one side" and "there remains sufficient content in the warrant affidavit to support a finding of probable cause," no violation occurs. *Id.* Moreover, *Franks's* requirement for a "truthful" affidavit does not mean that "every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Id.* at 165; *see also Heien*, 135 S. Ct. at 536 ("[S]earches and seizures based on mistakes of fact can be reasonable.").

Plaintiffs thus face a high hurdle to proceed on their Fourth Amendment claims. They must show (1) Officer Weyker purposely submitted false information to the grand jury or recklessly omitted material facts from the grand jury, and (2) the indictment, if supplemented with the corrected information still lacked probable cause. *Hawkins*, 759 F.3d at 959 (explaining that omitted material must be "'*clearly critical* to the finding of probable cause'") (quoting *United States v. Jacobs,* 986 F.2d 1231, 1235 (8th Cir.1993) (further citations omitted)). As detailed in the next section, the few specific, non-conclusory factual allegations in the complaints fail to plausibly allege a claim that meets this standard.

But as a threshold matter, there is a more fundamental reason, apart from failing to meet the *Franks* standard, why the Fourth Amendment claims fail for

certain Plaintiffs who were indicted for crimes other than sex trafficking. For example, Ahmed Khalif was not charged with *any* sex-trafficking crimes, and eleven other Plaintiffs were charged with crimes in addition to sex trafficking: Abdifitah Adan, Abdullahi Afyare, Musse Ali, Muhiyadin Hassan, Abdirahman Hersi, Abdifatah Jama, Abdifatah Omar, Liban Omar, Mohamed Omar, Hamdi Osman, Haji Salad, and Yassin Yusuf. *See* Ex. B. These crimes included credit card fraud, transporting stolen merchandise, identity fraud, and obstruction of justice. *See id.*

The above Plaintiffs do not specify any actions by Officers Weyker or Bandemer related to these other crimes, nor do the complaints plausibly allege a lack of probable cause for their indictment on those other crimes. This is fatal to any Fourth Amendment claim in their complaints. For even if there was not probable cause to indict these Plaintiffs on the sex-trafficking charges, Officers Weyker and Bandemer are entitled to qualified immunity if there was still arguable probable cause to arrest these Plaintiffs on any of the other counts listed in the indictment returned against these Plaintiffs. *See Greenman*, 787 F.3d at 889.

In *Greenman*, the plaintiff asserted a Fourth Amendment claim based on the argument that even if an officer had probable cause to arrest him for a traffic violation, the true basis for his arrest was other offenses for which no probable cause existed. *See id*. The Eighth Circuit rejected this argument, finding that as long as probable cause existed for violation of some other law, the officer was entitled to qualified immunity. The Supreme Court has ruled similarly, holding that the Fourth Amendment is not violated where no probable cause existed for the offense cited by

the officer, as long as probable cause existed for some other crime, even if that other crime was completely unrelated. *See Devenpeck v. Alford*, 543 U.S. 146, (2004).

*Greenman* and *Devenpeck* thus require the dismissal of the Fourth Amendment claims of the Plaintiffs who were not charged with sex-trafficking offenses. For example, even if it were true that Plaintiff Abdifitah Jama Adan was charged with making false statements "to pressure him into providing evidence about the fabricated sex-trafficking ring," Adan Compl. ¶ 45, he cannot proceed on his Fourth Amendment claim for the sex-trafficking charges if there was arguable probable cause to indict him for making false statements. Adan does not allege that there was no probable cause for an indictment on that offense. Moreover, considering Adan pleaded guilty to that count of the indictment, *id.* ¶ 46, he cannot attack his arrest and detention by arguing that probable cause did not exist for his arrest. *See Malady v. Crunk*, 902 F.2d 10, 11 (8th Cir. 1990) ("Malady's conviction of the offense for which he was arrested is a complete defense to a § 1983 action asserting that the arrest was made without probable cause.").

The same is true for the other Plaintiffs named above who did not plead guilty. The non-sex trafficking crimes were are all contained in the initial indictments, and some were also included in the Third Superseding Indictment, which was filed after some of the defendants were acquitted on the sex-trafficking charges. These Plaintiffs have made no allegations that probable cause did not exist to indict them for those other crimes, nor do they allege that Officers Weyker or Bandemer fabricated any evidence related to those counts of the indictments. Therefore, Officers Weyker and

Bandemer are entitled to qualified immunity on any Fourth Amendment claim by

plaintiffs Ahmed Khalif, Abdifitah Adan, Abdullahi Afyare, Musse Ali, Muhiyadin

Hassan, Abdirahman Hersi, Abdifatah Jama, Abdifatah Omar, Liban Omar,

Mohamed Omar, Hamdi Osman, Haji Salad, and Yassin Yusuf.

### F.    Plaintiffs' Factual Allegations Fail To Plausibly Allege A Violation Of Any Clearly Established Constitutional Right

As detailed in the prior sections, the legal deficiencies in Plaintiffs' claims

preclude any relief regardless of the underlying factual circumstances of each

particular Plaintiff. But even if the Court wishes to examine the few, non-conclusory

factual allegations in the complaints, the conclusion will still be the same: none of the

complaints allege an actionable constitutional claim.

When evaluating the factual allegations in the complaints, this Court should

scrupulously enforce pleading standards. As the Supreme Court has instructed, "[a]

pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements

of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic v.

Twombly*, 550 U.S. 544, 555 (2007)). Likewise, "general assertions of harm, lacking

elaboration as to the context of the alleged incidents or resulting injuries," fail to

meet pleading standards. *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d

624, 635 (8th Cir. 2010).

Under these standards, the complaints' conclusory allegations and bombastic

rhetoric should play no role in determining whether arguable probable cause existed

to indict Plaintiffs. For example, the following allegations epitomize "the-defendant-

unlawfully-harmed-me accusation[s]," *id.*, that this Court should ignore when

determining whether the complaints here state a claim:

- Upon information and belief, Weyker provided fabricated, knowingly false, misleading, and/or exaggerated statements and evidence to federal prosecutors, various law enforcement personnel, and a federal grand jury in the Spring and/or Summer and/or Fall of 2010 (Adan Compl. ¶ 30);

- The Indictment was based upon fabricated and manufactured evidence from Weyker and Bandemer (Afyare Compl. ¶ 41);

- Weyker knowingly intentionally and maliciously coerced, intimidated, pressured, threatened and bribed the alleged victims of the fictitious child sex trafficking conspiracy, including Jane Doe 2, into falsely recounting and testifying that they had been paid for sex in encounters arranged by other defendants in the Criminal Proceedings (Yasin Farah Compl. ¶ 29); and

- Upon information and belief, Weyker and Bandemer further violated [*Brady*] and denied Omar due process by suppressing other evidence favorable to him in bad faith (Liban Omar Compl. ¶ 45).

"To survive a motion to dismiss, a complaint must contain sufficient *factual*

matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*,

556 U.S. at 678 (quotations omitted) (emphasis added). "Where a complaint pleads

facts that are merely consistent with a defendant's liability, it stops short of the line

between possibility and plausibility of entitlement to relief." *Id* (quotations omitted).

*See also Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 717 (8th Cir. 2011) (finding that

a complaint was insufficient because it "merely alleged, but did not show" an

entitlement to relief).

A reviewing court should "draw on its judicial experience and common sense"

when determining whether a claim is plausible. *Hamilton v. Palm*, 621 F.3d 816, 817–

18 (8th Cir. 2010). For example, as this Court well knows, U.S. Attorneys' Offices often decline prosecutions, and do so for a variety of reasons. Consequently, the fact that one U.S. Attorney's Office might have declined to prosecute Plaintiffs does not lead to the conclusion that the case was based on fabricated evidence, especially when another U.S. Attorney's Office decided to pursue the matter. *See, e.g.,* Yusuf Compl. ¶ 32. In fact, it is evidence of the independent discretion federal prosecutors brought to bear on the decision to bring criminal charges against Plaintiffs. The other factual allegations in the complaints likewise fall far short of stating a plausible claim under any theory. Some examples are discussed below.

### 1.    Plaintiffs' Acquittals Or Assertions Of Innocence

All Plaintiffs attempt to support their claims by asserting their innocence to the charges and citing either their acquittals or the dismissal of charges against them. But as the Eighth Circuit has stated, an assertion of innocence is "largely irrelevant" to Fourth Amendment claims because the Constitution "does not guarantee that only the guilty will be arrested." *New v. Denver*, 787 F.3d 895, 900 (8th Cir. 2015); *see also Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 745 (7th Cir. 2003) ("All acquittals and terminated prosecutions do not lead to liability under § 1983.").

The standard for acquittals—lack of proof beyond a reasonable doubt—is different from that of probable cause. For that reason, evidence of an acquittal should not be considered in a subsequent civil suit because it "carries a potential risk of incorrectly implying a lack of probable cause." *Lowe Bey v. Hamon*, 977 F.2d 586 (8th Cir. 1992) (Table); *see also Anderson v. Genuine Parts Co., Inc.*, 128 F.3d 1267, 1272 (8th

Cir. 1997) ("A jury verdict does not constitute evidence."). Thus, the acquittals or the dismissals of charges have no weight on whether probable cause existed to indict Plaintiffs in the first place. Likewise, even if a plaintiff can point to "evidence and clues he believes the officers should have utilized sooner and would have more quickly established the truth, the due process clause does not require a perfect investigation." *Hawkins*, 759 F.3d at 957–58.

### 2.  The Sixth Circuit's Opinion

For similar reasons, the Sixth Circuit's criticism of Officer Weyker and the investigation is also irrelevant to this lawsuit. As the Supreme Court has recognized, "[a] creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *United States v. Sharpe,* 470 U.S. 675, 686 (1985). But when qualified immunity is at stake, courts should consider only "the relevant circumstances and the acts of the parties themselves, and not the conclusions of others about the reasonableness of those actions." *New*, 787 F.3d at 899–900 (quoting *Pace,* 201 F.3d at 1056). Probable cause depends on the totality of the circumstances "at the time of the arrest," not on what information eventually comes to light. *Gilmore v. City of Minneapolis*, 837 F.3d 827, 832 (8th Cir. 2016).

The Sixth Circuit's opinion is focused almost entirely on what happened *after* the indictments. Moreover, the sole issue presented on appeal was whether the trial court properly ruled that the government failed to prove a single conspiracy as charged. *See Fahra,* 643 F. App'x at 481. The Sixth Circuit affirmed that judgment,

agreeing that "the prosecution produced evidence that might demonstrate at least two, and perhaps more, separate and unrelated criminal sex trafficking conspiracies, but did not produce evidence to connect those unrelated conspiracies (and conspirators) into a single, unified conspiracy." *Fahra,* 643 F. App'x at 491.

The Sixth Circuit's holding, as well as its *dicta* expressing doubts that any sex-trafficking scheme actually existed based on the trial testimony of the victims, *id.* at 492, have no bearing on the issue currently before this Court: whether Plaintiffs adequately pled that Officers Weyker or Bandemer caused the grand jury to return an indictment that lacked even *arguable* probable cause. *See Schultz v. Thomas*, 832 F.2d 108, 111 (7th Cir. 1987) (judicial "findings and opinion[s]" from underlying or related matters are "irrelevant to an adjudication of a civil rights claim") (citing Fed. R. Evid. 602). If anything, the appellate court's agreement that the government may have proved *multiple* sex-trafficking conspiracies only bolsters the argument that arguable probable cause existed for the sex-trafficking crimes.

Plaintiffs also rely on the Sixth Circuit's statement that "the district court opined that Officer Weyker likely exaggerated or fabricated important aspects of this story," and that "the district court caught Weyker lying to the grand jury and, later, lying during a detention hearing." *Fahra,* 643 F. App'x at 482. As explained above in Section III, however, Officer Weyker has absolute immunity for any claim based on her grand jury testimony. Moreover, one of the "serious concerns" about Officer Weyker's grand jury testimony related to whether Officer Weyker properly disclosed that one of the victims had corrected her identification of Plaintiff Mohammed

Omar. *See* Ex. E at 3. That is a far cry from fabricating evidence. In any event, the

court still rejected Omar's motion to be released on bond. *See id.* Specifically, the

court opined that evidence independent of Officer Weyker supported Omar's

detention, including the victim's emotional reaction to being shown a photograph of

him and the victim's fears that she and her family might be harmed. *See id.* Thus, the

district court's concern about Officer Weyker's testimony in this instance does

nothing to plausibly suggest that probable cause was lacking to indict Omar, and it is

irrelevant to the other Plaintiffs.

### 3.   Officer Weyker's Meetings With The Victims

Plaintiffs also all generally allege that Officer Weyker coerced the victims to

testify falsely, but they fail to allege sufficient facts supporting that conclusion. For

example, the complaints allege that Officer Weyker "surreptitiously" met Jane Doe

Two after her parents would not allow Officer Weyker to speak to her. *See, e.g.,* Ali

Compl. ¶ 18 (alleging Jane Doe Two "was a habitual runaway who did not want to

talk to Weyker"); Afyare Compl. ¶ 43 ("Weyker cultivated a deep and manipulative

relationship with Jane Doe Two and the other Jane Doe witnesses."). But without

more, such as any indication that Officer Weyker threatened or intimidated any of

the victims, these allegations about repeated secret meetings do not plausibly suggest

that Officer Weyker coerced any victim into making a false statement.

The Constitution contains no prohibition on meeting with minors without

parental consent, no prohibition on reengaging with individuals who are reluctant to

identify as a victim of a crime, and no prohibition on following up with potential

victims who were reluctant to speak candidly in the presence of third parties. Nor is

there any precedent that would have provided "fair and clear warning" to Officer

Weyker that these actions could subject her to personal liability. *al-Kidd*, 563 U.S. at

741. Consequently, these allegations do nothing to state a plausible claim that Officer

Weyker coerced witnesses or that probable cause was lacking.

### 4.    The Victims' Conflicting Statements

Plaintiffs also attempt to support their claims by attempting to show that the

victims were not credible or gave conflicting statements. The law is well settled,

however, that officers are entitled to rely on the truth of information supplied by the

victim of a crime. *See, e.g., Royster v. Nichols*, 698 F.3d 681, 688 (8th Cir. 2012);

*Gilmore*, 837 F.3d at, 832–33. Even when witnesses are "of questionable and

unsavory character," police officers may still rely on them to arrest a suspect. *Ester v.*

*Faflak*, No. CIV.05-0049(PJS/JSM), 2006 WL 2700288, at *18 (D. Minn. Sept. 18,

2006), *aff'd,* 250 F. App'x 756 (8th Cir. 2007). As Magistrate Judge Mayeron

explained in *Ester,* a contrary rule would severely hamper law enforcement, which

often depends on using informants with problematic backgrounds. *Id.* at *19.

Plaintiffs also try to attack the victims' credibility by citing to the Sixth

Circuit's conclusion that the "witnesses repeatedly contradicted, disavowed, and

refuted their own testimony" at trial. *Fahra,* 643 F. App'x at 484. There are two flaws

with this argument. First, "probable cause is determined at the moment the arrest

was made, [and] any later developed facts are irrelevant to the probable cause

analysis for an arrest." *Gilmore*, 837 F.3d at 833-834 (quotation and citation omitted).

Second, the complaints do not specify what this conflicting information was or how it evidences a lack of probable cause. The mere fact that a witness provides conflicting statements at trial does not evidence a Fourth Amendment violation at the time charges were brought.[40] *See id*; *Stewart*, 836 F.3d at 984 (the Fourth Amendment does not require officers to disclose all of a witness's statements in a probable cause statement).

Even assuming that Officer Weyker knew about the victims' conflicting accounts at the time of the indictments, she still would be entitled to qualified immunity. A reasonable officer would know that teenaged victims of sexual trauma might be reluctant to acknowledge what happened to them or might give conflicting accounts of what happened. *See Beauchamp*, 320 F.3d at 745 (in light of rape trauma syndrome, a reasonable officer would not place much emphasis on a victim's failure to report a rape or inability to recall details). As the Eighth Circuit has recognized, even false accusations of sexual assault create a difficult situation for police because they must address the allegations made by the purported victims while at the same time respect the rights of the accused. *Hawkins*, 759 F.3d at 957–58.

---

[40] To provide further context, Jane Doe Two's trial testimony continued over five days and involved cross-examination by six different defense counsel about events that happened several years in the past. In fact, at one point the judge admonished defense counsel that they are not to "beat up on witnesses." *Adan*, Dkt. No. 2627, PageID 14813, attached as Exhibit L. The fact that there were some inconsistencies is to be expected under these circumstances, especially considering Jane Doe Two's age, the pressure of testifying, and the amount and nature of the details of events.

In *Hawkins*, a woman reported she had been raped by the plaintiff, who was arrested and spent nearly three weeks in jail before the woman recanted her allegations and admitted that the sex had been consensual. *Id.* at 952. The plaintiff sued the police officers who arrested him, alleging that they conducted a reckless investigation and withheld material facts from their arrest warrant. *Id.* The Eighth Circuit granted qualified immunity to the officers, noting that "the officers were forced to address a difficult question of credibility." *Id.* at 958.

*Hawkins* demonstrates why qualified immunity is appropriate in this case, too. For even if it is true that "in hindsight," there were "red flags" in the accounts of some of the Jane Doe witnesses, Plaintiffs have not shown "any omissions for which [the officers] fairly can be deemed reckless." *Id.* at 959. Even when a "legitimate question" exists whether a victim is really telling the truth, officers should be granted qualified immunity unless it was "entirely unreasonable" to rely on the victim's account. *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 672 (8th Cir. 2007); *see also Gilmore*, 837 F.3d at 832-833 ("In considering information given by a victim of a crime, an officer need not conduct a 'mini-trial' before effectuating an arrest although he cannot avoid 'minimal further investigation' if it would have exonerated the suspect.") (quoting *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011)).

None of the allegations in any of Plaintiffs' complaints plausibly suggest that it was entirely unreasonable for Officer Weyker to rely on the statements of the victims. Nor would minimal further investigation have exonerated any suspect, as these are not cases of mistaken identity. To the contrary, Officer Weyker and the

76

many other officers involved in the case conducted an incredibly thorough investigation, as evidenced by the thousands of documents and hundreds of witnesses offered by the prosecution to prove the charges at trial. *See Pace*, 201 F.3d at 1057 ("Even if we were to give no weight to the victim's interview with Officer Danner, we believe it likely that these additional facts would provide enough support for a finding of probable cause to entitle Officer Danner to qualified immunity.").

Plaintiffs' attempts to attack the background of the victims likewise do not establish any misconduct by Officer Weyker that would violate the Constitution. For example, Plaintiffs' allegation that Jane Doe Two was a "troubled runaway or juvenile delinquent," Afyare Compl. ¶ 50, does nothing to show that probable cause was lacking. To the contrary, those characteristics only made Jane Doe Two more vulnerable to being exploited for commercial sex. *See United States v. Evans*, 272 F.3d 1069, 1090 (8th Cir. 2001) (citing expert testimony that minor sex-trafficking victims are often runaways and individuals with family problems and drug dependency).

Similarly, Jane Doe Five's mental health issues bear no relevance to the actions of Defendants because Plaintiffs have not plausibly alleged that Officer Weyker knew of the mental illness. *See Ester*, 2006 WL 2700288 at *19 ("[T]he fact that Hall may have had a history of mental illness bears no relevance to the actions of defendants since there was no evidence presented that a mental illness affected Hall's reliability as an informant or that defendants even knew about Hall's mental illness."). Here, for example, Plaintiffs have alleged that "[i]t was well-known in the Nashville Somali community that Jane Doe Five was, to put it lightly, an unstable

woman, and that any statements given by her could never be worthy of belief." Adan
Compl. ¶ 22. But what the "Nashville Somali community" thinks of Jane Doe Five
has no bearing on whether a police officer like Officer Weyker knew that statements
by Jane Doe Five were unworthy of belief at the time they were made. In any event,
"the issue of informant credibility does not need to be presented to a grand jury by a
prosecutor, let alone an investigator on a case." *Ester*, 2006 WL 2700288 at *18 n.8.

At most, Plaintiffs' allegations show that a reasonable officer may have
questioned whether the victims really were underage and whether they actually
received compensation for the sex acts they undisputedly performed. But "it is not
the function of the police to establish guilt; the responsibility of sorting out
conflicting testimony and assessing the credibility of putative victims and witnesses
lies with the courts." *Hawkins*, 759 F.3d at 957–58 (quotation and citation omitted);
*see also Tech. Ordnance, Inc. v. United States*, 244 F.3d 641, 648 (8th Cir. 2001) ("[O]nce
an agent has established probable cause, he is not required to conduct a further
investigation in the hope of finding exculpatory evidence."). Therefore, Plaintiffs'
allegations about the conflicting accounts of the victims do not plausibly allege that
Officer Weyker lacked arguable probable cause or violated their due process rights.

### 5.    Jane Doe Four's Alleged Rape

Plaintiff Bashir Yasin Mohamud, and to a lesser extent other Plaintiffs, also
challenge Officer Weyker's conduct regarding Jane Doe Four. According to the
indictment, when Jane Doe Four was 18 years old, Mohamud and others
transported her to a motel in Minnesota and sexually assaulted her. *See* Ex. B at

¶¶ 59-60. Although Mohamud denies sexually assaulting Jane Doe Four, he admits he rented the hotel room and engaged in sexual activities with her. *See* Mohamud Compl. ¶¶ 25-28.

At Mohamud's initial detention hearing, Officer Weyker testified that Jane Doe Four did not consent to sex and that a nurse found "blunt force trauma" to Jane Doe Four's vagina. *Id.* at ¶ 35; *Adan,* Dkt. No. 2560 at 5, attached as Exhibit I. At a later detention hearing, the judge noted the phrase "blunt force trauma" was not in the nurse's report. *See* Ex. I at 5. The court also ordered Mohamud released from custody, concluding that Jane Doe Four's grand jury testimony, in which she denied exchanging sex for money, did not provide "clear and convincing" evidence to support continued detention. *Id.* at 7; *see also* Mohamud Compl. ¶¶ 49-52 (listing the conditions of his release under that order, including electronic monitoring and restrictions on travel).

Based on the above allegations, Mohamud and other Plaintiffs conclude that Officer Weyker fabricated evidence against them regarding Jane Doe Four. *See* Mohamud Compl. ¶ 36; Hassan Compl. ¶ 19. The above facts, even if accepted as true, do not plausibly state a claim for two reasons. First, the sole misconduct attributed to Officer Weyker concerns her purportedly false testimony at the detention hearing. As explained previously in Section III, however, Officer Weyker is entitled to absolute immunity for any claim based on false testimony. *See Conley*, 653 F.2d at 1242 (8th Cir. 1981) ("Witnesses are absolutely immune from section 1983 remedy actions arising from their testimony in judicial proceedings."). Second,

the allegations fail the *Franks* test because even when the allegedly false information

is removed, probable cause still existed for the indictment.

As Plaintiffs do not dispute, motel employees discovered Jane Doe Four

naked and unresponsive in the room rented by Mohamud. *See* Mohamud Compl.

¶ 34; Dkt. 1006 at 3-4, attached as Exhibit D. Jane Doe Four's underwear was

discovered in the garbage, used condoms were found in the bathroom, and blood-

stained towels were found in the bedroom. *See* Ex. D at 4. When police arrived (not

Officer Weyker), Jane Doe Four "was uncontrollably crying and unable to answer

questions directly due to her extreme emotional state." *Id*. at 5. Jane Doe Four was

taken to the hospital, and a medical report revealed two tears around her vagina. *Id.*

Mohamud admitted that Jane Doe Four performed oral sex on him and five other

males in the room but denies that anyone had intercourse. *Id.* Sperm recovered from

Jane Doe Four's perineum, however, matched a co-defendant's DNA. *Id.*

The above facts, which do not rely on Officer Weyker's actions or testimony,

more than establish arguable probable cause to indict Mohamud and others on the

sex-trafficking charges. Indeed, the primary reason cited by the trial court in releasing

Mohamud from custody was Jane Doe Four's *exculpatory* grand jury testimony. *See*

Ex. I at 7. Thus, this is not a case where Officer Weyker is alleged to have coerced a

witnesses to provide incriminating evidence against a defendant. And in any event,

after Jane Doe Four's purportedly exculpatory grand jury testimony, the prosecutors

still decided to pursue charges against Mohamud and others relating to Jane Doe

Four's alleged rape. Officer Weyker cannot be held personally liable for that decision, nor is she responsible for the outcome of the criminal proceedings.

###### 6.      Jane Doe Two's Forged Birth Certificate

One of the most contested issues in the criminal proceedings was Jane Doe Two's age. The indictments alleged that Jane Doe Two was a minor when the trafficking occurred, while the criminal defendants argued that that she was over the age of 18 when most of the conduct occurred. Prior to trial, the prosecutor learned that the Kenyan birth certificate for Jane Doe Two was fraudulent, and the government disclosed that fact to the defense. *See Adan*, 913 F. Supp. 2d at 566; Afyare Compl. ¶ 53. The fraudulent birth certificate was originally provided by Jane Doe Two's mother, who also submitted a false affidavit to the court about the identity of Jane Doe Two's father. *Adan*, 913 F. Supp. 2d at 566, 566 n.7. Nonetheless, the government still maintained that Jane Doe Two was a minor, and it proffered expert testimony to establish Jane Doe Two's age using radiographic bone age analysis and a forensic dental age assessment. *Id.* at 563 n.6. Although the court did not allow that evidence to be used during trial because it was disclosed too late, the court did allow testimony from lay witnesses to establish Jane Doe Two's age. *Id.* (also noting that expert testimony on Jane Doe Two's age would be needed for any subsequent trials).

Plaintiffs now allege that Officer Weyker knew or should have known that the victims were not minors and that Officer Weyker endorsed the forged birth certificate. These arguments fail for several reasons. First, the allegations rely on new

information developed well after the indictments, and probable cause is based on the information known to an officer at the time of arrest. *See Gilmore*, 837 F.3d at 832. Second, Officer Weyker was entitled to rely on the initial representations of Jane Doe Two and her mother about her age. *See id.* Finally, even if Plaintiffs had plausibly alleged that Officer Weyker knew of the fraudulent birth certificate at the time of the indictments, there was still arguable probable cause that Jane Doe Two was a minor, as evidenced by the trial court's rulings on that issue. *See Adan,* Dkt. No. 2625, PageID 14410 (Order denying motion to dismiss claims related to Jane Doe Two), attached as Exhibit J; *Adan*, 913 F.Supp.2d at 563-564.

In denying the defendants' motions to acquit based on Jane Doe Two's age, the court concluded that the government's admissible evidence, including testimony from Jane Doe Two's classmates, "could provide the jury a basis to find that at the times at issue, Jane Doe Two was under the age." *Adan*, 913 F. Supp. 2d at 563-564; *see also Fahra,* 643 F. App'x at 482 ("Jane Doe 2's actual age remains in dispute"). If a jury could reasonably conclude that Jane Doe Two was underage, it necessarily follows that Officer Weyker could too. *See Stewart*, 836 F.3d at 987.

**7.    The Nashville Statement By Jane Doe Two To Officer Weyker**

Plaintiffs also try to support their claims by citing an incident in Nashville where Jane Doe Two gave one account to Nashville police officers and a different account to Officer Weyker. *See Fahra,* 643 F. App'x at 483. According to Plaintiffs, at the time Jane Doe Two provided this conflicting statement, her parents had reported her missing in Minnesota, she was found in Nashville with several men, she was

arrested as a *juvenile* delinquent, and she reported having sex with numerous men on that trip. *See id.*; Hassan Compl. ¶ 23. Plaintiffs also allege that Jane Doe Two said nothing to the Nashville officers about engaging in sex acts in exchange for payment, nor about going anywhere against her will, but she purportedly changed her story in a recorded conversation she had with Officer Weyker. *See* Jama Compl. ¶ 19.

The above facts do not plausibly allege coercion. The mere fact that a witness changes her account does not lead to the conclusion that the witness was coerced to do so. Plaintiffs cite no actions by Officer Weyker—such as threats or intimidation— that any reasonable officer would know is prohibited. Indeed, police officers question reluctant witnesses all the time, and the fact that a witness gives conflicting accounts does not render the statement unreliable. *See Hawkins*, 759 F.3d at 957–58 ("[T]he responsibility of sorting out conflicting testimony and assessing the credibility of putative victims and witnesses lies with the courts.") (quotation and citation omitted).

In addition, because the complaints reference the recorded phone call, and because the transcript is a matter of public record in the criminal proceedings, the Court may—but does not have to—consider the transcript in this motion to dismiss. *See* Ex. K. In the conversation cited by Plaintiffs, Officer Weyker never explicitly mentions prostitution or kidnapping, nor is there anything else in the transcript that can plausibly be interpreted as coercion. *See id.* And even if the Court finds that Jane Doe Two's story changed, after previously speaking with two Nashville officers,

there is an "obvious alternative explanation," *Iqbal*, 556 U.S. at 682 (quotation and

citation omitted), as seen in the cross-examination of Jane Doe Two at trial:

> Q.    And you did not say anything to Sergeant Elliott about any of that
> sex being in exchange for money or anything else of value?
>
> A.    Again, I was not comfortable with those officers. And I didn't know
> what they were asking me or questioning me, and I did not feel
> comfortable to tell them everything, because I didn't know whether --
> what they wanted to know. And I didn't understand their tone of voice
> and their accent. And I was not comfortable talking to two female
> officers. And they already thought I was lying to them. And they didn't
> know -- what I should tell them, they already accused me of lying, so –

Ex. L at PageID 14876-14877.

### 8.    Jane Doe Two's Victim Compensation Form

Plaintiffs also attempt to support their claims by citing to this statement in the

Sixth Circuit opinion: "The defense has since pointed out that Weyker also lied on

an application to get Jane Doe 2's family some $3,000 from the Tennessee victim's

compensation fund, by claiming 'abduction' (Jane Doe 2 flatly denied an

abduction)." *Fahra,* 643 F. App'x at 482. But even accepting the truth of this

allegation (which is called into question by Jane Doe Two's authentication of her

*own* handwriting on the form, *see* Ex. M at PageID 15500), it does not show a clearly

established constitutional violation against any of the Plaintiffs here. Whatever

information Officer Weyker conveyed to a state fund *for Jane Doe Two* has no

relevance to whether she violated *one of the Plaintiffs'* clearly established constitutional

rights. There is no allegation or evidence that this form was presented to the grand

jury or otherwise caused any constitutional harm to any Plaintiff.

### 9.     Officer Weyker's Rough Notes And Reports

Plaintiffs also rely on the Sixth Circuit's characterization of the district court as noting that "Weyker's final reports frequently referred to sex for money while that assertion was conspicuously absent from her handwritten notes, appearing only once in all of those rough notes." *Fahra,* 643 F. App'x at 482. Likewise, the Sixth Circuit states, "Jane Doe 2 herself furthered the district court's suspicion when she testified on cross examination that Weyker had misstated facts in the reports, adding to and omitting things from her statements." *Id.* Neither of these allegations plausibly alleges a clearly established constitutional violation.

By definition, rough notes are not intended to convey every detail that is communicated in an interview, and an experienced officer may need more or less information in her notes written down to jog her memory when the time comes to write an official report. There is no case law that would put a reasonable officer on notice that rough notes must contain essential elements of a crime, if those elements appear in the final reports. *Cf. Schaffer v. Beringer*, No. 15-3438, 2016 WL 6832976, at *4 (8th Cir. Nov. 21, 2016) (holding that a police report does not contradict a search warrant affidavit merely because the police report does not repeat everything stated in the affidavit); *United States v. Redding*, 16 F.3d 298, 301 (8th Cir. 1994) (officers' rough notes are not subject to disclosure under the Jencks Act).

Plaintiffs do not identify the inconsistencies in the reports, much less allege that probable cause was lacking in any case because of the inconsistencies. Most importantly, though, Plaintiffs have not alleged they were harmed by these supposed

inconsistencies. "'[T]he mere filing of the false police reports, by themselves and without more, [does] not create a right of action in damages under 42 U.S.C. § 1983.'" *Lawrence*, 740 F. Supp. 2d at 1038-39 (quoting *Landrigan v. City of Warwick*, 628 F.2d 736, 744–45 (1st Cir. 1980)). In *Lawrence,* the court granted qualified immunity to an officer because the plaintiff did not allege that, "as a *consequence* of the allegedly false reports, she was deprived of a constitutionally protected interest." *Id.* The same is true here; Plaintiffs were arrested because of conduct alleged in an indictment, not because of a police report that contradicted one witness's account.

### 10.   Ifrah Yassin's Arrest

Although Yassin was the only Plaintiff who was not indicted in the underlying sex-trafficking case, her core grievance against Officer Weyker is just like the rest— *i.e.*, she was unlawfully arrested based on a false statement Officer Weyker made to the arresting Minneapolis officer (Officer Beeks). But Yassin, like every other plaintiff, has failed to allege non-conclusory facts showing that Officer Weyker lacked arguable probable cause—or, more fundamentally, that Officer Weyker was even the officer who *caused* Yassin's arrest.

First, the complaint reveals that Officer Weyker was not directly involved in Yassin's arrest. Officer Weyker was not at the scene, did not arrest Yassin, or order Officer Beeks or anyone else to do so. *Id.* ¶ 20. She simply relayed to Officer Beeks what the alleged victim, Muna Abdulkadir, told her on the phone after the assault— that Yassin and her friends were "actively seeking out Abdulkadir to intimidate her and cause bodily harm to her because of her role in the federal [sex-trafficking]

investigation." *Id.* ¶¶ 16, 18. As Yassin acknowledges, "Abdulkadir was a lynchpin" of the sex-trafficking prosecution. *Id.* ¶ 24.

Officer Beeks then consulted his supervisor about whether to make an arrest based on the available information. *Id.* ¶ 20. Although Yassin faults Officer Beeks for not vetting Officer Weyker's information, *id.* ¶ 19, that only underscores the key point: *Officer Beeks* was the officer responsible for deciding whether Officer Weyker's source (Abdulkadir) was reliable, whether and how to re-interview the witnesses, and ultimately whether there was probable cause to arrest Yassin.[41] Officer Weyker cannot be held liable under *Bivens* for any of those decisions by Officer Beeks. *See Iqbal*, 556 U.S. at 677; *accord Montgomery*, 829 F.3d 968 at 972-73.

Even if Officer Weyker could be held liable for the arrest made by Officer Beeks, Yassin fails to plead "sufficient factual detail," *Iqbal*, 556 U.S. at 677, supporting the wholly conclusory allegation that Officer Weyker's statement to Officer Beeks (that Officer Weyker had "information" regarding Yassin) was "knowingly and totally false," Compl. ¶ 21; *see also id.* ¶ 26 (referring to Officer Weyker's "non-existent 'information'"). At best, Yassin alleges that Officer Weyker failed to disclose to Officer Beeks that "Abdulkadir [had] previously made false statements to Weyker." *Id.* ¶ 23. But Officer Weyker was entitled to rely on

---

[41] Yassin's complaint is consistent with her own criminal-defense filings in which she represented that Officer Beeks (after speaking to Officer Weyker) "'formulated a plan to speak to these individuals separately and again to gather further information.'" Ex. S at 2 (quoting Officer Beeks's police report).

statements from a victim like Abdulkadir despite her allegedly questionable background, *see Royster*, 698 F.3d at 688, *Gilmore*, 837 F.3d at 832–33, *Ester*, 2006 WL 2700288, at **18-19; and the Fourth Amendment did not require her to disclose all statements that Abdulkadir previously made, *see Stewart*, 836 F.3d at 984.

In the end, Yassin does not allege relevant details demonstrating that Officer Weyker "knowingly" lied to Officer Beeks about what Abdulkadir told her. That is because Yassin was not on the phone call. *Id.* ¶¶ 15-16. She simply has no first-hand knowledge of what Abdulkadir told Officer Weyker. *Cf. Suggs v. Mobley*, No. 2:05CV00281 JMM-JWC, 2008 WL 5483348, at *7 (E.D. Ark. Dec. 12, 2008) ("[A]side from being a broad and conclusory allegation, Plaintiff has no firsthand knowledge of any false statement Defendant Lewis may or may not have made."), *report and recommendation adopted*, No. 2:05CV00281 JMMJWC, 2009 WL 32744 (E.D. Ark. Jan. 5, 2009).[42] What Yassin does have first-hand knowledge of—that Yassin and her friends "confronted" Abdulkadir *first* and stated their intention to "fight," Yassin Compl. ¶ 10—actually supports arguable probable cause for an arrest and is ultimately fatal to her claims.

---

[42] Though Yassin has no first-hand knowledge of what was said on the phone, Officer Weyker's affidavit in support of the post-arrest charges spells out what Abdulkadir told Officer Weyker and other federal officers—*i.e.*, Yassin and her friends confronted Abdulkadir and brought up her role in helping to "lock" up members of the "SOL," like "ChiTown." Ex. Q at 6-7.

### G.   Plaintiffs Fail To Show A Clearly Established Violation On Any Claim

Most of the above allegations of misconduct were previously raised in the criminal proceedings, and although the district court criticized the government's conduct at times, the court never found a constitutional violation by Officers Weyker or Bandemer. To the contrary, the criminal court rejected attempts to dismiss the indictments, rejected motions to release defendants based on alleged government misconduct, and rejected the argument that government misconduct justified acquitting some of the defendants. These rulings further demonstrate that Officers Weyker and Bandemer did not violate any clearly established Fourth, Fifth, or Sixth Amendment right. *See Stewart*, 836 F.3d at 987.

In *Stewart*, the Eighth Circuit held that if a court denies a criminal defendant's motion to suppress or exclude testimony that was obtained unconstitutionally, that ruling establishes a "fundamental" reason why the officers should be granted qualified immunity in a subsequent civil suit—the trial court's ruling necessarily means there was no constitutional violation. *Id.* Like the Plaintiffs here, the plaintiff in *Stewart* alleged that officers falsified evidence in his criminal proceedings, and like this case, the plaintiff was nonetheless detained and tried. *Id.* The court held that the plaintiff's failure to obtain "pretrial release or dismissal of the charges . . . strongly suggests that the presence of arguable probable cause was overwhelming." *Id.* at 984. The same is true here, based on multiple rulings by the trial court.

First, the trial court rejected attempts by the criminal defendants to dismiss the indictment for insufficient evidence. *See, e.g., Adan,* Dkt. No. 960 (denying motion to dismiss by Bashir Yasin Mohamud), attached as Exhibit C; *Adan,* Dkt. No. 1768 (denying motion to dismiss by Hamdi Osman; Abdullahi Afyare; Hassan Ahmed Dahir; and Haji Osman Salad), attached as Exhibit G. Second, despite accusations that Officer Weyker provided misleading testimony to the grand jury, the court still denied a motion by Plaintiff Mohammed Omar to be released from custody, finding that independent evidence supported his detention on sex-trafficking charges. *See* Ex. E at 3. Third, during trial, the district court rejected a motion to dismiss the charges related to Jane Doe Two. *See* Ex. J at PageID 14410. Fourth, after trial, the court denied motions for acquittal based on Jane Doe Two's age, finding that the jury could reasonably conclude she was underage at the time of the events. *See Adan*, 913 F. Supp. 2d at 563-564.

At a minimum, these rulings show that neither Officer Weyker nor Officer Bandemer violated any clearly established Fourth or Fifth Amendment right. The court could have—but did not—dismiss charges against any defendant based on alleged misconduct by them. *See Stewart*, 836 F.3d at 987. The Eighth Circuit has ruled that when a party loses a motion for judgment as a matter of law before trial, that party may not recover for malicious prosecution. *See Porous Media Corp.*, 186 F.3d at 1080–81.

In *Porous Media*, the plaintiff sought damages for malicious prosecution in a prior civil lawsuit. *See id.* In that previous lawsuit, the plaintiff moved for judgment

90

as a matter of law after the defendant finished its case in chief. The court denied the motion and allowed the case to go to the jury, which ruled for the plaintiff. *See id.* Notwithstanding that successful verdict, the Eighth Circuit held that the plaintiff could not sue for malicious prosecution because the trial court's denial of the motion for judgment as a matter of law "fatally undermines" the claim, as that ruling necessarily means that probable cause existed to bring the claim. *Id.* (citing cases where a loss of a summary judgment motion likewise precludes a subsequent malicious-prosecution claim). The same is true here, as the criminal court repeatedly refused to dismiss the charges in the indictment.

The trial court's criticisms of Officer Weyker do not affect the analysis. "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *See Hunter*, 502 U.S. at 229, 112 (quoting *Malley,* 475 U.S. at 343). Likewise, due process violations for police misconduct are available only for "truly egregious and extraordinary cases." *Lawrence*, 740 F. Supp. 2d at 1037. Police officers cannot be held personally liable "merely for aggressively investigating the crime, believing witnesses, following leads, and discounting those pieces of evidence that do not fit with the evidence at the scene of the crime." *Winslow*, 696 F.3d at 734. Only if officers recklessly ignored evidence of innocence or systematically pressured witnesses to manufacture false testimony will they lose qualified immunity. *See id.* Plaintiffs have not plausibly alleged any such conduct here, as evidenced by the trial court's rulings in the criminal proceedings.

91

## V.   PLAINTIFFS' STATE LAW MALICIOUS-PROSECUTION CLAIMS FAIL AS A MATTER OF LAW

All Plaintiffs except Yasin Farah and Ifrah Yassin assert malicious-prosecution claims against Officers Weyker or Bandemer under Minnesota law. The United States has separately filed a certification that Officers Weyker and Bandemer were acting within the scope of their federal employment at the time this tort allegedly occurred. Thus, by operation of law, the United States is now the sole defendant for Plaintiffs' state law malicious-prosecution claims. *See* 28 U.S.C. § 2679(b)(1). However, even if the United States' certification is rejected, Plaintiffs' state law malicious-prosecution claims fail as a matter of law.

To state a malicious-prosecution claim under Minnesota law, a criminal action must be (1) brought without probable cause or reasonable belief that the plaintiff would ultimately prevail on the merits; (2) instituted *and* prosecuted with malicious intent; and (3) terminated in the defendant's favor. *Dunham v. Roer*, 708 N.W.2d 552, 569 (Minn. Ct. App. 2006). Plaintiffs fail to establish the first two elements. First, Plaintiffs fail to establish that Officer Bandemer or Officer Weyker actually brought charges against them, much less without probable cause. In fact, it is undisputed that the criminal proceedings were instituted by federal prosecutors,

92

who obtained the indictments in which Plaintiffs were accused of sex trafficking.

Second, Plaintiffs do not allege that federal prosecutors acted with malice.[43]

In *Jacobson v. Mott*, Civ. No. 07-4420, 2009 WL 113379 (D. Minn. Jan. 16, 2009), a federal judge in this District rejected the argument that a malicious-prosecution claim can be asserted against a police officer based upon his alleged fabrication of evidence where there was no evidence that the prosecutor's independent judgment was overshadowed or that the prosecutor acted with malicious intent. *Id.* at *10-11; *see also id.* at *11 (noting that the plaintiff did not make the requisite showing that the suit in question was both initiated *and* prosecuted with malicious intent). The court observed that "while a law enforcement officer's statements to a prosecutor may certainly influence the direction of a case, such statements do not overshadow the independent judgment applied to criminal prosecutions by the prosecuting authority." *Id.* at *11; *see Dunham*, 708 N.W.2d at 570 (rejecting malicious-prosecution claim because plaintiff did not produce evidence that the prosecutor was controlled or otherwise failed to exercise independent discretion). Therefore, Plaintiffs have not stated a plausible claim for malicious prosecution under Minnesota law.

---

[43] In fact, the allegation that federal prosecutors were "beguiled" by Officers Bandemer and Weyker, *see, e.g.,* Afyare Compl. ¶ 46, (Omar) Liban Compl. ¶ 32, would undercut any allegation that prosecutors acted with malice.

## CONCLUSION

For the reasons stated above, this Court should dismiss all claims against

Defendants Weyker and Bandemer with prejudice.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

ANDREA W. McCARTHY
Senior Trial Counsel

*s/ Glenn S. Greene, Brant S. Levine, and David G. Cutler*
GLENN S. GREENE
District of Columbia Bar No. 450348
glenn.greene@usdoj.gov
Senior Trial Attorney

BRANT S. LEVINE
District of Columbia Bar No. 472970
brant.levine@usdoj.gov
Senior Trial Attorney

DAVID G. CUTLER
Illinois Bar No. 6303130
david.g.cutler@usdoj.gov
Trial Attorney

United States Department of Justice
Civil Division, Constitutional Torts Staff
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-4373 | Fax: (202) 616-4314

*Counsel for Defendants Weyker and Bandemer*

December 21, 2016