| | |
|---|---|
| Hamdi Ali Osman, | Civ. No. 16-cv-908 (JNE/TNL) |
| Plaintiff, | |
| v. | |
| Heather Weyker, in her individual capacity as a Saint Paul Police Officer, John Bandemer, in his individual and official capacities as a Saint Paul Police Sergeant, the City of Saint Paul, Robert Roes 1 – 3, in their individual capacities as Saint Paul Police Officers, and Robert Roes 4 – 6, in their individual and official capacities as supervisory members of the Saint Paul Police Department, | |
| Defendants, | |

| | |
|---|---|
| Abdifatah Basir Jama, | Civ. No. 16-1230 (JNE/TNL) |
| Plaintiff, | |
| v. | |
| Heather Weyker, et al., | |
| Defendants, | |

| | |
|---|---|
| Abdifitah Jama Adan, | Civ. No. 16-1235 (JNE/TNL) |
| Plaintiff, | |
| v. | |
| Heather Weyker, et al., | |
| Defendants, | |

Abdigadir Ahmed Khalif,                              Civ. No. 16-1237 (JNE/TNL)

      Plaintiff,

   v.

Heather Weyker, et al.,

      Defendants,

---

Musse Ahmed Ali,                                    Civ. No. 16-1241 (JNE/TNL)

      Plaintiff,

   v.

Heather Weyker, et al.,

      Defendants,

---

Haji Osman Salad,                                   Civ. No. 16-1242 (JNE/TNL)

      Plaintiff,

   v.

Heather Weyker, et al.,

      Defendants,

---

Abdifatah Sharif Omar,                              Civ. No. 16-1243 (JNE/TNL)

      Plaintiff,

   v.

Heather Weyker, et al.,

Defendants,

Abdirahman Abdirzak Hersi,                    Civ. No. 16-3714 (JNE/TNL)

      Plaintiff,

    v.

Heather Weyker, et al.,

      Defendants.

## The Osman Plaintiffs' Memorandum in Opposition to the Individual Defendants' Motion to Dismiss

## <u>Introduction</u>

The lawsuits before this Court seek to hold two Saint Paul police officers accountable for their brazen attempts to frame nearly thirty men and women for sex trafficking, almost all of whom are Somali refugees. The Defendants' methods were unsound and their motives corrupt. After the prosecutions collapsed from the sheer weight of the Defendants' mendacity, the Sixth Circuit (stating the obvious) concluded that the alleged sex trafficking ring at issue in this case "is likely a fictitious story." *U.S. v. Fahra*, 643 Fed. Appx. 480, 484 (6th Cir. 2016).

For their Complaints, the Osman Plaintiffs allege in more than sufficient detail that Defendant Heather Weyker ("Weyker") is primarily responsible for concocting this phony story through a host of misconduct, including by fabricating evidence. Defendant John Bandemer ("Bandemer") is culpable as well, particularly for his unlawful failure to properly supervise Weyker's conduct, despite having knowledge of her wrongdoing. As

a result, the Osman Plaintiffs spent years in various forms of federal custody.  If such conduct does not shock the conscience, almost nothing can.  The clearly established right of freedom from arbitrary and capricious imprisonment and perversion of the legal process are amongst the oldest in our land:

> The origin of the Due Process Clause is Chapter 39 of Magna Carta which declares that 'No free man shall be taken, outlawed, banished, or in any way destroyed, nor will We proceed against or prosecute him, except by the lawful judgment of his peers and by the law of the land.' … As early as 1354 the words 'due process of law' were used in an English statute interpreting Magna Carta, and by the end of the 14th century 'due process of law' and 'law of the land' were interchangeable.

*Duncan v. State of La.*, 391 U.S. 145, 169 (1968).

In their Memorandum in Support of Motion to Dismiss, Weyker and Bandemer have created a jurisdictional Rube Goldberg machine for this Court to process their legal technicalities, rather than address the simple and cohesive whole of the Osman Plaintiffs' allegations – Weyker fabricated evidence to create the false pretense of probable cause for what was actually a non-existent child sex-trafficking conspiracy, and Bandemer helped and/allowed her do it, with knowledge of her wrongdoing.  The Osman Plaintiffs' primary allegation is that this conduct violates their Fourteenth Amendment rights and is actionable pursuant to 42 U.S.C. § 1983.  In order for the Court to deny Weyker's motion to dismiss this claim, the Court need only make these core findings:

1. It was clearly established at all times material hereto that a police officer's fabrication of evidence to create the false pretense of probable cause was an actionable substantive due process violation under the Fourteenth Amendment;

2. It is plausible that Weyker fabricated evidence to create the false pretense of probable cause as to this non-existent sex trafficking conspiracy; and

3.   It is plausible that Weyker fabricated at least some of this evidence prior to her federal deputation in August 2010, or otherwise within the scope of her duties as a Saint Paul Police Officer.

In order for the Court to deny Bandemer's motion to dismiss on the supervisory liability claim, the Court need only make similar findings:

1.   It was clearly established at all times material hereto that a police officer's fabrication of evidence to create the false pretense of probable cause was an actionable substantive due process violation under the Fourteenth Amendment;

2.   It is plausible that Bandemer, as Weyker's supervisor, knew that Weyker was fabricating evidence to create the false pretense of probable cause as to this non-existent sex trafficking conspiracy, Bandemer had the ability to stop her, and with deliberate indifference he either failed to do so or tacitly authorized Weyker's offensive acts; and

3.   It is plausible that Bandemer failed to intervene at times prior to his deputation, or otherwise within the scope of his duties as a Saint Paul Police Sergeant, despite his deputation.

The Osman Plaintiffs have alleged, either in the alternative or in addition to their Fourteenth Amendment claims, that Weyker and Bandemer are similarly liable under the Fourth Amendment (via Section 1983) for the same conduct. As discussed below, the Osman Plaintiffs maintain that that the Fourteenth Amendment is the proper Amendment to protect against this type of evidence fabrication and reckless investigation. Should the Court employ the Fourth Amendment, the analysis remains the same. Indeed, under either the Fourteenth or the Fourth Amendment, no reasonable officer could state that they did not have fair warning that fabricating evidence to create the pretense of probable cause was unconstitutional.

The Osman Plaintiffs have also alleged, either in the alternative or in addition to their Section 1983 claims, that Weyker can also be held liable under the federal common law *Bivens* doctrine for her violations of the Fifth and Fourth Amendments. To find these allegations plausible, the Court would need to make the same three findings as discussed above on Section 1983, except find that it is plausible Weyker was acting, at least at times, under color of federal rather than state law. Given the Osman Plaintiffs' allegations and the record before the Court, it is plausible that Weyker worked under color of both state and federal law at various times to be further defined during discovery.[1]

At this stage in the pleadings: (1) all inferences are taken in the Osman Plaintiffs' favor; (2) the Court is to look at the allegations as a whole; and (3) the Court is to employ its experience and common sense. Here, the Court need look no further than the strongly worded Sixth Circuit opinion to give plausibility to the Osman Plaintiffs' claims. Not only did the District Court condemn Weyker's conduct, but the Sixth Circuit Court of Appeals did as well. Such strident condemnation of the acts of a law enforcement officer by the federal bench is exceedingly rare. A prosecuted federal conspiracy case is not commonly or lightly coined "fictitious" by a panel of federal judges. Yet, the Osman Plaintiffs have pleaded additional facts beyond the District Court's Order and the Sixth Circuit's opinion that further strengthen their claims.

---

[1] The Osman Plaintiffs seek—simultaneously with this motion—to amend their pleadings withdraw their state law malicious prosecution and failure to intervene claims. Plaintiffs Jama, Hersi, and Ali also withdraw their claims under *Brady* and the Sixth Amendment in their proposed amendments.

Defendants assert that this lawsuit is nothing more than an attempt to challenge the decision to prosecute. The Osman Plaintiffs have made no such claims. This is a case of "garbage-in-garbage-out." Here, the actionable conduct, *i.e.,* the garbage-in, is the fabricated evidence created by Weyker and handed to federal prosecutors at the investigative stages of this alleged conspiracy case. That is the wrongdoing that is at the crux of this litigation and must be further explored in discovery. Respectfully, the Individual Defendants' motion to dismiss must be denied.

## Table of Contents

Introduction…………………………………………………………………………..3

Facts………………………………………………………………………………….9

    A.    Weyker Fabricates a Child Sex Trafficking Ring……………...………...9

    B.    The First Group of Alleged Conspirators Proceed to Trial and Weyker is Exposed……………………………………………..…14

    C.    Bandemer's Indifference to Weyker's Unlawful Conduct……………...16

Standard of Review…………………………………………………………………17

Argument…………………………………………………………………………...18

    A.    Plaintiffs have Stated Valid Section 1983 Claims Against Weyker and Bandemer………………………………………………………………18

        1.    Color of state law…………………………………………………19

            a.    The relevant temporal inquiry is when the wrongful act occurred, not when a plaintiff experienced damages………20

            b.    Fact questions exist as to whether Weyker and Bandemer were working within the scope of their state or federal capacities…………………………………………………...22

      c.     Federal actors can also be held liable under Section 1983 when they engage in joint activity with state actors...........27

  2.    Constitutional violations……………………………………………...29

      a.     Fourteenth Amendment violation for fabrication of evidence……………………………………………………29

      b.     Fourth Amendment violation for fabrication of evidence....32

  3.    Weyker and Bandemer are not entitled to qualified immunity on Plaintiffs' Section 1983 claims……………………………………35

B.    The Osman Plaintiffs have Alleged Plausible *Bivens* Claims……………39

  1.    The Osman Plaintiffs do not allege a new context for *Bivens*……..40

  2.    Even if this is a new context for *Bivens*, there is no adequate alternative remedial scheme for compensating Plaintiffs…………43

      a.     The Federal Rules of Criminal Procedure, Section 2255, and the criminal trial are not 'remedial -schemes' sufficient to defeat a *Bivens* remedy to vindicate and compensate the violation of constitutional rights……………………………45

      b.     The possibility of a motion for attorneys' fees and litigation expenses has no bearing on this matter……………………47

      c.     The Unjust Conviction and Imprisonment Act has no bearing on this matter because it applies only to convictions………48

      d.     Defendants' reliance on *Vennes* is misplaced and misleading…………………………………………………49

      e.     Defendants' reliance on immigration cases and habeas relief is misplaced and misleading………………………………..50

  3.    There are no special factors in the context counseling against applying *Bivens* to federal agents who fabricate evidence………...54

C.     No Osman Plaintiff has Asserted Claims Based Solely on Grand Jury (or Trial) Testimony; therefore, No Claim should be Dismissed under the Doctrine Absolute Immunity……………………………………………...56

D.     The *Parratt/Hudson* Doctrine is Inapposite………………………………57

E.     Section F of Weyker and Bandemer's Memorandum is Nothing More than a Thinly-Veiled Attempt to Undermine the Pleading Standard…………...59

F.     The Osman Plaintiffs' Amended Complaints……………………………..61

Conclusion…………………………………………………………………………………62

## Facts

## A.     Weyker Fabricates a Child Sex Trafficking Ring

On October 20, 2010, an Indictment was filed under seal in the Middle District of Tennessee against twenty-nine men and women, who were virtually all Somali immigrants and refugees.[2]  The Indictment alleged that nearly all of the men and women were engaged in a vast conspiracy to recruit and transport minors for the purpose of engaging in commercial sexual acts.[3]  Despite allegations of other crimes within the Indictment, the sex trafficking conspiracy allegation was the marquee charge.[4]  The

---

[2] *Osman v. Weyker*, Case No. 16-cv-00908, ECF Doc. No. 13, Osman First Amended Complaint ("Osman FAC") ¶ 20.  This memorandum primarily cites to the Osman FAC; however, the core allegations are uniform throughout the Osman Plaintiffs' respective Complaints.  Specific allegations pertaining to individual Osman Plaintiffs, that might be unique to one or some of the Plaintiffs, are noted herein.

[3] *Id.*

[4] *See, e.g.,* Mara H. Gottfried, *29 Charged in bust of sex slave ring tied to 3 Minneapolis gangs*, Pioneer Press, at http://www.twincities.com/2010/11/08/29-charged-in-bust-of-sex-slave-ring-tied-to-3-minneapolis-gangs/ (Nov. 8, 2010) (last accessed, February 14, 2017).

Indictment alleged that these acts of sex trafficking occurred over a ten-year period from January 2000 through July 2010.[5]

The investigation into this supposed sex trafficking ring commenced at some point in 2008, and Weyker and Bandemer were involved in the investigation since its beginning.[6] Weyker was the lead Saint Paul Police investigator investigating the alleged ring.[7] Weyker knew that no sex trafficking conspiracy existed.[8] Nevertheless, Weyker engaged in a number of unconscionable acts to create the false pretense of probable cause, including: (1) supplying fabricated evidence to federal prosecutors;[9] (2) fabricating or endorsing documents fabricating the ages of alleged victims to make them appear as though they were minors, when Weyker knew they were not;[10] (3) fabricating the existence of a sweeping criminal enterprise that did not exist;[11] and (4) fabricating police reports with allegations of coercive sexual conduct and commercial sex trafficking of minors, when it was known to Weyker that these acts had not taken place.[12]

More specific allegations of fabrications pleaded by the Osman Plaintiffs include:

- Weyker knowingly and intentionally manipulated, defrauded, threatened, coerced, and pressured Jane Doe Three into fabricating evidence and

---

[5] *U.S. v. Adan*, Case No. 3:10-00260, ECF Doc. No. 3 (M.D. Tenn. Oct. 20, 2010).

[6] *Id.* at ECF Doc. No. 1962 (filed Mar. 14, 2012, Weyker Grand Jury Testimony at 167 ¶ 11; *see also supra* n.3 ("St. Paul police began the investigation in 2008, with the department's Gerald D. Vick Human Trafficking Task Force leading the investigation, [St. Paul Police Chief Thomas] Smith said.

[7] Osman FAC ¶ 19.

[8] *Id.* ¶

[9] *Id.* ¶ 29.

[10] *Id.* ¶ 30.

[11] *Id.* ¶ 25.

[12] *Id.* ¶¶ 31, 35.

testimony that her visit to Nashville was solicited by Osman for the purpose of commercial sex. This was demonstrably false, and Weyker knew it.[13]

- Weyker solicited patently and knowingly false statements from Jane Doe Five, a person known to be unstable and unbelievable, to falsely implicate Somalis living in Nashville of sex trafficking, including Adan.[14]

- Weyker solicited patently and knowingly false statements—in April 2009—from Jane Doe Two, particularly by soliciting statements from her that she was kidnapped by the alleged co-conspirators, when in fact Jane Doe Two voluntarily went on this April 2009 road trip to Nashville. Weyker proceeded to use and expand this fabrication to rope in a number of innocent victims.[15]

- Weyker intentionally participated in the fabrication of Jane Doe Two's age.[16] The FBI found that Jane Doe Two's birth certificate, which Weyker endorsed the validity of over and over, was a forgery.[17]

- Weyker sought retribution against innocent parties, such as Plaintiff Jama, for refusing to assist her in the fabrication of evidence.[18]

- Several Osman Plaintiffs, such as Ali, A. Omar, and Hersi had never even met - much less conspired to traffic - the Jane Doe(s) they were alleged to have trafficked, yet Weyker fabricated evidence to the contrary.[19]

- Many Osman Plaintiffs, including Osman herself, were indicted on other charges as well, such as obstruction or witness tampering, with no overt acts or other alleged facts to support those charges.[20] However, because Weyker had fabricated a non-existent, over-arching conspiracy of which Osman was allegedly a participant, many Osman Plaintiffs were similarly

---

[13] *Id.* ¶ 36.
[14] *Adan v. Weyker*, Case No. 16-cv-01235, ECF Doc. No. 1, Complaint ¶¶ 21-23.
[15] *Ali v. Weyker*, Case No. 16-cv-01241, ECF Doc. No. 1, Complaint ¶¶ 19-27; *Omar v. Weyker*, Case No. 16-cv-01243, ECF Doc. No. 1, Complaint ¶¶ 21-26; *Salad v. Weyker*, Case No. 16-cv-01242, Complaint ¶¶ 19-30; *Hersi v. Weyker*, Case No. 16-cv-03714, ECF Doc. No. 1 ¶¶ 11-28.
[16] *Jama v. Weyker*, Case No. 16-cv-01230, ECF Doc. No. 1, Complaint ¶¶
[17] *Fahra*, 643 Fed. Appx. at 482.
[18] *Id.* at ¶ 12.
[19] Ali Comp. at ¶ 15; Omar Comp. at ¶ 13; Hersi Comp. at ¶¶ 34-39, 50-51.
[20] *See e.g. U.S. v. Adan*, Case No. 3:10-00260, ECF Doc. No. 3 (M.D. Tenn. Oct. 20, 2010).

indicted on many such fabricated counts with no factual support whatsoever.

- All of the Osman Plaintiffs suffered severe harm to their reputation in the community as a result of the fabrications, and as a result were either unable to return home afterwards because they had been branded as child molesters or sex traffickers, or struggled to reintegrate and begin re-establishing their standing in their communities.[21]

Other Plaintiffs in this case have alleged additional specific allegations of fabrications, including a conversation where Weyker attempted to coerce a Jane Doe into maintaining fabricated testimony:

Weyker:      Well, because, because [Jane Doe] when we met with you, I mean, it's...it's not..."

Jane Doe:    Well, yeah I know, I know, when you met with me but I was perhaps just trying to get the interest of you guys trying to help me get a house that's about it."

Jane Doe:    You guys got it all wrong. I told you guys that I was forced to say all this.

Weyker:      You what, that's OK because I know that it happened.

Jane Doe:    You guys should just stop people from making...from trying to make other people do false statements.

Weyker:      But you know what, I don't think you're making a false statement.

Jane Doe:    I am.

Weyker:      No.

Weyker:      But OK [Jane Doe], [Jane Doe], think about when you were here in Nashville, OK, and what you told us happened.

---

[21] *See e.g.* Adan Comp. at ¶ 63.

Jane Doe:     No. It doesn't. No. No. No. No. I told you guys that because I wanted to get some profit out of it because my uncle told me that [unintelligible] gonna get some profit out of it."[22]

The Osman Plaintiffs' Complaints make it clear that Weyker engaged in these and other fabrications of evidence **before** providing the fabricated evidence to federal prosecutors and seeking the involvement of the US Attorney's Office in Tennessee.[23]   Indeed, Weyker was not even federally deputized until August 24, 2010, a mere two months before the Indictment was filed, which means she was operating **solely** as a Saint Paul Police Officer for the overwhelming majority of the investigative stage.[24]  As noted by Chief Judge Haynes, most of the "critical documents" Weyker created, many of them containing fabricated evidence, "existed well before [the Indictment] was filed."[25]  In addition to Weyker's fabrications made during the investigatory stage, Weyker continued to provide fabricated, misleading, and perjurious testimony to the grand jury and during detention hearings.[26]

   After the Indictment was unsealed, nearly all of the alleged conspirators were arrested on November 8, 2010.[27]  The Osman Plaintiffs were subsequently detained in various forms of federal custody, from home detention to electronic monitoring, over a

---

[22] *See Fahra v. Weyker*, Case No. 16-cv-01146, ECF Doc. No. 1 ¶ 28.
[23] Osman FAC at ¶¶ 29, 30.
[24] *See Adan v. Weyker*, ECF Doc. No. 33-1 at *30 of 31, Declaration of Mark Shafer at Ex. A, Special Weyker Deputation Appointment ("Weyker Deputation").
[25] *Adan*, 913 F. Supp. 2d at 589.
[26] Osman FAC ¶ 45.
[27] *See, e.g.,* Osman FAC ¶ 20.

period of time ranging between two and five years.[28]  Several of the Osman Plaintiffs

were forced to spend their in-custody time in county jail facilities, which allowed virtual

no vocational or educational opportunities or other "amenities" associated with long-term

prison settings.[29]

**B.** **The First Group of Alleged Conspirators Proceed to Trial and Weyker is Exposed.**

The AUSA for the Middle District of Tennessee proceeded with the phony case

handed to him by Weyker.  By February 12, 2012, the District Court Judge began

publicly expressing serious concerns about the truthfulness of Weyker's testimony to the

Grand Jury.[30]  The Government proceeded with trial in March 2012 against nine of the

alleged conspirators, some of whom were Osman Plaintiffs.[31]  Despite being the lead

investigator, Weyker was so discredited by March 2012 that she did not even testify at

the trial.[32]  The jury acquitted six of the alleged conspirators of all charges.[33]  The

remaining three defendants were all acquitted by the district court on post-trial motions.[34]

---

[28] *See, e.g., id.* ¶¶ 59 – 61 (over 3 years in jails and remaining time on EHM); Salad Compl. ¶ 64 – 66 (over 4 years in jails and remaining time on EHM).
[29] *Id.*
[30] Osman FAC ¶ 48 (citing *United States v. Mohamud*, No. 3:10-cr-260, 2013 WL 1935506, at *11 n.6 (M.D. Tenn. May 9, 2013); *United States v. Adan*, No. 3:10-cr-260, at ECF No. 1392).
[31] Osman FAC ¶ 42; Ali Comp. at ¶ 48; Jama Comp. at ¶ 46; Hersi Comp. at  ¶ 69; *Fahra*, 643 Fed. Appx. at 483.
[32] *See Mohamud*, 2013 WL 1935506, at *11 n.6.
[33] Osman FAC ¶ 43; *Fahra*, 643 Fed. Appx. at 488.
[34] *Fahra*, 643 Fed. Appx. at 488; Osman FAC ¶ 44 (citing *U.S. v. Adan et al.,* File No. 10-CR-260, Doc. No. 2958 (M.D. Tenn. 2012).

The post-trial acquittal was appealed to the Sixth Circuit, while many of the alleged conspirators remained in pre-trial detention.[35] In affirming the trial court's post-trial acquittals, the Sixth Circuit expressed its "acute concern, based on [its] painstaking review of the record, that this story of sex trafficking and prostitution may be fictitious…" and that, because "all nine defendants were acquitted of all charges (six by the jury and three by the court), we merely recognize that we start our analysis from what is likely a fictitious story."[36] The Sixth Circuit expressed particular concern with Weyker's conduct:

- "The district court opined that Officer Weyker likely exaggerated or fabricated important aspects of this story, noting (among other inconsistencies) that Weyker's final reports frequently referred to sex for money while that assertion was conspicuously absent from her handwritten notes, appearing only once in all of those rough notes."

- "And Jane Doe 2 herself furthered the district court's suspicion when she testified on cross examination that Weyker had misstated facts in the reports, adding to and omitting things from her statements."

- "Elsewhere, the district court caught Weyker lying to the grand jury and, later, lying during a detention hearing, and scolded her for it on the record."

- "The defense has since pointed out that Weyker also lied on an application to get Jane Doe 2's family some $3,000 from the Tennessee victim's compensation fund, by claiming "abduction" (Jane Doe 2 flatly denied an abduction) and endorsing the validity of the forged birth certificate."[37]

The Sixth Circuit also found it "curious that even though Officer Weyker (the lead agent), Jane Doe 2 (the principal victim-witness), and all but a few of the 30 defendants reside in Minnesota, and an overwhelming portion of the events at issue occurred in

---

[35] *See Fahra*, 643 Fed. Appx. 480; Osman FAC ¶ 44.
[36] *Fahra*, 643 Fed. Appx. at 484.
[37] *Id.* at 482.

Minnesota, the federal prosecutor in Minnesota did not prosecute this case in Minnesota."[38]  In fact, the U.S. Attorney in Minnesota had previously reviewed the case, and correctly declined to prosecute it.[39]  Thus, Weyker added more fabricated evidence and took the case to the AUSA in Tennessee.[40]

Following the Sixth Circuit's 2016 affirmance of the trial court's acquittal, all federal charges against the remaining alleged co-conspirators were dismissed.[41]  Shortly thereafter, the remaining Osman Plaintiffs were finally released from custody.

## C.    Bandemer's Indifference to Weyker's Unlawful Conduct

Defendant Saint Paul Police Sergeant John Bandemer ("Bandemer") was the lead sergeant for Saint Paul Police Department's Vice Unit and was Weyker's supervisor throughout this investigation.[42]  Bandemer, like Weyker, knew that no overarching conspiracy to traffic minors existed.[43]  Bandemer also knew that several of the alleged victims were not minors.[44]  Moreover, Bandemer failed to properly supervise much of Weyker's work, including proper supervision over her report writing.[45]  Bandemer and other Saint Paul supervisors had actual notice of Weyker's unlawful conduct, from Judge Haynes' public opinions; however, they failed to intervene and allowed several of the

---

[38] *Id.* at 482.
[39] Osman FAC ¶ 46.
[40] *Id.*
[41] *Id.* ¶ 57.  This underscores how the fabricated child sex trafficking charges were the bedrock of this phony conspiracy, as charges were dropped against all of the remaining criminal defendants—including those not even charged with sex trafficking (e.g., Plaintiff Khalif).
[42] *Id.* ¶¶ 1, 7, and 27.
[43] *Id.* ¶ 20.
[44] *Id.* ¶ 30.
[45] *Id.* ¶ 40.

alleged conspirators, such as Osman and Salad, to remain wrongfully imprisoned for nearly four additional years, while many others remained in various other forms of detention.[46]

## Standard of Review

In analyzing a Rule 12(b)(6) motion, the Court must "accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party." *Haney v. Portfolio Recovery Assocs., L.L.C.,* 837 F.3d 918, 924 (8th Cir. 2016*), as amended* (Dec. 27, 2016) (internal quotes and quotation omitted). A reviewing court must ask itself if the claim is merely "plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court "assesses plausibility by drawing on [its] own judicial experience and common sense." *Haney*, 2016 WL 5112026, at *4 (internal quotes and quotation omitted). A court examines "'the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010)).

A district court's analysis of a 12(b)(6) motion is "'not strictly limited to the four corners of complaints.'" *Seneca Companies, Inc. v. Becker*, 134 F. Supp.3d 1148, 1151 (S.D. Iowa 2015) (quoting *Dittmer Props., L.P. v. F.D.I.C.*, 708 F.3d 1011, 1021 (8th Cir. 2013)). The Eighth Circuit holds that:

> while courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider matters incorporated by reference or integral to the claim, items

---

[46] *Id.* ¶ 41.

> subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; without converting the motion into one for summary judgment.

*Id.* (citation omitted). A district court can consider additional matters wholly outside the pleadings and convert a Rule 12(b)(6) motion into a motion for summary judgment, but the court must first give the parties notice of the conversion and the opportunity to present additional materials. *McDonald Construction, Inc. v. Oborn*, No. 15-cv-3126, 2016 WL 3232899, at *1 (D. Minn. May 19, 2016) (citing Fed. R. Civ. P. 12(d)). However, even if materials are submitted, the court can make it clear that the materials were not considered and that the court ruled in accordance with Rule 12(b)(6). *Seneca Companies, Inc.*, 134 F. Supp.3d at 1151 (citing *Skyberg v. United Food and Commercial Workers Int'l Union*, 5 F.3d 297, 302 n.2 (8th Cir. 1993) (additional citation omitted)).

## Argument

### A. Plaintiffs have Stated Valid Section 1983 Claims Against Weyker and Bandemer.

Plaintiffs allege causes of action against both Weyker and Bandemer pursuant to 42 U.S.C. § 1983. 42 U.S.C. § 1983 provides a private right of action for violations of federal law by state actors. "The essential elements of a constitutional claim under § 1983 are (1) that the defendant acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *L.L. Nelson Enterprises, Inc. v. County of St. Louis, Mo.*, 673 F.3d 799, 805 (8th Cir. 2012) (citation omitted). In this case, Plaintiffs have plausibly alleged that Defendants Weyker

and Bandemer were acting under color of state law at the time they violated Plaintiffs' rights secured by the United States Constitution.

## 1.    Color of state law

Section 1983's under-color-of-state-law element, like the Fourteenth Amendment's state-action requirement, is intended to "exclude from its reach merely private conduct, no matter how discriminatory or wrongful." *American Manufacturers Mutual Insurance Company v. Sullivan*, 526 U.S. 40, 50 (1999).  This element is satisfied against those "who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it."  *Monroe v. Pape*, 365 U.S. 167, 172 (1961) overturned on other grounds by *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978); *see also Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion) ("Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it.").  Like purely private actors, individuals acting under color of federal law do not fall within the grasp of Section 1983.  *See Haley v. Walker*, 751 F.2d 284, 285 (1984) (citing *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 398 n.1 (1971)).

Defendants argue that the Plaintiffs fail to state a claim that Weyker or Bandemer acted under of color of state law because: (1) Weyker was federally deputized on August 24, 2010; (2) Bandemer was federally deputized on May 30, 2008; (3) all relevant acts taken by Weyker and Bandemer after their respective deputation were taken under federal not state law; and (4) Weyker and Bandemer are not liable for any actions taken prior to deputation because Plaintiffs experienced no harm until they were indicted in October

2010, *i.e.,* after both Weyker and Bandemer were deputized. Their argument is misguided for several reasons.

      a.      **The relevant temporal inquiry is when the wrongful act occurred, not when a plaintiff experienced damages.**

Accepting Weyker and Bandemer's deputation-timing as true, the Osman Plaintiffs have plausibly alleged that the overwhelming majority of Weyker's wrongful conduct occurred **prior** to her deputation. Weyker's counsel understands this, which is why they have concocted an argument—with zero supporting legal authority—that a wrongdoer does not act under color of state law for purposes of Section 1983 if they commit the wrong while acting under color of state law but the victim suffers damages from that wrongful act at some later point in the future when the wrongdoer is no longer acting under color of state law. This argument is too clever by half, and Defendants cite no case in any jurisdiction holding that a state actor later deputized as a federal agent cannot be sued under Section 1983 for tortious acts committed **before** the deputation.

It is well established that the critical inquiry is whether the actor was acting under color of state law at the time of the wrongdoing. *See, e.g., Lee ex rel. Lee v. Borders*, 764 F.3d 966, 971 (8th Cir. 2014) ("Sexual abuse by a state official may constitute a violation of the substantive due process right to bodily integrity, provided the state official was acting under color of state law **at the time of the abuse."** (citing *Rogers v. City of Little Rock*, 152 F.3d 790, 795-96 (8th Cir. 1998) (emphasis added)); *see also Hayut v. State University of New York*, 352 F.3d 733, 744 (2d Cir. 2003) (plaintiff must show defendant "was acting 'under color of state law' **at the time he committed the conduct**

**complained of**…") (emphasis added and citation omitted); *Monistere v. City of Memphis*, 115 Fed. Appx. 845, 850 (6th Cir. 2004) (was plaintiff deprived of rights "by a person who was acting under the color of state law **at the time of the offending conduct**.") (emphasis added and citation omitted).

There is no dispute that Weyker acted within the course and scope of her duties as a Saint Paul police officer from the beginning of the investigation in 2008 until her deputation in late-August 2010. At this stage of the proceedings, the Osman Plaintiffs have plausibly alleged and it is presumed as true that Weyker engaged in a reckless or malicious investigation, coerced witnesses, ignored and suppressed myriad exculpatory evidence, and fabricated evidence while acting under color of state law, prior to her deputation. Weyker cannot escape this actionable conduct through a subsequent deputation. Indeed, the very cases cited by Weyker and Bandemer undermine this absurd proposition. *See Harris v. Gadd*, No. 4:06CV01510 SWW, 2008 WL 176384, at *3 (E.D. Ark. Jan. 16, 2008) (plaintiff failed to state 1983 claim because the agents "were acting within scope of their employment as *federal* agents **at all times during the alleged incidents.**") (italics in original, bold added).

Weyker's and Bandemer's proposed rule would lead to absurd results. For example, a doctor works at a state penitentiary on a Friday, and is deliberately indifferent to a prisoner's medical needs by withholding necessary medication. On Monday, the doctor commences work for a federal agency and becomes a federal actor. On Tuesday, the prisoner has a sudden aneurysm from the lack of medication—the first onset of any sign or symptom. Under Weyker's and Bandemer's statement of the law, the deliberately

indifferent doctor could not be liable under Section 1983 for her actions under color of state law because she became a federal actor before the claim accrued. This absurd result the law does not countenance.

The inverse of this scenario is even more laughable. The doctor is deliberately indifferent to a federal prisoner at her federal place of employment on a Friday, and on Monday she commences working at a state agency. The federal prisoner succumbs to the aneurysm on Tuesday. Of course, no Court would entertain a Section 1983 claim against the wrongdoing doctor because of that doctor's subsequent change of job status.

In sum, all of the wrongful actions Weyker took prior to her deputation were under color of state law, and she is therefore liable under Section 1983 for her actions at that time that later caused the violations of the Osman Plaintiffs' rights. This analysis alone carries the day on 'color of law' for the Osman Plaintiffs, but there are several other, independent legal bases that belie the individual Defendants' attempts to avoid Section 1983 liability by painting themselves as solely federal actors at all times.

> **b.  Fact questions exist as to whether Weyker and Bandemer were working within the scope of their state or federal capacities.**

The Supreme Court recognized in *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 296 (2001), that the question of state action is a **factual** inquiry. ("Our cases have identified a host of **facts** that can bear on the fairness of such an attribution.") (emphasis added). *See also Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007) ("Our ultimate conclusion must turn on the particular facts of the case, since '[o]nly by **sifting facts and weighing circumstances** can the

nonobvious involvement of the State in private conduct[47] be attributed its true

significance.'") (emphasis added) (quoting *Burton v. Wilmington Parking Authority*, 365

U.S. 715, 726 (1961)); *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982)

(state-action determination is a "necessarily fact-bound inquiry"); *Moonblatt v. District of

Columbia*, 572 F. Supp. 2d 15, 22 (D.C. Cir. 2008) (recognizing that the state action

inquiry "requires examining the totality of the circumstances … the true nature of the

State's involvement may not be immediately obvious, and detailed inquiry may be

required.") (internal quotes and citation omitted).

Weyker and Bandemer argue and ask this Court to accept that they acted within

the scope of their federal capacities after their deputation.  However, their federal

deputation does not rule out that they were, at times, working wholly or concurrently in

their capacities as a Saint Paul police officer and sergeant, respectively.  While Weyker

and Bandemer may be entitled to certain presumptions for purposes of the FTCA under

28 U.S.C. § 2679, Defendants cite no case law holding that a certification under Section

2679 has any bearing on a Section 1983 action.  Indeed, the plain language of Section

2679 reflects no applicability to Section 1983, and no deference should be given.  *See

Anderson v. Government of the Virgin Islands*, 199 F. Supp. 2d 269, 275 (D.V.I. 2002)

("The FTCA does not apply to claims alleging constitutional violations.") (citing 28

U.S.C. § 2679(b)(2).  Even under the FTCA, the Westfall Act does not make "the

Attorney General's delegate the final arbiter of 'scope-of-employment'" – "the Attorney

---

[47] While this case does not address private actors, the logic relating to private actors
extends to federal actors as discussed in the following subsection.

General's scarcely disinterested certification on that matter is by statute made the first, but not the final word." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 425, 432 (1995).

Consistent with the Court's reasoning in *Brentwood*, a close, factual analysis is necessary when an actor's employment has characteristics of working under both federal and state law. *See, e.g., Johnson v. Orr*, 780 F.2d 386, 390 (3d Cir. 1986) (citations omitted) ("All of the circumstances must be examined to consider whether the actions complained of were sufficiently linked to the state."); *see also Guzman v. United States*, No. 11 Civ. 5834, 2013 WL 543343, at *10 (S.D.N.Y. Feb. 14, 2013) (order modified on other grounds) (at motion to dismiss stage, the "Court cannot definitely determine that [the deputized state police officers] were not acting in the scope of their employment as City, as well as Federal, officers.").

Regardless of Weyker's and Bandemer's[48] deputation, the Section 1983 claims against them both remain plausible because only discovery can reveal whether they were working, at least at times, wholly under state law or concurrently under state and federal law. Indeed, Courts have recognized that concurrent employment is sufficient to establish a Section 1983 claim. *See Anderson*, 199 F. Supp. 2d at 275 ("Whether Davila was a federal employee acting within the scope of his federal employment, he was clearly acting under the color of Virgin Islands law as Commissioner when the alleged acts were

---

[48] The Court should also note that regardless of Bandemer's alleged deputation in 2008, factual questions persist related to whether Bandemer was **supervising** Weyker in his role as a federal agent or Saint Paul police sergeant, because he remained the supervising Sergeant of the Saint Paul Vice Unit.

committed.  Accordingly, I find that Anderson's section 1983 claim may proceed against Davila individually."); *see also Hayden v. Broward County*, Case No. 12-62278, 2013 WL 4786486, at *4 n.5 (S.D. Fla. Sept. 6, 2013) ("to the extent that Plaintiff's other claims are based on a dual-employment argument, the certification of federal employment does not necessarily preclude *concurrent* state employment.") (emphasis in original) (citing *Guzman*, 2013 WL 543343, at *10).

The Osman Plaintiffs' claims differ from the allegations in *Harris,* 2008 WL 176384, at 3 n.7, where the plaintiff sought, under Section 1983, "relief for conduct committed by defendants while acting under the color of their authority as federal officers."  Indeed, the Osman Plaintiffs make it clear that their allegations under Section 1983 are for violations under color of state law.  In *Petty v. United States*, 80 Fed. Appx. 986, 989 (6th Cir. 2003), the Sixth Circuit found—with respect to the FTCA not Section 1983—that a deputized officer acted under federal law.  Importantly, however, that case was decided after discovery on summary judgment, so the Court could conclusively find that the officer "was acting within the scope of his employment when he" committed the alleged wrongdoing.  *Id.* at 989.  Additionally, the motion brought in *Ellis v. Ficano*, 73 F.3d 361, 1995 WL 764127, at *6 (6th Cir. 1995), was to dismiss and for summary judgment, and it cannot be discerned what facts the Court relied upon in determining that the officers were federal and not state actors at the time of the alleged wrongdoing.  Therefore, these non-binding, inapposite cases do little to undercut the axiomatic principle that fact questions remain on this issue, and cannot be resolved at this stage of the case.

The need to weigh the specific facts and circumstances surrounding the scope of Weyker's and Bandemer's employment in light of their actions is consistent with general principles of agency. *See Felder v. Casey*, 487 U.S. 131, 139 (1988) ("…because federal civil rights laws fail to provide certain rules of decision thought essential to the orderly adjudication of rights, courts are occasionally called upon to borrow state law."); *see also Anderson*, 199 F. Supp. 2d at 276 (analyzing Virgin Islands and Restatement agency principles to determine whether state commissioner was working within scope of federal agency); *Guzman,* 2013 WL 543343, at *9-10 (analyzing New York and Restatement agency principles to determine whether state officers were acting within scope of federal or state law). The Minnesota Supreme Court, like other jurisdictions, has long recognized that the existence of an agency relationship is generally a question of fact. *Vacura v. Haar's Equipment, Inc.* 364 N.W.2d 387, 391 (Minn. 1985) ("We have frequently held that the existence of an agency relationship is a question of fact.").

Furthermore, although Bandemer may have been deputized for certain investigative actions, he remained a Sergeant in the SPPD chain of command, and supervisor of the VICE Unit, of which Weyker was a member. Therefore, even after his deputation in 2008, he still acted (or failed to act) under color of state law insofar as he was a supervisor of the VICE Unit at SPPD. Thus, whether Weyker and Bandemer were working under color of federal or state law, or at times both, is a question of fact, if not for the jury, at least in need of further discovery. Accordingly, Plaintiffs have plausibly alleged at this stage of the proceedings that Weyker and Bandemer acted under color of state law at the time of their alleged wrongdoings.

c. **Federal actors can also be held liable under Section 1983 when they engage in joint activity with state actors.**

The record before the Court suggests—without the Plaintiffs having any benefit of discovery—that Weyker was acting in a capacity solely under state law far longer than Bandemer appeared to be, given his much earlier deputation, although he remained a state actor as supervisor of the VICE Unit. However, even if the Court concludes on the record before it that Bandemer was acting solely in a federal capacity during all times material hereto, it would still be inappropriate to dismiss the Section 1983 claims against him.

The *Brentwood* Court made it clear that there are "a host of **facts** that can bear on the fairness" of attributing state actor status to a nominally non-state actor. 531 U.S. at 296 (emphasis added). Critically, a private actor can act under color of state law "when the private actor is a willful participant in joint activity with the State or its agents." *Id.* This attribution of state action stemming from joint activity applies with equal force to federal actors as it would to private actors. Indeed, federal courts have described a variety of circumstances where a federal actor can engage in conduct sufficient to give rise to Section 1983 liability. *See, e.g., Premachandra v. Mitts*, 753 F.2d 635, 641 n.7 (8th Cir. 1985) ("Conspiracies that make federal officials liable under section 1983 are not commonplace but nor are they unheard of."); *see also Strickland on Behalf of Strickland v. Shalala*, 123 F.3d 863, 867 (6th Cir. 1997) ("To transform a federal official into a state actor, the appellees must show that there is a symbiotic relationship between the federal defendants and the state such that the challenged action can fairly be attributed

to the state.") (quoting *Cabera v. Martin*, 973 F.2d 735, 742-43 (9th Cir. 1992) (internal quotes omitted); *Case v. Milewski*, 327 F.3d 564, 567 (7th Cir. 2003) ("it is assumed that a § 1983 action can lie against federal employees—as it can against private individuals if they conspire or act in concert with state officials to deprive a person of her rights under color of state law.").

In *Johnson v. District of Columbia*, 461 F. Supp. 2d 48, 51 (D.D.C. 2006), the plaintiff alleged that a federal marshal and the District of Columbia "acted in concert with the purpose of executing a jointly developed unconstitutional policy of strip searching all female—but not male—arrestees without individualized suspicion." The court recognized that "[a] person, including a federal agent, may be considered a state actor for purposes of § 1983 if he is a 'willful participating in joint activity with the State or its agents.'" *Id.* (quoting *Williams v. U.S.*, 396 F.3d 412, 414 (D.C. Cir. 2005)). Applying this rule, the Court held that it could not dismiss the plaintiff's claims against the federal marshal at the motion to dismiss stage of the pleadings. The Eighth Circuit has long recognized that a party who acts "in concert" with state police officers can be held liable under Section 1983. *Murray v. Wal-Mart, Inc.*, 874 F.2d 555, 559 (8th Cir. 1989) ("…a store and its employees may be considered to be acting jointly with police when the police will detain accused shoplifters … pursuant to a customary plan between the store and the police department…") (citations omitted). No Eighth Circuit jurisprudence exists to suggest that this standard would not apply with equal force to federal actors.

At this stage in the pleadings, the Osman Plaintiffs have plausibly alleged that Bandemer and Weyker acted in concert with one another to deprive the Osman Plaintiffs

of their constitutional rights at times when **at least** Weyker was acting under color of state law. The Osman Plaintiffs have therefore plausibly alleged that both Bandemer and Weyker were acting under color of state law at the time of the alleged wrongdoings. Furthermore, fact questions remain about whether Bandemer remained a state actor at times after his deputation at least insofar as he remained a Sergeant at SPPD and Weyker's supervisor in the VICE Unit. Accordingly, Weyker's and Bandemer's motion to dismiss the Osman Plaintiffs' Section 1983 claims for a failure to plead that they acted under color of state law must be denied.

2. **Constitutional violations**

a. **Fourteenth Amendment violation for fabrication of evidence.**

At the crux of the Osman Plaintiffs' case, is the claim that Weyker, with the unlawful acquiescence or assistance of Bandemer, fabricated evidence in order to formulate a false pretense of probable cause. It has long been established that use of "false evidence" to cause detention, indictment, or conviction, "must fall under the Fourteenth Amendment ... ." *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959).

It has been clearly established in the Eight Circuit for over a decade that such conduct can establish a Fourteenth Amendment substantive due process violation. *See Winslow v. Smith*, 696 F.3d 716, 739 (8th Cir. 2012) (Plaintiffs' right to be free from a reckless investigation and use of false evidence was clearly established by 1989); *Livers v. Schenck*, 700 F.3d 340, 354 (8th Cir. 2012) ("It was clearly established by 2006 that the Fourteenth Amendment's guarantee of due process is violated by 'the manufacturing of … false evidence' in order to 'falsely formulate a pretense of probable cause.'" (citing

29

*Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) (en banc) (*Moran I); Moran v. Clarke*, 359 F.3d 1058, 1060-61 (8th Cir. 2004) (*Moran II*); *Wilson v. Lawrence Cty.,* 260 F.3d 946, 954 (8th Cir. 2001) (citing *Napue*, 360 U.S. at 269) ("If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated."); *see also Flah v. Maple Grove*, Case No. 14-cv-0264 (PJS/FLN), 2015 WL 7303546, at *6 (D. Minn. Nov. 19, 2015) (allegation that officer lied about arrestee attempting to kick officer sufficient to support a Fourteenth Amendment claim for fabrication of evidence); *Eden v. Vaughn*, Case No. 4:15CV00212, 2016 WL 4269547 (E.D. Mo. Aug. 15, 2016) (summary judgment denied on Fourteenth Amendment fabrication of evidence claim where plaintiff alleged that the officer planted drugs on him, provided false evidence supporting assault charges, and a police report was fabricated).

The Osman Plaintiffs have alleged, and the Court may take judicial notice of, more than sufficient facts to support a Fourteenth Amendment violation for fabrication of evidence against Weyker. The Osman Plaintiffs have alleged that Weyker fabricated evidence and coerced others into fabricating evidence in such a sweeping manner that it shocks the conscience to the degree necessary to support a substantive due process claim. *See White v. Smith*, 696 F.3d 740, 758 (8th Cir. 2012) ("There can be little doubt that intentionally manufacturing false evidence to convict a criminal defendant is the sort of 'brutal and inhumane abuse of official power' that shocks the conscience."). As the Seventh Circuit just recognized weeks ago, every Circuit to consider the issue has found that the fabrication of evidence by a police officer violates due process. *Avery v. City of*

*Milwaukee*, Case No. 15-3175, 2017 WL 396578, at *7 n.5 (7th Cir. Jan. 30, 2017) (collecting cases, including *Livers*).

The Osman Plaintiffs also allege sufficient facts to establish that Bandemer — as Weyker's supervisor in the SPPD Vice Unit — had knowledge of Weyker's pattern of fabrications, he was deliberately indifferent to those acts, he failed to take remedial measures, and as a result the Osman Plaintiffs were harmed. *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (citing *Jane Doe A. v. Special Sch. Dist. of St. Louis County*, 901 F.2d 642, 645-46 (8th Cir. 1996)).[49] Although he was involved in and aware of Weyker's investigation from its inception in 2008, perhaps the most damning evidence of Bandemer's indifference was his failure to take any action after the District Court publicly outed Weyker's conduct in its February 15, 2012 memorandum.[50] A number of the Osman Plaintiffs remained in federal custody for approximately four more years as a result of his failure to take remedial measures. Overall, the Osman Plaintiffs have plausibly alleged a claim for supervisory liability at this stage of the pleadings against Bandemer, Weyker's direct supervisor throughout the entirety of the time Weyker was fabrications evidence to formulate a false pretense of probable cause against the Osman Plaintiffs and others.

As Defendants recognize, whether probable cause existed to arrest the Osman Plaintiffs on other charges may apply to a Fourth Amendment analysis but is irrelevant to

---

[49] As part of their proposed Amended Complaint, the Osman Plaintiffs are withdrawing their "failure to intervene" allegations against Bandemer.
[50] *See, e.g.,* Osman Compl. ¶¶ 41, 45, 59.

a Fourteenth Amendment analysis.[51]  Indeed, even a conviction as to an unrelated, lesser

crime should not foreclose a substantive due process claim for fabrication of evidence of

a far more serious crime.  If it did, for example, a defendant could be guilty of disorderly

conduct but prosecuted illegally for first-degree murder based upon fabricated evidence

with impunity.  Such is not the case, and the Osman Plaintiffs have plausibly stated

clearly established substantive due process violations against the Individual Defendants.

### b.    Fourth Amendment violation for fabrication of evidence

The Eighth Circuit recently held that a fabrication of evidence claim may also

constitute a cause of action under the Fourth Amendment.  *See Stewart v. Wagner*, 836

F.3d 978, 983-84 (2016).  In *Stewart*, the plaintiff alleged that the officers produced

"fabricated statements to create probable cause when none existed."  *Id.* at 983.  The

panel distinguished *Stewart* from *Moran*, reasoning that *Moran* contained "additional

considerations" that "may trigger substantive due process protection, like the impact of

'falsely-created evidence and other defamatory actions' on a public employee plaintiff's

career, and the equal protection interest in not being investigated or punished on account

of race, that were present in that case."  *Id.* at 983-94 (citing *Moran I*, 296 F.3d at 645).

Ultimately, the *Stewart* Court narrowly found that Stewart's claims were governed by the

Fourth Amendment because "Stewart was not a public employee, race was not an issue,

and the alleged fabricated evidence was only used in a probable cause statement."  *Id.* at

984.

---

[51] Def. Mem. at 65-66.

*Stewart* represents a narrow outlier in the field of evidence fabrication jurisprudence. *See Avery*, 2017 WL 396578, at *7 n.5. Additionally, the *Moran I* opinion was *en banc*, so the *Stewart* court was incapable of overruling *Moran*'s clear statement of the law. *See U.S. v. Jackson*, 554 F.3d 716, 717 (8th Cir. 2009) (citing *United States v. Wright*, 22 F.3d 787, 788 (8th Cir. 1994)); *see also Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (when later court creates a conflict, earlier panel must be followed). Furthermore, the instant case is easily distinguished from Stewart because: 1) this case does not involve an isolated incident, but rather an ongoing, long-term scheme; 2) the Osman Plaintiffs' reputations were harmed, as in *Moran*; 3) the evidence fabricated in this case was used in countless ways, not just a probable cause statement, as in *Stewart*; and 4) the Osman Plaintiffs allege a systematic perversion of the legal process by Weyker through reckless investigation, witness tampering/coercion, evidence fabrication, bribery, false statements in warrant affidavits, to other law enforcement, in countless police reports and inter-agency memoranda, etc., and not merely a single lie in a single statement, as in *Stewart.*

Indeed, claims regarding fabrication of evidence are better understood as Fourteenth Amendment substantive due process actions, which inherently require the requisite intent, unlike the Fourth Amendment and its objective reasonableness standard. Regardless, here, the Osman Plaintiffs' allegations fall outside the narrow holding of *Stewart* because the sprawling nature of Weyker's fabrications do not amount to fabrications "only used in a probable cause statement." *Stewart*, 836 F.3d at 984. Here, the fabrications occurred in police reports, news conferences, were solicited from coerced

witnesses, were fed to federal prosecutors, were used in search warrant affidavits, and much later made their way into federal Indictments and testimony. Accordingly, this is a case where the claims are better analyzed under the Fourteenth Amendment, as the more narrow Fourth Amendment framework is an unworkable fit for such intentional, malicious, widespread, long-term conduct that seeks to intentionally pervert the legal process.

To the extent the Court analyzes these claims under the Fourth Amendment, however, Weyker and Bandemer are still liable for the same reasons set forth in their Fourteenth Amendment analysis above. Indeed, the Fourth Amendment's objective reasonableness standard should make it even easier to deny Weyker's and Bandemer's motion to dismiss the Section 1983 claims. None of the Osman Plaintiff pleaded guilty to any of the allegations contained in the October 20, 2010 Indictment, and they all, of course, have long denied—throughout their criminal proceedings—any criminal liability or that there was probable cause to arrest them for those crimes.[52] The existence of arguable probable cause is a defense that Defendants bear the burden of establishing, and too many fact issues remain at this stage for the Court to rule on the effects that other charges may have had on the Osman Plaintiffs' unlawful arrests. *See Hoyland v.*

---

[52] Adan did later plead guilty to an immigration-related charge; however, there was no probable cause to arrest him on that charge at the time of the Indictment, and he was not charged in the initial Indictment with that offense. It merely came to light throughout the course of the criminal proceedings, which would not have occurred without Weyker's fabrications. Furthermore, Adan received a ten-month sentence on that count, but served over two years, further proving that his prolonged detention was the result of the fabricated evidence, and not the far less serious charge he ultimately pleaded guilty to.

*McMenomy*, 185 F. Supp. 3d 1111, 1123 (D. Minn. 2016) (collecting cases recognizing the need to put arguable probable cause before a jury).

Here, when construing the evidence in a light most favorable to the Osman Plaintiffs, the dismissal of all charges against all of the Osman Plaintiffs should, at the every least, create fact questions related to the absence of probable cause. Furthermore, the Osman Plaintiffs have alleged and argued that there was **no** arguable probable cause to initially indict and detain them in 2010 without the fabricated evidence. For example, Osman herself was charged primarily with sex-trafficking and conspiracy, and the Indictment contains only one alleged overt act by Osman regarding those charges. However, Osman was also indicted for witness tampering/obstruction, and **no overt acts** were alleged to support those charges. Thus, without the fabricated evidence to support the conspiracy and sex-trafficking charges against Osman, clearly no arguable probable cause existed to indict and detain her on any charges. The same argument holds true for the other Osman Plaintiffs, as there was not probable cause (nor arguable probable cause) to indict and detain them in 2010 (the time of their arrest) without the fabricated evidence.

### 3. Weyker and Bandemer are not entitled to qualified immunity on Plaintiffs' Section 1983 claims.

The defense of "[q]ualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Montoya v. City of Flandreau*, 669 F.3d 867, 872 (8th Cir. 2012) (reversing trial court's grant of qualified

immunity on excessive force claim). The Court must ask: "(1) whether the facts alleged, construed in the light most favorable to the nonmoving party, establish a violation of a constitutional right, and (2) whether such right was clearly established so that a reasonable officer would have known her actions were unlawful." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 456 (citation omitted). The Court has discretion to address these issues in either order; however, the sequence set forth above "is often appropriate…." *Shannon v. Koehler*, 616 F.3d 855, 862 (8th Cir. 2010) (citing *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009) (additional citations omitted)). "The defendant bears the burden of proof on this affirmative defense." *Herts v. Smith*, 345 F.3d 581, 585 (8th Cir. 2003) (citing *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002) (recognizing that plaintiff must still show rights were clearly established); *see also White v McKinley*, 519 3d. 806, 813 (8th Cir. 2008) ("The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences.").

The issue of "clearly established" is "a legal question for the court to decide." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). The court asks "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *El-Ghazzawy*, 636 F.3d at 459 (citation omitted). The Eighth Circuit has long taken and continues to take a "'broad view' of what constitutes clearly established law; in the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits and district courts.'" *Wilson v. Lamp*, 142 F. Supp. 3d 793 (N.D. Iowa 2015) (quoting *Tlamka v. Serrell*, 244

F.3d 628, 634 (8th Cir. 2001); *Buckley v. Rogerson*, 133 F.3d 1125, 1128 (8th Cir. 1998);

also citing *Bell v. Burl*, 605 Fed. Appx. 593 (8th Cir. 2015)).  There is no requirement

that a court "previously confronted a situation identical to this case … there is no

requirement that the very action in question be previously held unlawful." *Atkinson v.

City of Mountain View*, 709 F.3d 1201, 1212 (8th Cir. 2013) (internal quotes omitted).

As a result, "officials can still be on notice that their conduct violates established law

even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  The

question is whether the officer had "fair warning" that her conduct was unconstitutional.

*Id.*

Defendants absurdly argue that the Eighth Circuit's recent opinion in *Stewart v.

Wagner* made it unclear to law enforcement as to whether or not they were entitled to

fabricate evidence at all times material to the Osman Plaintiffs' allegations.[53] A debate at

the Eighth Circuit as to when the Fourteenth or the Fourth Amendment applies to

fabrication of evidence claims does not undermine well-established Eight Circuit

precedent giving fair warning to law enforcement that the **act** of fabricating evidence was

clearly in contravention of a constitutional norm.  *Hope*, 536 U.S. at 741; *see* Magna

Carta.  There is no genuine dispute that "the unlawfulness" of the conduct is "apparent."

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Eighth Circuit precedent (*e.g.*, *Moran*

and *Livers*), at the very least, provides "general statements of the law" that give law

enforcement "fair and clear warning" that fabrication of evidence to create a pretense of

probable cause is unconstitutional.  *Morris v. Zefferi*, 601 F.3d 805, 812 (8th Cir. 2010)

---

[53] Def. Mem. at 58.

(quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).  Indeed, "[t]here can be little

doubt that intentionally manufacturing false evidence to convict a criminal defendant is

the sort of 'brutal and inhumane abuse of official power' that shocks the conscience."

*White v. Smith*, 696 F.3d 740, 758 (8th Cir. 2012).

No reasonable officer could have believed during the times material to this

complaint that it was acceptable to fabricate evidence to falsely create a pretense of

probable cause.  As a matter of common sense, the notion of law enforcement fabricating

evidence is anathema to our fundamental rights and notions of liberty.  "The Supreme

Court has observed, there has never been … a § 1983 case accusing welfare officials of

selling foster children into slavery; it does not follow that if such a case arose, the

officials would be immune from damages."  *Heartland Acad. Cmty. Church v. Waddle*,

595 F.3d 798, 810 (8th Cir. 2010) (quoting *Lanier*, 520 U.S. at 271) (internal quotes

omitted).

Ultimately, the Osman Plaintiffs agree with the Defendants that the Court does not

need to determine whether the Fourteenth or Fourth Amendment applies at this time.[54]

The Osman Plaintiffs have plausibly pleaded that Weyker fabricated evidence in a

manner that violated the Osman Plaintiffs' constitutional rights, and which constitutional

amendment applies will likely hinge on discovery and a factual analysis of "additional

considerations," as recognized by the *Stewart* court.  836 F.3d at 983-84.  Indeed, it

remains possible that the Court could conclude that Weyker's actions violate **both** the

---

[54] Def. Mem. at 57.

Fourth[55] and Fourteenth Amendments. "Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands." *Soldal v. Cook County*, 506 U.S. 56, 70 (1992). When this happens, "applicability of one constitutional amendment" does not "pre-empt[] the guarantees of another." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 49 (1993). At this point, the Osman Plaintiffs have plausibly pleaded claims that their Fourteenth and/or Fourth Amendment rights were violated by Weyker's fabrication of evidence to create a false pretense of probable cause.

**B.  The Osman Plaintiffs have Alleged Plausible *Bivens* Claims.**

At this stage of the proceedings and at the time they filed their Complaints, the Osman Plaintiffs obviously had little information about the nature and scope of Weyker's relationship to the federal government. Additional discovery must be had in order to better define those contours. However, to the extent Weyker violated the Osman Plaintiffs' constitutional rights under color of federal law, the Osman Plaintiffs have alleged plausible claims under the common law doctrine of *Bivens*, 403 U.S. 388. Once discovery has been had, the Osman Plaintiffs' *Bivens* claim may ultimately supplement

---

[55] In the case of *Manuel v. City of Joliet*, currently pending before the U.S. Supreme Court, DOJ filed an amicus brief stating on pages 9 and 10 of their brief that officers who intentionally mislead a tribunal into believing that probable cause exists violate the Fourth Amendment. *Manuel v. City of Joliet*, 590 Fed. Appx. 641 (7th Cir. 2015) *cert. granted* 126 S.Ct. 890. This position by DOJ is apparently inconsistent with their position in this case.

  Amicus brief of DOJ publicly available at http://www.scotusblog.com/wp-content/uploads/2016/05/14-9496_manuel_v._city_of_joliet.pdf (last accessed February 14, 2017). How the intent element is workable under the Fourth Amendment is not explained.

their Section 1983 claim or even proceed in lieu of. *See Kinetic Co. v. Medtronic, Inc.*, 672 F. Supp. 2d 933, 948 (D. Minn. 2009) ("Under the federal rules, a plaintiff may plead inconsistent facts in support of alternative theories of recovery." (quoting *Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 536 (8th Cir. 1970)).

In *Bivens*, the Supreme Court held that a "federal agent acting under color of his authority" may be liable for money damages when he engages in conduct that violates an individual's Fourth Amendment rights even though there is no federal statute expressly authorizing an award of damages. 403 U.S. at 392, 396–97. The Court found this common law, private right of action notwithstanding the absence of a statutory right of action, finding "no special factors counseling hesitation in the absence of affirmative action by Congress," *id.* at 396, and no express statement from Congress that relief should *not* be available under the circumstances, *id.* at 397; *see also Vance v. Rumsfeld,* 701 F.3d 193, 198 (7th Cir. 2012) (en banc) ("*Bivens* was the first time the Supreme Court created a non-statutory right of action for damages against federal employees."). The decision rested on a general premise that "'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.'" *Id.* at 392 (quoting *Bell v. Hood,* 327 U.S. 678, 684 (1946)).

1. **The Osman Plaintiffs do not allege a new context for *Bivens*.**

The Osman Plaintiffs allege that Weyker and Bandemer, to the extent they acted under federal rather than state law, violated the Osman Plaintiffs' Fifth and Fourth Amendment rights in the same manner as addressed in the Osman Plaintiffs' Section

1983 argument above regarding the Fourteenth and Fourth Amendment violations. The sole difference is the alternative allegation that, at times, Weyker and Bandemer were acting under color of federal law at the time of some of the fabrications. Weyker and Bandemer argue that no such claim can exist under *Bivens*, and that the Osman Plaintiffs attempt to expand *Bivens* to a new context.

*Bivens* itself makes it clear that federal agents can be held liable for monetary damages for violations of the Fourth Amendment while acting under color of federal law. Moreover, the Supreme Court has recognized since at least 1979 that *Bivens* applies to Fifth Amendment violations as well. *See Davis v. Passman,* 442 U.S. 228 (1979) (answering in the affirmative "whether a cause of action and a damages remedy can also be implied directly under the Constitution when the Due Process Clause of the Fifth Amendment is violated."); *Carlson v. Green,* 446 U.S. 14 (1980) (expanding *Bivens* remedy to Eighth Amendment context against federal prison officials, and acknowledging that Fifth Amendment context was already created in *Passman*, supra.). At least one Circuit Court expressly recognized a *Bivens* claim in the context of evidence fabrication by federal actors. *See Manning v. Miller*, 355 F.3d 1028, 1031 n.1 (7th Cir. 2004) (also recognizing that the Seventh Circuit has permitted *Bivens* actions to proceed in other procedural and substantive due process contexts). And the Eighth Circuit has likewise recognized that "[a] *Bivens* action may be brought on due process grounds." *Vennes v. An Unnkown Number of Unidentified Agents of the U.S.*, 26 F.3d 1448, 1452 (8th Cir. 1994) (citing *Passman*, 442 U.S. at 245-48).

Defendants overwhelmingly rely on *Vennes* for their argument that no *Bivens* claim exists for fabrication of evidence by federal agents.[56] Again, the Eighth Circuit in *Vennes* recognized that due process violations can underlie *Bivens* claims, and the court recognized that "outrageous police conduct" could amount to a substantive due process violation. *Vennes,* 26 F.3d at 1452 (citations omitted). The *Vennes* Court simply found that such conduct did not occur in that case. *Id.* at 1453. *Vennes* says absolutely nothing about the availability of a *Bivens* remedy to someone who was the victim of an evidence fabrication scheme who did not plead guilty to any of the fabricated offenses, and was never convicted of any of the fabricated sex-trafficking offenses.[57] That a federal agent would be liable for fabricating evidence "should hardly seem a surprising proposition." *Bivens*, 403 U.S. at 395 (further recognizing that "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty.") (emphasis added); *see also Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) (denying qualified immunity to federal actors under *Bivens* and stating "[i]t is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer.").

Unlike the federal law enforcement/correctional agent contexts explicitly allowed by the Court, the Court has identified specific other contexts in which "special factors" counsel against extending the *Bivens* remedy—factors often keyed to concerns about the

---

[56] *See* Def. Mem. at 18-21.

[57] For the same reasons discussed in the context of Section 1983, Weyker and Bandemer are not entitled to qualified immunity. Indeed, it cannot be reasonably argued that federal law enforcement officials did not have "fair notice" that fabricating evidence and related conduct was unlawful at the times material herein.

special status of the federal defendants or sensitivity to the nature of the governmental activity involved. *See, e.g., Corr. Servs. Corp. v. Malesko,* 534 U.S. 61, 63 (2001) (no *Bivens* action against private correctional corporation acting under color of federal law); *FDIC v. Meyer,* 510 U.S. 471, 473 (1994) (no *Bivens* action against a federal agency itself); *United States v. Stanley,* 483 U.S. 669, 683–84 (1987) (no *Bivens* action for injuries arising out of or in the course of activity incident to military service); *Chappell v. Wallace,* 462 U.S. 296, 299–302 (1983) (same). Plaintiffs here are not seeking to expand *Bivens* to cover the military, congress, private prisons, or a federal agency. They seek only a rote application of *Bivens* in its quintessential context: the context of an individual federal law enforcement agent's plainly unconstitutional interactions with civilians.

      **2.**      **Even if this is a new context for *Bivens*, there is no adequate alternative remedial scheme for compensating Plaintiffs.**

If the claims present a new context for *Bivens*, the Court has explained that the existence of a comprehensive, alternative remedial scheme may preclude a *Bivens* remedy even where the alternative relief is imperfect compared to *Bivens* and Congress has not explicitly declared it to be a substitute. *See, e.g., Schweiker v. Chilicky,* 487 U.S. 412, 414 (1988) (no *Bivens* action for an alleged due-process violation in connection with the denial of disability benefits because relief is available under a comprehensive statutory scheme); *Bush v. Lucas,* 462 U.S. 367, 368 (1983) (no *Bivens* action where a federal employer commits a First Amendment violation because relief is available under a comprehensive statutory scheme).

Next, the Court has identified specific contexts in which "special factors" counsel against extending the *Bivens* remedy—factors often keyed to concerns about the special status of the federal defendants or sensitivity to the nature of the governmental activity involved. *See, e.g., Malesko,* 534 U.S. at 63 (no *Bivens* action against private correctional corporation acting under color of federal law); *Meyer,* 510 U.S. at 473 (no *Bivens* action against a federal agency); *Stanley,* 483 U.S. at 683–84 (no *Bivens* action for injuries arising out of or in the course of activity incident to military service); *Chappell,* 462 U.S. at 299–302 (1983) (same).

The Court synthesized these refinements in its *Bivens* jurisprudence in *Wilkie v. Robbins,* 551 U.S. 537, 541 (2007), which involved a claim by a landowner who alleged that federal employees had engaged in a campaign of harassment and intimidation to induce him to give them an easement over his property. The Court distilled its *Bivens* jurisprudence into a two-step framework for evaluating whether to authorize an implied right of action for damages against a federal official for a constitutional violation in a new context:

> In the first place, there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages. But even in the absence of an alternative, a *Bivens* remedy is a subject of judgment: "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation."

*Id.* at 550 (citation omitted) (quoting *Bush,* 462 U.S. at 378). Defendants draw non-existent parallels between this case and *Wilkie.*

In *Wilkie*, the Plaintiff engaged in kitchen sink pleading, complaining about every interaction he had ever had with federal officials in what amounted to a landowner's spat over an easement with federal land management officials. *Id.* *Wilkie* did not sue law enforcement agents for 'discrete constitutional violations,' but instead alleged that the land management officials had videotaped his cattle drives, attempted to force him to sell cattle, and generally meddled in his ranching affairs to harass him in to granting the easement. *Id.* The facts of *Wilkie* could not be more dissimilar from the facts here, and the Defendants misleading citations that *Wilkie* commands disposal of the analysis here at step one because of the existence of the Federal Rules of Criminal Procedure is patently false. (*Cf. Wilkie,* 551 U.S. at 550, 554; Def. Mem. Dismiss. at 22, n.20).

Plaintiffs carefully pleaded their claims to rely on Defendants' tortious acts before indictment and trial, because the perjured testimony, no matter how false, is likely the subject of absolute immunity. Therefore Defendants' attempts to shoe-horn the evidence fabrication claims in to some nebulous complaint about the criminal prosecution generally is misguided.

      **a.**     **The Federal Rules of Criminal Procedure, Section 2255, and the criminal trial are not 'remedial schemes' sufficient to defeat a *Bivens* remedy to vindicate and compensate the violation of constitutional rights.**

Defendants argue that the existence of the federal criminal process, including the Rules, Section 2255, trials and appeals, suffice as a process to vindicate and remediate the rights violated here. However, as the Seventh Circuit recognized in a similar due

process case that involved fabricated evidence and evidence withholding that resulted in

conviction:

> This argument misunderstands the nature of the government's duty under *Brady.* The *Brady* obligation is not a mere prophylactic designed to protect a constitutional right, it is *itself* a component of the due process owed to criminal defendants under the Constitution. The failure of the government's agents to adhere to the *Brady* obligation is the very constitutional wrong that wants for redress, so it cannot be right to say that the duty of disclosure is itself a sufficient remedy for the constitutional violation. The disclosure rule cannot be both the duty *and* the remedy for its violation.

*Engel v. Buchan*, 710 F.3d 698, 703–04 (7th Cir. 2013).  So too here, the obligation on

law enforcement under due process to not fabricate evidence, suppress evidence, coerce

and bribe witnesses, ignore and hide exculpatory evidence, and otherwise engage in a

reckless or malicious investigation to pervert the justice system, formulate probable

cause, and cause the prosecution, indictment, and prolonged detention of individuals

cannot be both the duty and the remedy.  The Defendants in essence argue that because

the Federal Rules of Criminal Procedure provided Plaintiffs with a way to fight the

possibility of conviction and even more detention, that alone compensates and remediates

the five years of detention Plaintiffs suffered due to the false evidence.  Defendants'

thinking is mistaken.

 Like *habeas* relief, the Federal Rules of Civil Procedure are "limited to securing

prospective relief from unlawful incarceration, halting the ongoing harm from

[imprisonment] prejudicially tainted by a constitutional violation—a powerful remedy to

be sure, but not a *compensatory* one."  *Engel*, 710 F.3d at 703–04.  The Supreme Court

reiterated in *Minneci* that the alternative remedy need not be "perfectly congruent" to

*Bivens* but should provide "roughly similar incentives" for compliance with constitutional requirements and "**roughly similar compensation to victims of violations**." *Minneci v. Pollard,* 565 U.S. 118, 130 (2012) (emphasis added). None of the various federal statutory schemes relied on by Defendants to attempt to defeat a *Bivens* remedy in this familiar context have similar deterrent incentives nor offer similar compensation to victims, like Plaintiffs, for constitutional violations.

      **b.**      **The possibility of a motion for attorneys fees and litigation expenses has no bearing on this matter.**

Defendants make much ado about the Hyde Amendment of 1988, which provided federal courts discretion to award attorneys' fees and litigation expenses to federal defendants who were prosecuted frivolously, or in bad faith. (Def. Mem. Dism. at 27-28.) Of course, this does nothing to remedy the actual harm suffered by Plaintiffs, which was their prolonged, unjustified pre-trial detention based on Defendants' fabricated evidence, and not merely their litigation expenses. Indeed, by definition, the Amendment and its corollary, the Equal Access to Justice Act, do not implicate liberty, but only expenses. " A motion under the Hyde Amendment, on the other hand, does not implicate the movant's liberty interest. Indeed ... the interests it implicates are identical to those implicated by a motion for attorney's fees under 28 U.S.C. § 2412, the Equal Access to Justice Act." *United States v. Truesdale*, 211 F.3d 898, 903 (5th Cir. 2000).

Defendants misleadingly quote Chairman Hyde as saying, "Congress 'has [ ] declined to impose personal liability on prosecutors for negligence' and 'made federal prosecutors immune from the tort of malicious prosecution.'" (Def. Mem. Dism. at 28

citing H.R. 2267.) But of course, Plaintiffs here have not sued the prosecutor, nor do they allege negligence, and a motion for fees and expenses, by definition, does not seek to compensate or deter the loss of liberty, as required by *Minneci.* A motion against the U.S. Attorney's Office for litigation expenses and fees is simply not a remedial scheme with "roughly similar incentives" for compliance with constitutional requirements and "roughly similar compensation to victims of violations ..." as a *Bivens* remedy against the individual bad actor agents. *Minneci,* 565 U.S. at 130.

> **c.    The Unjust Conviction and Imprisonment Act has no bearing on this matter because it applies only to convictions.**

Again attempting to mislead the Court, Defendants next point to the Unjust Conviction and Imprisonment Act as a comprehensive remedial scheme that counsels against a *Bivens* remedy in this context.  (Def. Mem. Dism. at 28-29.)  But of course, this Act only applies to wrongful **convictions**.  28 U.S.C. § 1495 (The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim for damages by any person **unjustly convicted** of an offense against the United States **and imprisoned**.) (emphasis added).  Here, there were no convictions entered.  Because none of the Plaintiffs in this matter were convicted of the fabricated sex-trafficking offenses, but were instead held in various forms of pre-trial detention, the plain language of the Act does not apply to them. 28 U.S.C. § 2513(a) (Requiring proof that "his **conviction** has been reversed or set aside... .") (emphasis added).  Either Defendants accidentally included this section in their brief, or they have sought to mislead.

### d. Defendants' reliance on *Venne*s is misplaced and misleading.

Defendants attempt to square this case with *Vennes*, by stating that, because Congress created a criminal trial framework, and the aforementioned wrongful conviction statutes, "That is why the Eighth Circuit declined to extend a Bivens remedy in a wrongful-conviction." (Def. Mem. Dism. at 31 citing *Vennes,* 26 F.3d at 1451.) But of course, *Vennes* is easily distinguished. Vennes pleaded guilty. *Vennes,* 26 F.3d at 1451. Vennes did not have his conviction set aside. *Id.* Vennes failed in his attempt to first collaterally attack his conviction with Section 2255. *Id.* Vennes was sentenced and served his entire term. *Id.* Vennes then sought to collaterally attack his **valid conviction** through *Bivens*. *Id.*

That new context, and the fact that Vennes sought to wildly expand *Bivens* in a manner that would wholly subsume the criminal trial process, "would have a chilling effect on law enforcement officers and would flood the federal courts with constitutional damage claims by the many criminal defendants who leave the criminal process convinced that they have been prosecuted and convicted unfairly." *Id.* at 1452. *Vennes* involved a validly convicted man who felt he had been "convicted unfairly." *Id.* That is, with all due respect to Defendants, somewhat distinct from a case in which a Federal Circuit Court of Appeals expressed its:

> acute concern, based on our painstaking review of the record, that this story of sex trafficking and prostitution may be fictitious and the prosecution's two primary witnesses, Jane Doe 2 and Jane Doe 5, unworthy of belief. We are, of course, limited to only the witness testimony and evidence introduced at trial—and that on a paper transcript—but we also note the district court's expression of similar concerns. These witnesses repeatedly contradicted, disavowed, and refuted their own testimony, while other

portions of their testimony defied belief or were rendered implausible by indisputable contradictory evidence. Given that all nine defendants were acquitted of all charges (six by the jury and three by the court), we merely recognize that we start our analysis from what is likely a fictitious story.

*Fahra*, 643 Fed. Appx. at 484 (affirming - after three years of painstaking review - district court's judgment of acquittal in Plaintiffs' conspiracy case herein).

This is what the Sixth Circuit said about Weyker's deliberately coerced witnesses and their false evidence at trial. This is not some other case where the person was validly convicted, then failed to achieve *habeas* relief, and finally sued under *Bivens* as a last attempt to collaterally attack a valid conviction. The instant case before the Court constituted such a grave miscarriage of justice, based on evidence fabricated by Weyker and Bandemer, that the Sixth Circuit saw fit to name Weyker personally in its opinion over a dozen times. *Id.* After first reciting how Weyker manipulated witnesses and fabricated evidence, and then agreeing with myriad technical defense arguments on venue and conspiracy law, the Sixth Circuit ended by stating in disgust, "one way or the other, this acquittal was appropriate." *Id.* at 494.

### e. Defendants' reliance on immigration cases and habeas relief is misplaced and misleading.

Again attempting to re-frame this case as attacking the federal prosecution of Plaintiffs, instead of attacking the fabrication of evidence by Defendants (primarily before the prosecution began) Defendants next re-hash all of their prior *habeas* arguments in the context of immigration. (Def. Mem. Dism. at 33-35.) Some Circuit Courts of Appeals - not the Eighth - have declined to extend *Bivens* to collaterally attack immigration proceedings, due in part to the availability of *habeas* relief. But of course: 1)

Section 2255 relief was never available to Plaintiffs herein, who were not convicted; 2) *Bivens* itself already authorized the remedy in the context of suing individual federal law enforcement agents who violate the constitution before the institution of criminal proceedings; and, unlike in the immigration context, there is substantial authority for allowing the *Bivens* remedy in the criminal justice/trial context even after the institution of criminal proceedings. *See e.g.*; *Manning v. Miller*, 355 F.3d 1028 (2004) (finding *Bivens* applies to agents who violate due process at trial); *Engel*, 710 F.3d at 705–06 (re-affirming that *Bivens* applies to agents who violate due process at trial). Here, as in *Carlson*:

> Neither situation obtains in this case. First, the case involves no special factors counseling hesitation in the absence of affirmative action by Congress. [Defendants] do not enjoy such independent status in our constitutional scheme as to suggest that judicially created remedies against them might be inappropriate. *Davis v. Passman, supra*, at 246, 99 S.Ct., at 2277. Moreover, even if requiring them to defend respondent's suit might inhibit their efforts to perform their official duties, the qualified immunity accorded them under *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), provides adequate protection. *See Davis v. Passman, supra*, at 246, 99 S.Ct., at 2277.

*Carlson*, 446 U.S. at 19.

Furthermore, there is no explicit congressional declaration that persons injured by federal officers' violations of the Fourth and Fifth Amendments should not recover money damages from the agents but must be remitted to another remedy. Defendants can "point to nothing in the Federal Tort Claims Act (FTCA) or its legislative history to show that Congress meant to pre-empt a *Bivens* remedy or to create an equally effective remedy for constitutional violations." *Id.* at 19-20. The "FTCA was enacted long before

*Bivens* was decided" and "when Congress amended FTCA in 1974 to create a cause of

action against the United States for intentional torts committed by federal law

enforcement officers" the "congressional comments accompanying that amendment made

it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes

of action ... ." *Id.*

> "[A]fter the date of enactment of this measure, innocent individuals who
> are subjected to raids [like that in *Bivens* ] will have a cause of action
> against the individual Federal agents *and* the Federal Government.
> Furthermore, this provision should be viewed as a *counterpart* to the *Bivens*
> case and its progeny [*sic* ], in that it waives the defense of sovereign
> immunity so as to make the Government independently liable in damages
> for the same type of conduct that is alleged to have occurred in *Bivens* (and
> for which that case imposes liability upon the individual Government
> officials involved)." S.Rep.No.93–588, p. 3 (1973) (emphasis supplied).

> In the absence of a contrary expression from Congress, § 2680(h) thus
> contemplates that victims of the kind of intentional wrongdoing alleged in
> this complaint shall have an action under FTCA against the United States as
> well as a *Bivens* action against the individual officials alleged to have
> infringed their constitutional rights.

*Carlson,* 446 U.S. at 20.  This conclusion is buttressed by the significant fact that

Congress follows the practice of explicitly stating when it means to make FTCA an

exclusive remedy.  *See* 38 U.S.C. § 4116(a), 42 U.S.C. § 233(a), 42 U.S.C. § 2458a, 10

U.S.C. § 1089(a), and 22 U.S.C. § 817(a) (malpractice by certain Government health

personnel); 28 U.S.C. § 2679(b) (operation of motor vehicles by federal employees); and

42 U.S.C. § 247b(k) (manufacturers of swine flu vaccine).

> Four additional factors, each suggesting that the *Bivens* remedy is more
> effective than the FTCA remedy, also support our conclusion that Congress
> did not intend to limit respondent to an FTCA action. First, the *Bivens*
> remedy, in addition to compensating victims, serves a deterrent purpose.
> *See Butz v. Economou, supra*, at 505, 98 S.Ct., at 2910. Because the *Bivens*

> remedy is recoverable against individuals, it is a more effective deterrent than the FTCA remedy against the United States. It is almost axiomatic that the threat of damages has a deterrent effect, *Imbler v. Pachtman*, 424 U.S. 409, 442, 96 S.Ct. 984, 1000, 47 L.Ed.2d 128 (1976) (WHITE, J., concurring in judgment), surely particularly so when the individual official faces personal financial liability.

*Carlson,* 446 U.S. at 20-21. "Second, our decisions, although not expressly addressing and deciding the question, indicate that punitive damages may be awarded in a *Bivens* suit." *Id.* Punitive damages are "a particular remedial mechanism normally available in the federal courts," *Bivens*, 403 U.S. at 397, and are especially appropriate to redress the violation by a Government official of a citizen's constitutional rights. *Butz v. Economou*, suggests that the "constitutional design" would be stood on its head if federal officials did not face at least the same liability as state officials guilty of the same constitutional transgression. 438 U.S., at 504. But punitive damages in an FTCA suit are statutorily prohibited. 28 U.S.C. § 2674. "Thus FTCA is that much less effective than a *Bivens* action as a deterrent to unconstitutional acts." *Carlson,* 446 U.S. at 20-22.

"Third, a plaintiff cannot opt for a jury in an FTCA action, 28 U.S.C. § 2402, as he may in a *Bivens* suit." *Id.* "Fourth, an action under FTCA exists only if the State in which the alleged misconduct occurred would permit a cause of action for that misconduct to go forward." *Id* at 23. "Yet it is obvious that the liability of federal officials for violations of citizens' constitutional rights should be governed by uniform rules." *Id.* The question whether respondent's action for violations by federal officials of federal constitutional rights should be left to the vagaries of the laws of the several States admits of only a negative answer in the absence of a contrary congressional resolution. *Id.*

"Plainly FTCA is not a sufficient protector of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy." *Id.*

It is true that in some contexts the availability of habeas corpus weighs against authorizing a *Bivens* remedy, but that is usually so when habeas is one element of a broader, integrated **remedial** scheme. *Engel*, 710 F.3d at 706; *see also, Mirmehdi v. United States,* 689 F.3d 975, 981–82 (9th Cir. 2012) (declining to recognize a *Bivens* remedy for claimed constitutional violations in the immigration context in light of the availability of habeas corpus as one component of a comprehensive adjudicative and remedial process); *Rauschenberg v. Williamson,* 785 F.2d 985, 987 (11th Cir. 1986) (declining to recognize a *Bivens* remedy in a suit for damages against a parole officer in light of the availability of habeas corpus in addition to other administrative remedies).

The habeas and immigration analogies are entirely inapplicable to this case, and the existence of the Fed. R. Crim. P., the FTCA, and the wrongful conviction statutes do not provide "roughly similar incentives" for constitutional compliance and "roughly similar compensation" for victims of *Brady* violations. *Minneci,* 132 S.Ct. at 625.

### 3. There are no special factors in this context counseling against applying *Bivens* to federal agents who fabricate evidence.

Because there is no comprehensive remedial scheme providing "roughly similar incentives" for constitutional compliance and "roughly similar compensation" for victims, *Minneci,* 132 S.Ct. at 625, the Court then proceeds to step two of the *Wilkie* framework, which requires consideration of whether "any special factors counsel...

54

hesitation before authorizing a new kind of federal litigation." *Wilkie,* 551 U.S. at 550 (internal quotations and citation omitted). Here, there are none, because this is a familiar context for *Bivens.*

Among the special factors that may counsel hesitation are: conflict with federal fiscal policy; the unique agency operational concerns of immigration agencies; and the unique structure and nature of the military. *Schweiker,* 487 U.S. at 421–23; *Stanley,* 483 U.S. at 683–84; *Chappell,* 462 U.S. at 304; *Bush,* 462 U.S. at 380–81, 388.

Of course, lawsuits against federal agents in their individual capacities do not implicate federal fiscal policy, and Plaintiffs here have not sued a federal agency, any immigration officials, military personnel, or the like. Plaintiffs have brought straight-forward constitutional claims against individual actors for discrete actions of theirs taken under color of state, and later, federal law. This is the original *Bivens* context, and no special factors counsel against applying *Bivens* to federal law enforcement agents. Indeed, the closest Federal Circuit Court of Appeals to address the question squarely after *Wilkie* and *Minneci* reached the same conclusion:

> Defendants have not identified any special factors, and we ourselves see none. As we have noted, this part of the analysis has tended to focus on concerns about judicial intrusion into the sensitive work of specific classes of federal defendants—military officials in *Stanley* and *Vance,* for example; immigration authorities in *Mirmehdi;* and federal agencies in *Meyer*—and sometimes also concerns about doctrinal unworkability, as in *Wilkie.* **Here, in contrast, an FBI agent stands accused of violating the constitutional rights of a person targeted for a criminal investigation and prosecution. This parallels *Bivens* itself.** In all material respects, the *Brady* claim at issue in this case is very much like the Fourth Amendment claim in *Bivens.* We are hard-pressed to identify a distinction that makes a difference

*Engel*, 710 F.3d at 707–08 (emphasis added).

Allowing the *Bivens* remedy in this context does not constitute an expansion of *Bivens,* nor do special factors (such as intrusion on into the sensitive work of military or immigration officials) counsel against allowing the remedy in its original context.  The absence of special factors such as comity between the courts and the military, or federal fiscal policy (not implicated by individual capacity claims), and the absence of a sufficient remedial, compensatory scheme, allow the Plaintiffs to proceed with their *Bivens* claims against Defendants for their conduct occurring **after** deputation.

**C.**     **No Osman Plaintiff has asserted claims based solely upon grand jury (or trial) testimony; therefore, no claim should be dismissed under the doctrine of absolute immunity.**

The claims set forth by the Osman Plaintiffs rely on the manufacturing of false evidence that took place before Weyker was deputized, before the witnesses provided the false evidence to the grand jury, and before the first indictment was returned.  The Osman Plaintiffs plausibly allege, while providing specific instances, that Weyker and Bandemer spent **years** artfully crafting the fabricated evidence, shopping it to the U.S. Attorney in Minnesota, getting rejected, adding more fabricated evidence, and then shopping the case to the U.S. Attorney in Nashville before any testimony was ever given in any forum.  *See, e.g., Zar v. South Dakota Bd. of Examiners of Psychologists*, 976 F.2d 459, 466 (8th Cir. 1992) (police investigative work may be afforded qualified but not absolute immunity); *see also Jones v. Slay*, 61 F. Supp. 3d 806, 830-31 (E.D. Mo. 2014) (a police officer does not have "absolute witness immunity where he deliberately provides false information to a prosecutor."); *Odom v. Kaizer*, 417 Fed. Appx. 611 (8th Cir. 2011) (police officer not

entitled to absolute immunity on Fourth Amendment claim that he knowingly gave false information while testifying in support in issuance of a warrant); *Coggins v. Buonora*, 776 F.3d 108, 113-14 (2d Cir. 2015) (officer not entitled to absolute immunity where plaintiff based claim on police reports, investigative statements, and statements made to prosecutor).

While the Osman Plaintiffs note Weyker's wrongdoings in front of the grand jury, they do so to highlight Weyker's publicly-admonished, continued pattern of bad conduct, which adds further plausibility to their claims. Weyker's continued fabrications and wrongful conduct will also likely bear upon issues of causation and damages later in this case. Moreover, it is also imperative to note that just because Weyker eventually testified before a grand jury, that testimony does not immunize all of her misconduct prior to those proceedings. *See, e.g., Lisker v. City of Los Angeles*, 780 F.3d 1237, 1241-42 (9th Cir. 2015) (citing *Keko v. Hingle*, 318 F.3d 639, 642-44 (5th Cir. 2003); *Spurlock v. Satterfield*, 167 F.3d 995, 1001-04 (6th Cir. 1999)). Ultimately, Defendants identify no specific claim made by any of the Osman Plaintiffs that rests solely on grand jury (or other) testimony, and therefore their request for absolute immunity should be denied.

**D.    The *Parratt/Hudson* doctrine is inapposite.**

Weyker and Bandemer argue that the Osman Plaintiffs claims are barred by the *Parratt-Hudson* doctrine. This argument is misguided for several reasons.

First, the *Parratt-Hudson* doctrine applies solely to "random and unauthorized" acts by a state actor. *See Keating v. Nebraska Public Power Dist.*, 562 F.3d 923, 929 (8th Cir. 2009) (internal quotes omitted); *see also Betts v. University of Nebraska Medical*

*Center*, Case No. 8:97CV11, 1998 WL 34345518, at *7 (D. Neb. Oct. 15, 1998) ("the

*Parratt-Hudson* analysis applies only in those situations where the deprivation is the

result of a 'random and unauthorized' act by a state employee.";) *Queen Anne Courts v.*

*City of Lakeville*, 726 F. Supp. 733, 736 (D. Minn. 1989) ("*Parratt* only applies in cases

where the state action is random and unauthorized.").

The Osman Plaintiffs have plausibly pleaded that Weyker engaged in repetitive,

multiple instances of unconstitutional conduct with the approval and cooperation of

Bandemer and other supervisors.  Furthermore, Plaintiffs have alleged that Weyker acted

pursuant to Saint Paul's unconstitutional policies and customs in contravention of *Monell*.

*See Giron v. City of Alexander, Ark.*, Case No. 4:07-CV-00568, 2009 WL 2998946, at

*21, n.40 (E.D. Ark. Sept. 11, 2009) (citing *Woodard v. Andrus*, 419 F.3d 348 (5th Cir.

2005); *Wilson v. Civil Town of Clayton, Ind.*, 839 F.2d 375, 380 (7th Cir. 1988)).  Thus,

the Osman Plaintiffs have plausibly alleged that the complained of conduct was neither

random nor unauthorized, and the *Hudson/Parratt* doctrine is therefore inapplicable.

Second, the *Parratt-Hudson* doctrine applies only to procedural due process

claims masquerading as substantive due process, not pure claims of substantive due

process violations.  *See Vennes*, 26 F.3d at 1452 (citations omitted) ("claims based on the

same actions but alleging denial of substantive due process should be barred as well.");

*See White*, 696 F.3d at 758 (fabricating evidence is conscience shocking behavior).  As

discussed above, the Osman Plaintiffs' claims sound solely in substantive, and not

procedural, due process.  *See, e.g., Livers*, 700 F.3d at 354; *Moran I*, 296 F.3d at 647.  If

the *Parratt-Hudson* doctrine applied to substantive due process claims for fabrication of

evidence, the opinions in *Livers and Moran I* would have been wholly unnecessary on that point, as any decision on their merits should have been barred by *Parratt*. Moreover, if the Court determines that the Osman Plaintiffs' fabrication of evidence claims fall under the Fourth Amendment, it is even clearer that *Parratt* would not apply. *See Collier v. City of Springdale,* 733 F.2d 1311, 1316 n.8 (8th Cir. 1984) (citations omitted); *see also Gilmore v. Dubuc*, Case No. 13-1019, 2015 WL 3645846 (D. Minn. June 10, 2015) (citations omitted).

Finally, Weyker and Bandemer argue on one hand that the Osman Plaintiffs cannot allege malicious prosecution, yet argue on the other that the availability of malicious prosecution acts as a post-deprivation remedy (a strictly procedural due process concept) to the Osman Plaintiffs.[58] The Osman Plaintiffs, concurrently herewith, move this Court for leave to amend their complaint to, in part, dismiss their malicious prosecution claims. Defendants should not be permitted to benefit from their contradictory positions. *See, e.g., Jones v. Bob Evans Farms, Inc.*, 811 F.3d 1030, 1032 (8th Cir. 2016) (applying judicial estoppel to bar inconsistent claims). For all of these reasons, the *Parratt/Hudson* doctrine is inapplicable to the Osman Plaintiffs' claims.

**E.      Section F of Weyker's and Bandemer's Memorandum is Nothing More than a Thinly-Veiled Attempt to Undermine the Pleading Standard.**

To briefly revisit pleading standards and the standard of review, Federal Rule of Civil Procedure 8 only requires that a complaint present a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A

---

[58] *Compare* Def. Mem. at 53 *with* 92-93.

plaintiff's complaint must be read "as a whole, not parsed piece by piece to determine whether each allegation, in isolation, in plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (citation omitted). On a motion to dismiss, a court's review is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Iqbal*, 129 S.Ct. at 1950).

Pages 68 through 91 of the Individual Defendants' Memorandum is an exercise in ignoring the pleading and motion to dismiss standards. Weyker and Bandemer ask the Court to make inferences in their favor and pick at individual allegations, rather than accepting the Osman Plaintiffs' facts as true and reading their respective Complaints as a whole.

The Osman Plaintiffs' core claim is that Weyker fabricated evidence to create the pretense of probable cause for a non-existent conspiracy to engage in the commercial sex trafficking of minors. The uniform acquittal of those charges as to the Osman Plaintiffs and all other plaintiffs lends plausibility to their core claim. The Sixth Circuit's and District Court's opinions lend plausibility to that claim. The Osman Plaintiffs' allegations of Weyker coercing fabricated evidence from the Janes Does lend plausibility to that claim. The Osman Plaintiffs' allegations that Weyker facilitated the fabrication of evidence related to Jane Doe Two's age lends plausibility to the claim. Weyker's solicitation of false statements from Jane Doe Two during the April 2009 road trip to Nashville lends plausibility to the claim. Weyker's continued lies, including those on Jane Doe Two compensation form, lends plausibility to the claim. Weyker's almost complete lack of reference to sex trafficking in her rough notes lends plausibility to the

claim.  Taken as a whole in a light most favorable to the Osman Plaintiffs, all of these alleged facts create a plausible claim that Weyker fabricated evidence in violation of the Fourteenth Amendment.

There may later be nuanced questioned about causation and the effects of other charges, convictions, etc.  However, those questions need not be decided at this time. *See, e.g., Schaub v. Vonwald*, 638 F.3d 905, 921 (8th Cir. 2011) (difficult questions of fact are generally reserved for a jury).  Here, the Court need only conclude that the totality of the pleadings before it create a plausible claim that Weyker fabricated evidence to create the pretense of probable cause as to a sex trafficking conspiracy that did not exist, the Individual Defendants' motion to dismiss on the Fourteenth and Fourth Amendment Section 1983 and *Bivens* claims should be denied as to **all** Plaintiffs, particularly given the nature of criminal conspiracies.

**F.      The Osman Plaintiffs' Amended Complaints**

Simultaneously with this motion response, the Osman Plaintiffs all seek leave to amend their Complaints.  In an effort to streamline the issues before the Court, the Osman Plaintiffs shall withdraw their claims under the Sixth Amendment, under *Brady*, their failure to intervene claims, and their state law claims for malicious prosecution.  The Osman Plaintiffs also have added allegations further detailing Weyker's wrongful conduct, and Bandemer's notice thereof, and making clear that most or all of the critical conduct occurred while Weyker was acting under color of **state** law.

While the Osman Plaintiffs maintain that they have alleged sufficient detail already to meet the pleading standard for the Fourteenth, Fifth, and Fourth Amendment

claims, these additional allegations bolster those claims. In the event the Court finds that

the Osman Plaintiffs' allegations do not meet their pleading standard in the initial claims,

the Osman Plaintiffs' respectfully request that the Court consider the proposed amended

complaints, and find that the allegations contained therein state claims under the

Fourteenth, Fifth, and Fourth Amendment.

In the event the Court, despite the proposed amended complaints, dismisses any

portion of the Osman Plaintiffs' claims, the dismissal should be **without** prejudice. *See*

*Milliman v. County of Stearns*, Civ. No. 13-136, 2013 WL 5426049, at * (D. Minn. Sept.

26, 2013) (quoting *Michaelis v. Neb. State Bar Ass'n*, 717 F.2d 437, 438-39 (8th Cir.

1983) ("Ordinarily dismissal of a plaintiff's complaint for failure to comply with Rule 8

should be with leave to amend. But if the plaintiff has persisted in violating Rule 8 the

district court is justified in dismissing the complaint with prejudice."); *see also Oberg v.*

*Shapiro*, Case No. 15-cv-3678, 2016 WL 4501354, at *12 (D. Minn. July 29, 2016). In

the event any of their claims are dismissed, the Osman Plaintiffs respectfully request that

the Court exercise its broad discretion under Federal Rule of Civil Procedure 15, and

grant them 60 days from the date of the dismissal order to submit new, proposed

amended complaints. Given the early stage of the proceedings and the grave import of

the Osman Plaintiffs' claims, it would be just to grant the Osman Plaintiffs leave to

amend any aspect of their pleadings the Court dismisses pursuant to the instant motion.

## Conclusion

This is not a case that opens the floodgates for litigants to second-guess

prosecutorial decision-making. This case presents the set of atypical facts that shock the

conscience. The Osman Plaintiffs have stated a plausible claim that Weyker manufactured evidence in violation of primarily the Fourteenth Amendment, and that Bandemer—with deliberate indifference—let her do it. Accordingly, the Individual Defendants' motion must be denied with respect to the Osman Plaintiffs' Fourteenth, Fifth, and Fourth Amendment claims under Section 1983 and *Bivens*.

**ANDREW IRLBECK LAWYER CHTD.**

Dated: February 21, 2017

/s/ Andrew M. Irlbeck
Andrew M. Irlbeck, #392626
Fifth Street Towers
100 South Fifth Street
Minneapolis, MN 55402
Phone: 612-455-7053
Fax: 612-455-7051
andrew@irlbecklaw.com

**NEWMARK STORMS LAW OFFICE LLC**

/s/ Jeffrey S. Storms
Jeffrey S. Storms, # 0387240
100 South Fifth Street, Suite 2100
Minneapolis, MN 55402
Phone: 612.455.7050
Fax: 612.455.7051
jeff@newmarkstorms.com

**APPLEBAUM LAW FIRM**

/s/ Paul Applebaum
Paul Applebaum, #223098
First National Bank Building
332 Minnesota Street, Suite W1610
Saint Paul, Minnesota 55101
Phone: 651-222-2999
Fax: 651-223-5179
paul@applebaumlawfirm.com