UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Hamdi Ali Osman,

      Plaintiff,

   vs.

Heather Weyker, in her individual capacity
as a Saint Paul Police Officer, John Bandemer,
in his individual and official capacities as a
Saint Paul Police Sergeant, the City of Saint Paul,
Robert Roes 1 – 3, in their individual and official
capacities as supervisory members of the
Saint Paul Police Department,

      Defendants.

Case No. 16-cv-00908 (JNE/JSM)

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED
UNDER FED. R. CIV. P. 38(b)**

For her Second Amended Complaint, Plaintiff Hamdi Ali Osman ("Osman") states

and alleges as follows:

1.     This is an action for money damages arising out of the violation of

Osman's Fourteenth, Fourth, and Fifth Amendment rights by Defendant Heather Weyker

("Weyker"), who in pursuit of personal and professional glory, falsified and fabricated

evidence in a failed effort to obtain convictions in one of the largest sex-trafficking

conspiracy prosecutions in U.S. History.  Weyker repeatedly manufactured false evidence

in order to create a pretense of, *inter alia,* probable cause to federally indict and detain

Osman, thereby violating Osman's well-settled federal civil rights while acting under

color of state law.  But for the evidence Weyker fabricated, no probable cause existed to

detain or otherwise restrict Osman's liberty.  Osman's well-settled federal civil rights

were violated by Saint Paul Police Sergeant John Bandemer ("Bandemer") and Robert

Roes 1 – 3, Saint Paul police supervisors who were aware of, but deliberately indifferent

to Weyker's unconstitutional actions, further violated Osman's rights.  Finally, Osman's

well-settled federal civil rights were also violated through the City of Saint Paul's and its

supervisory officers' longstanding and widespread practice of deliberate indifference to

its officers' practice of fabricating evidence to falsely formulate probable cause, and the

City's failure to supervise and discipline Weyker.

2.     Osman brings this action to vindicate her well-settled civil rights pursuant

to 42 U.S.C. §§ 1983 and 1988, the Fourteenth, Fourth, and Fifth Amendments to the

United States Constitution, and 28 U.S.C. §§ 1331 and 1343(3).  These statutory and

constitutional provisions confer original jurisdiction of this Court over this matter.

3.     Venue is proper under 28 U.S.C. §§ 1391(b)(1), (2) and (e)(1)(A), (B).

4.     Osman is twenty-six years old; she is a permanent, legal resident of the

United States, residing in the State of Minnesota.

5.     Upon information and belief, Weyker is, and was at all times material

hereto, a United States citizen residing in the State of Minnesota.  At all times material

hereto, Weyker was an officer of the Saint Paul Police Department, acting under color of

state law, and she is sued in her individual capacity for the constitutional deprivations

that caused Osman severe and irreparable harm.

6.     Upon information and belief, John Bandemer ("Bandemer") is, and was at

all times material hereto, a United States citizen residing in the State of Minnesota.  At all

times material hereto, Bandemer was an officer of the Saint Paul Police Department,

2

acting under color of state law, and he is sued in his individual and official capacities. Bandemer was the lead sergeant for the Saint Paul Police Department's vice unit and had supervisory responsibility over Weyker.

7.      The City of Saint Paul is a municipality duly incorporated under the laws of the State of Minnesota.

8.      Robert Roes 1 – 3 are unknown St Paul Police Department supervisors sued in their individual and official capacities, who, upon information and belief, were aware of and deliberately indifferent to a pattern of unconstitutional acts by their subordinates.

9.      In or about early 2008, Osman moved from Minneapolis to Nashville, Tennessee to live with two friends.

10.      In early 2008, Osman received a call from Jane Doe Three,[1] who she knew from the Somali community in Minneapolis.

11.      Jane Doe Three told Osman that she had left her home and was coming to stay with Osman in Nashville.

12.      Osman informed Jane Doe Three that she could not permanently reside with her, but would allow her to remain there briefly until her mother retrieved her.

13.      Jane Doe Three's mother retrieved Jane Doe Three from Osman's residence the next day.

---

[1] The Alias Jane Doe Three, which was used in prior grand jury proceedings and public pleadings, is being observed at present even though Jane Doe Three is no longer a minor and her identity is known to Plaintiff.  There has been a profound lack of respect for the privacy of even those minors it **wrongly identified** as the victims of sex trafficking and accused of being prostitutes, and Plaintiff does not want to further tarnish the reputation of these young women.

3

14.     Jane Doe Three was not a prostitute, did not travel to Nashville to engage in commercial sex, and her presence in Nashville was not solicited by Osman.  Moreover, Osman had no intention, desire or expectation that Jane Doe Three engage in commercial sex anywhere at any time. There was no agreement or understanding, implicit or explicit, of any commercial exchange or sexual activity, and none in fact occurred.

15.     Osman eventually moved back to Minnesota of her own accord having nothing to do with Jane Doe Three.

16.     Osman is not aware of anyone paying a fee or providing anything of value in exchange for engaging in sex acts with Jane Doe Three, and to the best of Osman's knowledge such conduct never occurred.

17.     During this time period, Weyker was the lead Saint Paul Police investigator investigating a supposed sex-trafficking ring, and, at times, deputized as a member of an FBI Task Force on sex-trafficking.

18.     An October 20, 2010 Indictment was filed under seal in the Middle District of Tennessee against Osman and twenty-eight other young men and women—nearly all Somali immigrants and refugees.  Osman was indicted on several conspiracy counts under 18 U.S.C. §§ 2; 1512(b)(1)-(2); 1512(c)(1)-(2); and 1591(a)(1)-(2).  The Indictment alleges that she was engaged in a conspiracy to recruit and transport minors for the purpose of engaging in commercial sex acts.  No such conspiracy existed, and Defendants Weyker and Bandemer knew it.

19.     Osman was arrested on November 8, 2010, for this alleged, far-reaching sex-trafficking conspiracy, and the Indictment was unsealed shortly thereafter.

4

20.     The federal detention statute, 18 U.S.C. § 3142(e)(3)(E), states in relevant part:

> Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed ... an offense involving a minor victim under section ... § 1591.

Because Weyker had falsely formulated probable cause for some of the gravest offenses in the federal criminal justice system, to wit, sex-trafficking of minors under 18 U.S.C. § 1591 *et seq.*, Osman was subject to presumptive detention and was ordered detained pending trial.  But for those specific charges, Osman would not have been detained.

21.     The Indictment smacks of falsehoods beginning in Paragraph 2, where it states that the sex trafficking conspiracy was ongoing from approximately January 2000 until July 2010.  Many of the alleged co-conspirators, including Osman, were children themselves over the vast majority of that time period.

22.     The Indictment did not allege an overt act prior to 2005.  Furthermore, the made-up time period of January 2000 to July 2010 is conspicuously absent from the Third Superseding Indictment that was eventually filed on August 22, 2012.

23.     Weyker spun an elaborate story of an organized gang whose stock in trade was child prostitution.  In reality, there was no child prostitution happening, no conspiracy, and no real evidence of a criminal organization or 'gang,' as noted by the

Sixth Circuit. *United States v. Fahra*, Nos. 13-5122, 13-6391, 13-6422, 2016 WL

807380, at *2, n.1 (6th Cir. Mar. 2, 2016). [2]

24.     The Indictment contained a vague and conclusory allegation that Osman

"attempted to entice Jane Doe 1 into engaging in a commercial sex act."  The only

alleged overt act of any specificity related to Jane Doe Three's unsolicited visit to

Nashville in January 2008, alleging that Osman agreed to give Jane Doe Three food and

shelter in exchange for Jane Doe engaging in commercial sex acts.

25.     Securing an Indictment on this alleged sex-trafficking conspiracy was of

paramount importance for the Saint Paul Police Department's vice unit, of which

Bandemer was the lead sergeant and Weyker a key member.  This was the unit's largest

case.  Weyker was the lead investigator on the case, and many of her victims, including

Osman, were forced to sacrifice years of their liberty due to Defendants' constitutional

violations and desire for personal and professional glory.

26.     The Defendants failed to behave in an objectively reasonable manner, and

the supervisory Defendants failed to intervene to stop the unconstitutional conduct,

despite a meaningful opportunity and a constitutional duty to intervene, all in violation of

clearly established federal law.  This continuing course of conduct by all Defendants

directly resulted in the prolonged, unconstitutional detention of Osman.

27.     The overwhelming majority of the material evidence supporting the

indictments in this alleged conspiracy was fabricated and then supplied to federal

prosecutors by Weyker.

---

[2] Filed at *Osman v. Weyker*, Case No. 16-cv-00908, ECF Doc. No. 1-1 (4/7/16).

28.     Weyker, Bandemer, and others also knew or had reason to know that several of the alleged Jane Doe victims were not actually minors, but Weyker repeatedly wrote and stated that they were minors at the time of the alleged conspiracy to establish, *inter alia*, probable cause for the federal indictment and to get the interest of the U.S. Attorney's Office in Tennessee.  Weyker even went so far as to fabricate and/or endorse documents falsifying the ages of certain alleged Jane Doe victims.

29.     Weyker also knew that many or all of the alleged Jane Doe victims engaged in lawful, consensual activities with many of the alleged co-conspirators, but instead Weyker fabricated extensive documentary and testimonial evidence of coercion, commercial sex with minors, and enticement.

30.     Upon information and belief, Weyker provided fabricated, knowingly false, misleading, and/or exaggerated statements and evidence to federal prosecutors, various law enforcement personnel, and a federal grand jury in or about the Spring and/or Summer and/or Fall of 2010.

31.     For example, Weyker took thousands of pages of rough notes during the course of her investigation.  These notes contained little or no reference to commercial sex, but when Weyker later wrote her police reports, search warrant affidavits, inter-agency memoranda, and other pertinent documents, they were replete with allegations of commercial sex acts of minors who had been allegedly coerced by Osman and her co-Defendants.

32.     Perhaps worst of all, Weyker intentionally and maliciously manipulated, pressured, defrauded, coerced, and threatened the Jane Does into lying about their age,

whether they consented to sex acts, whether they were enticed or coerced by Osman and her co-defendants, whether they were paid for sex, and whether they traveled places voluntarily or not.  None of these women ever engaged in any commercial sex acts at the direction of Osman nor her former co-defendants; however, because of the nature of federal criminal conspiracy law, the false allegations against her co-defendants also violated Osman's federally secured civil rights.

33.    Weyker created the facade of a deep, meaningful relationship with the Jane Does, who she referred to as "my girls" in a news interview about the indictment.  In truth, she was insidiously cultivating a phony trust, which allowed Weyker to coerce and manipulate the Jane Does into fabricating evidence for her, such as turning willful runaway teenagers into kidnapping victims, and consensual sex acts between adults without pay into coerced, commercial sex acts with minors.

34.    Specifically regarding Osman, Weyker knowingly and intentionally manipulated, defrauded, threatened, coerced and pressured Jane Doe Three into fabricating evidence and testimony that her visit to Nashville was solicited by Osman for the purpose of commercial sex.  This was demonstrably false, and Weyker knew it.

35.    Weyker also attempted to manipulate, threaten, pressure, defraud, and coerce two other young women who knew Osman into framing Osman as a pimp or madam, but these young women ultimately resisted Weyker's threats, shaming, enticements, pressuring, and other coercive behaviors, and told Weyker the truth: that they were not engaged in commercial sex, had not been sex-trafficked or pimped, and that Osman was in no way involved in any commercial sex-trafficking.  Weyker ignored

8

this and voluminous other exculpatory evidence, and instead continued with her perfidious scheme to fabricate evidence against Osman, and others, of a sprawling, non-existent conspiracy to sex-traffic minors.

36.     Weyker also fabricated evidence that Osman had entered an agreement with some or all of the other co-defendants to sex-traffic minors and adults for financial gain, when Weyker knew that Osman had never entered into any such agreement regarding sex-trafficking of anyone for any reason.

37.     By fabricating a staggering amount of evidence, Weyker convinced an Assistant United States Attorney in Tennessee to indict the refugees against whom she had concocted her imaginary case in the Middle District of Tennessee.  This directly resulted in Osman losing over five years of her life to federal pre-trial detention while she awaited trial on the phony case based on Weyker's sprawling fabrications.

38.     Weyker was able to perpetrate her craven machinations because she was given a free hand by her supervisors and principals, including Bandemer and Robert Roes 1 – 3, who were deliberately indifferent to her committing constitutional violations against Osman and others.  Weyker worked with almost no supervision by her employer and principal, the City of Saint Paul and its Police Department.  For example, the vast majority of her reports were never reviewed or approved by her supervisors, in contravention of Department policy.

39.     By February 12, 2012, at the latest, Bandemer, the other supervisory Defendants, and the City had actual notice of the falsity of the allegations put forth by Weyker and others.

40.     Meanwhile, the AUSA in the Middle District of Tennessee slogged forward with the phony case he had been handed, and the federal government proceeded with trial in March 2012 against several of the defendants (not Osman) on four charges, including two conspiracy counts that named Osman.

41.     The jury acquitted six of the defendants of all charges.  *See Fahra*, 2016 WL 807380, at *8.

42.     The remaining three defendants were all acquitted by the district court on post-trial motions.  *U.S. v. Adan et al.,* Mid. D. Tenn. File No. 10-CR-260, Doc. No. 2958 (2012).  However, this did not end Osman's American Nightmare, as she remained in various forms of federal custody for nearly *four more years* after the acquittals of those nine co-defendants.  Despite the acquittals and scathing post-trial order for acquittal by the District Court for the Middle District of Tennessee, neither Weyker, Bandemer, Robert Roes, nor the City of Saint Paul took any remedial action to end the harm caused to Osman by the obvious, unreasonable, and unconstitutional actions of the Defendants.

43.     In affirming these acquittals, the Sixth Circuit expressed its "acute concern, based on [its] painstaking review of the record, that this story of sex trafficking and prostitution may be fictitious…" and that, because "all nine defendants were acquitted of all charges (six by the jury and three by the court), we merely recognize that we start our analysis from what is likely a fictitious story." *Fahra*, 2016 WL 807380, at *4.  The Sixth Circuit expressed particular concern with Weyker's conduct:

> a.  "The district court opined that Officer Weyker likely exaggerated or
>
>     fabricated important aspects of this story, noting (among other

inconsistencies) that Weyker's final reports frequently referred to sex for money while that assertion was conspicuously absent from her handwritten notes, appearing only once in all of those rough notes." *Id.* at 2.

b. "And Jane Doe 2 herself furthered the district court's suspicion when she testified on cross examination that Weyker had misstated facts in the reports, adding to and omitting things from her statements." *Id.*

c. "Elsewhere, the district court caught Weyker lying to the grand jury and, later, lying during a detention hearing, and scolded her for it on the record." *Id.*

d. "The defense has since pointed out that Weyker also lied on an application to get Jane Doe 2's family some $3,000 from the Tennessee victim's compensation fund, by claiming "abduction" (Jane Doe 2 flatly denied an abduction) and endorsing the validity of the forged birth certificate." *Id.*

44.    The Sixth Circuit also found it "curious that even though Officer Weyker (the lead agent), Jane Doe 2 (the principal victim-witness), and all but a few of the 30 defendants reside in Minnesota, and an overwhelming portion of the events at issue occurred in Minnesota, the federal prosecutor in Minnesota did not prosecute this case in Minnesota." *Id.*  In fact, the U.S. Attorney in Minnesota had previously reviewed the case, and correctly declined to prosecute it.  Thus Weyker added more fabricated evidence and took the case to the AUSA in Tennessee.

11

45.     Weyker's supervisors were deliberately indifferent to Weyker's unconstitutional actions spanning nearly a decade.  By 2012, at the very latest, Saint Paul, its Police Department, and Weyker's supervisors were all aware of the nature and extent of Weyker's fabricated evidence in a case that garnered news headline after news headline, because the first nine Defendants had been acquitted and Weyker's lies were exposed by the district court's orders in the Middle District of Tennessee.

46.     The City and all other supervisory Defendants had actual notice due to repeated findings by the United States District Court for the Middle District of Tennessee that Weyker was lying.  *United States v. Mohamud,* No. 3:10-cr-260, 2013 WL 1935506, at *11 n.6 (M.D. Tenn. May 9, 2013) (expressing "serious concerns about the truthfulness of Weyker's testimony to the grand jury."); *see also* Adan, No. 3:10-cr-260, ECF No. 1392 (referring to memorandum of Feb. 12. 2012 in which the Court found "serious issues about the testimony of the Government's lead agent [Weyker] in this action."); *U.S. v. Adan*, 913 F. Supp. 2d 555, 589 n.10 (M.D. Tenn. Dec. 19, 2012) (stating that "serious credibility issues arise from Jane Doe Two's testimony that involved the Government's lead agent.").

47.     However, in contravention of *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978), the Saint Paul Police Department and Weyker's supervisors, including Bandemer and Robert Roes, took no disciplinary or remedial action, which directly and proximately resulted in four more years of continued detention for Osman.

48.     Weyker similarly attempted to take no remedial action herself following the public recognition of her fabrications in 2012, which directly and proximately resulted in four more years of continued detention for Osman.

49.     Ultimately, a Third Superseding Indictment was filed on August 22, 2012, again primarily alleging that Osman was engaged in a conspiracy to recruit and transport minors for the purpose of engaging in commercial sex acts.

50.     The sole overt act attributed to Osman in the Third Superseding Indictment related to Jane Doe Three's unsolicited visit to Nashville in January 2008, alleging that Osman agreed to give Jane Doe Three food and shelter in exchange for Jane Doe Three engaging in commercial sex acts.  Again, there was in fact no such conspiracy, and Osman had no desire or expectation, express or implied, that Jane Doe Three, nor anyone else, engage in commercial sex acts, nor travel for that purpose.  Weyker knew this, and then fabricated material evidence to the contrary.

51.     Furthermore, although Saint Paul had previously disciplined Weyker numerous times, as well as - upon information and belief - failed to sustain numerous accusations of similar evidence fabrication practices in other Internal Affairs investigations.  However, Saint Paul took no remedial action, and made no attempt to meaningfully supervise Weyker, who traveled all over the Twin Cities and the Midwest piecing together an elaborate, and demonstrably false, story of commercial sex-trafficking.  As a direct and proximate result of this deliberate indifference by her employer and supervisors, Weyker used her fabricated evidence with impunity to deprive Osman of her liberty for an extended period of time.

52.     The Saint Paul Police Department publicly announced that Weyker was put on leave in March 2016, following the Sixth Circuit's ruling.  However, upon information and belief, she has since returned to duty.

53.     All federal charges against Osman and her alleged co-conspirators were dismissed on March 10, 2016.

54.     Osman never would have been indicted or detained had Weyker not fabricated evidence, coerced witnesses, and misled federal authorities.  Because of the nature of criminal conspiracy law, the evidence Weyker fabricated as to Osman's alleged co-conspirators directly and proximately caused Osman's own incarceration.

55.     Weyker's illegal and unconstitutional fabrication of evidence directly and proximately caused Osman to spend **years** wrongly imprisoned.  Following her November 2010 arrest, Osman remained imprisoned as a pre-trial detainee from November 2010 to June 2012.  Osman was released to home monitoring from June 2012 to September 2014; however, her home monitoring was revoked and she remained imprisoned as a pre-trial detainee from September 2014 until March 2016.  In total, Osman spent over five years in various federal custody settings as a direct and proximate result of Weyker's sprawling and tawdry scheme, and more than 36 months in jail.

56.     As a direct and proximate result of Weyker's illegal activities, Osman suffered a staggering loss of liberty in the prime of her life, and will continue to suffer from grave emotional distress for the rest of her life, as well as reduced earning capacity, lost income, and additional damages, including actual money damages for things like visitation traveling, phone calls from jail, food, and commissary.  These damages are a

natural and foreseeable consequence of being charged in a massive sex-trafficking case that garnered heavy news coverage for years.

57.    Osman was forced to serve all of the in-custody time at county jails.  These facilities, like most county jails, are not equipped to house inmates long-term.  While prisons offer vocational and educational opportunities, and allow for recreation and exercise, the jail in which Osman was housed contained no such opportunities for self-betterment.  Osman spent 23 hours a day on lockdown, and suffered from years without any exposure to sunlight.  Osman was also forced to eat food to which she had religious objections, and was unable to effectively practice her faith for years.  Without the 'amenities' of a prison, serving four years in a county jail - which is not intended for long-term warehousing of inmates - constitutes hard time.  Furthermore, due to the nature of the allegations against Osman, she was housed with the worst criminals in the jail, and afforded less protection than other inmates due to the allegations against her.

58.    Osman missed her cousin's wedding, the first birthday of her niece and nephew, the death of cousins, and countless other significant life events due to her wrongful incarceration.  Although she is now home with her family, nothing will ever be the same.  Osman's family often calls her throughout the day to make sure that nothing has happened to her.  Her entire family lives under a shroud of fear and anxiety that at any moment Osman's life and liberty could again be arbitrarily and capriciously snatched away by the false accusations of our trusted civil servants.

<u>COUNT I</u>
**42 U.S.C. § 1983 – Fourteenth and Fourth Amendment Violations**
*Plaintiff v. Weyker*

59.     Plaintiff realleges each of the preceding allegations as if set forth fully herein.

60.     Weyker fabricated evidence against Osman and her alleged co-conspirators maliciously, willfully, and with deliberate indifference to their liberty and constitutional rights, and in such a manner that shocks the conscience.

61.     Weyker's conscience-shocking fabrication of evidence while acting under color of state law violated Osman's clearly established and well-settled Fourteenth Amendment Due Process rights and infringed gravely upon her liberty interest.

62.     Weyker's fabrication of evidence while acting under color of state law also directly and proximately caused Osman to be wrongfully arrested, indicted, detained, and imprisoned in violation of her clearly established and well-settled Fourth Amendment rights.

63.     As a direct and proximate result of Weyker's acts and omissions, Osman was wrongfully denied her liberty, wrongly arrested, wrongly imprisoned, was forced to endure and will endure mental and emotional pain, suffering, and distress, actual money damages, lost wages, lost value of working time, loss of the enjoyment of life, and was damaged in an amount exceeding TEN MILLION ($10,000,000.00) DOLLARS.

64.     Weyker subjected Osman to these deprivations in such a manner as to render Weyker liable for punitive damages, which are hereby alleged as a matter of

federal common law pursuant to *Smith v. Wade*, 461 U.S. 30 (1983), in an amount

exceeding TEN MILLION ($10,000,000.00) DOLLARS.

65.     Osman is entitled to recovery of her costs against Weyker, including

reasonable attorneys' fees under 42 U.S.C. § 1988.

## COUNT II
### Fifth and Fourth Amendment Violations Under *Bivens*
*Plaintiff v. Weyker*

66.     Plaintiff realleges each of the preceding allegations as if set forth fully

herein.

67.     To the extent Weyker was deputized and/or deemed a federal actor and

represented herself as a federal agent acting under color of federal law at any time

material hereto due to her involvement with a federal task force, Weyker is liable for the

above-described Fifth[3] and Fourth Amendment violations under the federal common law

doctrine established in *Bivens v. Six Unknown Named Agents of Federal Bureau of*

*Narcotics*, 91 S.Ct. 1999 (1971).

68.     As a direct and proximate result of Weyker's acts and omissions, Osman

was wrongfully denied her liberty, wrongly arrested, wrongly imprisoned, was forced to

endure and will endure mental and emotional pain, suffering, and distress, actual money

damages, lost wages, lost value of working time, loss of the enjoyment of life, and was

damaged in an amount exceeding TEN MILLION ($10,000,000.00) DOLLARS.

---

[3] Unconstitutional conduct attributed to federal actors is governed by the Fifth
Amendment's Due Process Clause rather than the Fourteenth's, as alleged in Count I's
Section 1983 Action.  The Due Process theories of liability are the same under the Fifth
and Fourteenth Amendments.

69.     Weyker subjected Osman to these deprivations in such a manner as to render Weyker liable for punitive damages, which are hereby alleged as a matter of federal common law in an amount exceeding TEN MILLION ($10,000,000.00) DOLLARS.

70.     Osman is entitled to recovery of her costs against Weyker, including reasonable attorneys' fees under 42 U.S.C. § 1988 or other federal common law and statutory provisions.

### COUNT III
**Malicious Prosecution Under Minnesota State Law**

[WITHDRAWN][4]

### COUNT IV
**42 U.S.C. § 1983 Failure to Intervene**

[WITHDRAWN]

### COUNT V
**42 U.S.C. § 1983 Supervisory Liability**
*Plaintiff v. Bandemer and Robert Roes 1 – 3 in their individual capacities*

71.     Plaintiff realleges each of the preceding allegations as if fully set forth herein.

72.     Bandemer and Robert Roes 1 – 3 are Saint Paul Police Department supervisors who had actual or constructive notice of Weyker's pattern of unconstitutional acts.

---

[4] Plaintiff denotes withdrawn claims in this amended complaint, to avoid any confusion with regard to references to count numbers in the pending motions.

73.     Despite this notice, Bandemer and Robert Roes 1 – 3 demonstrated deliberate indifference to or tacitly authorized the offensive acts.

74.     Bandemer and Robert Roes 1 – 3 also failed to take any remedial action upon notice of Weyker's unconstitutional actions.

75.     As a direct and proximate result of Bandemer's and Robert Roes 1 – 3's acts and omissions, Osman was wrongfully denied her liberty, wrongly arrested, wrongly imprisoned, was forced to endure and will endure mental and emotional pain, suffering, and distress, actual money damages, lost wages, lost value of working time, loss of the enjoyment of life, and was damaged in an amount exceeding TEN MILLION ($10,000,000.00) DOLLARS.

76.     Bandemer and Robert Roes 1 – 3 subjected Osman to these deprivations in such a manner as to render them liable for punitive damages, which are hereby alleged as a matter of federal common law pursuant to *Smith v. Wade*, 461 U.S. 30 (1983), in an amount exceeding TEN MILLION ($10,000,000) DOLLARS.

77.     Osman is entitled to recovery of her costs against Bandemer and Robert Roes 1 – 3, including reasonable attorneys' fees under 42 U.S.C. § 1988.

### COUNT VI
**42 U.S.C. § 1983 Liability Under *Monell***
*Plaintiff v. Saint Paul, Bandemer and Robert Roes 1 – 3 in their Official Capacities*

78.     Plaintiff realleges each of the preceding allegations as if fully stated herein.

79.     Prior to Weyker's fabrication of evidence in this case, the City of Saint Paul, Bandemer, and Robert Roes 1 – 3 with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted, and/or ratified a

longstanding custom, pattern or practice with the force of law on the part of its officers,

including Weyker, of improperly fabricating evidence.

80.     Through the ratification and approval by Saint Paul's final policymakers,

such as the chiefs of police, of its officers' conduct, and by failing to discipline Weyker

or failing to intervene in Osman's unlawful detention after Weyker's illegal and

unconstitutional conduct came to light, there has been an approval or a deficient policy,

custom, or practice of fabricating evidence to establish probable cause without sanction

or consequence.

81.     The City of Saint Paul also had actual notice before the first indictment

naming Osman that there was a pattern or practice of fabricating evidence by

investigators, specifically Weyker.  By December of 2012, the Defendants named in this

Count had actual notice of Weyker's fabricated evidence in this particular case.

However, these Defendants were deliberately indifferent to, and tacitly authorized, the

use of such fabricated evidence by Weyker and other unnamed investigators within the

Saint Paul Police Department, and therefore failed to take any meaningful remedial,

disciplinary, or corrective action until March 2016.  This deliberate indifference and its

attendant failure to supervise or discipline investigators, including Weyker, for

fabricating evidence, directly and proximately caused Osman to remain in federal custody

for over five years.

82.     The violation of Osman's civil rights was directly and proximately caused

by the aforementioned acts and omissions and by the City's customs, patterns, and/or

practices.

83.     As a direct and proximate result of Saint Paul's, Bandemer's, and Robert

Roes 1 – 3's acts and omissions, Osman was wrongfully denied her liberty, wrongly

arrested, wrongly imprisoned, was forced to endure and will endure mental and emotional

pain, suffering, and distress, lost wages, lost value of working time, loss of the enjoyment

of life, and was damaged in an amount exceeding TEN MILLION ($10,000,000.00)

DOLLARS.

84.     Osman is entitled to recovery of her costs against Saint Paul, Bandemer,

and Robert Roes 1 – 3, including reasonable attorneys' fees under 42 U.S.C. § 1988.

**PLAINTIFF DEMANDS A JURY TRIAL TO ALL ISSUES OF FACT HEREIN.**

WHEREFORE, Plaintiff Hamdi Ali Osman prays for judgment against Defendants

as follows:

1.     As to Count I, a money judgment against Heather Weyker in the amount of

TWENTY MILLION ($20,000,000.00) DOLLARS, together with her costs, including

reasonable attorneys' fees under 42 U.S.C. § 1988, and prejudgment interest;

2.     As to Count II, a money judgment against Heather Weyker in the amount of

TWENTY MILLION ($20,000,000.00) DOLLARS, together with her costs and

prejudgment interest;

3.     As to Count V, a money judgment against John Bandemer and Robert Roes

1 – 3 in the amount of TWENTY MILLION ($20,000,000.00) DOLLARS, together with

her costs, including reasonable attorneys' fees under 42 U.S.C. § 1988, and prejudgment

interest;

4.     As to Count VI, a money judgment against Saint Paul, John Bandemer, and Robert Roes 1 – 3 in the amount of TEN MILLION ($10,000,000.00) DOLLARS, together with her costs, including reasonable attorneys' fees under 42 U.S.C. § 1988, and prejudgment interest; and

5.     For such other and further relief as this Court deems just and equitable.

**ANDREW IRLBECK LAWYER CHTD.**

Dated: March 13, 2017          /s/ Andrew M. Irlbeck
                              Andrew M. Irlbeck, #392626
                              First National Bank Building
                              332 Minnesota Street, Suite W1610
                              Saint Paul, Minnesota 55101
                              Phone: 651-366-6909
                              Fax: 651-223-5179
                              andrew@irlbecklaw.com

**NEWMARK STORMS LAW OFFICE LLC**

                              /s/ Jeffrey S. Storms
                              Jeffrey S. Storms, # 0387240
                              Jill A. Brisbois, #0345477
                              100 South Fifth Street, Suite 2100
                              Minneapolis, MN 55402
                              Phone: 612.455.7050
                              Fax: 612.455.7051
                              jeff@newmarkstorms.com

**APPLEBAUM LAW FIRM**

                              /s/ Paul Applebaum
                              Paul Applebaum, #223098
                              First National Bank Building
                              332 Minnesota Street, Suite W1610
                              Saint Paul, Minnesota 55101
                              Phone: 651-222-2999
                              Fax: 651-223-5179
                              paul@applebaumlawfirm.com