# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

HAMDI ALI OSMAN,

       Plaintiff,

  v.

HEATHER WEYKER, *in her individual*       Case No. 16cv908 (JNE/TNL)
*capacity as a St. Paul Police Officer*;     ORDER
ROBERT ROES 1-3, *in their individual*
*and official capacities as St. Paul Police*
*Officers*; THE CITY OF ST. PAUL;
JOHN BANDEMER, *in his individual*
*and official capacities as a St. Paul*
*Police Officer*,

       Defendants.

## I.    INTRODUCTION

Plaintiff Hamdi Ali Osman alleges violations of her constitutional rights in an investigation that led to her indictment by a federal grand jury and her subsequent arrest. The investigation targeted a suspected venture between mostly Somali individuals across Minnesota, Tennessee, and Ohio involving the sex-trafficking of minor girls, and resulted in the criminal indictment of thirty people in the Middle District of Tennessee in 2010-2011 ("Tennessee Case"). Osman alleges that Defendant Heather Weyker, a police officer for the St. Paul Police Department in Minnesota, who was at some point specially deputized as part of an FBI Task Force, played a key role in this investigation. Osman alleges that Weyker fabricated evidence about her and others throughout the investigation, culminating in a tainted indictment that was further corrupted by Weyker's continuing deception before the grand jury and leading up to the trial of nine of Osman's co-defendants. After the jury acquitted six of those co-defendants on all charges and the trial court granted motions for acquittal by the other three on the basis of a

variance between the proof at trial and the charged offenses, an appellate court affirmed the court's acquittals. The appellate court also took the highly unusual step of suggesting that "Weyker likely exaggerated or fabricated important aspects of th[e] story" told by the government's star witness at trial and that the entire case as presented at trial "is likely a fictitious story." *United States v. Fahra*, 643 Fed. Appx. 480, 482, 484 (6th Cir. 2016). Osman also sues John Bandemer, a St. Paul Police Department sergeant who is alleged to have been Weyker's supervisor; Robert Roes 1-3, who are alleged to be supervisory St. Paul police officers; and the City of St. Paul ("St. Paul").

Nineteen of Osman's co-defendants in the Tennessee Case have brought separate suits similarly alleging violations of their constitutional rights in the investigation, their indictment, and their arrests. A twenty-first person, who was not indicted in the Tennessee Case but was separately arrested on charges of intimidating a witness in that federal case, brings another civil suit against Weyker and others for alleged constitutional violations. A motion to consolidate these twenty-one cases was denied on November 21, 2016.

Weyker and Bandemer move to dismiss Osman's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and on absolute and qualified immunity grounds. Dkt. No. 59. St. Paul, which filed an answer, moves on behalf of the City of St. Paul and Robert Roes 1-3 for judgment on the pleadings pursuant to Rule 12(c). Dkt. No. 68. The Court held a hearing on these motions on May 3, 2017, and now grants in part and denies in part Weyker and Bandemer's motion and grants St. Paul's motion.[1]

---

[1] Defendants also moved to dismiss the complaints in each of the twenty related cases. In the interests of efficiency, the parties proposed and the Court ordered a consolidated briefing process. At the May 3, 2017 hearing, the Court heard arguments from all parties to the twenty-one cases, including Osman. Because the cases are not consolidated, the Court decides each separately. More recently, in June, two additional plaintiffs filed related cases, *see* Nos.

## II.     APPLICABLE STANDARDS

A motion to dismiss or a motion for judgment on the pleadings is appropriately granted "only when there is no dispute as to any material facts and the moving party is entitled to judgment as a [m]atter of law." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (citation omitted).  Further, to survive a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Haney v. Portfolio Recovery Assocs., LLC*, 837 F.3d 918, 924 (8th Cir. 2016), *as amended* (Dec. 27, 2016).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Haney*, 837 F.3d at 924 (quoting *Iqbal*, 556 U.S. at 678).  Although a pleading is not required to contain detailed factual allegations, a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).  The court reviews "the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation." *Haney*, 837 F.3d at 924 (citation omitted).

In ruling on a Rule 12(b)(6) or 12(c) motion, a court accepts the facts alleged in the complaint as true and grants all reasonable inferences in favor of the plaintiff.  *Haney*, 837 F.3d

---

17cv2069 & 17cv2070, but those cases are not subject to the pending motions.  In addition to the motions under consideration, the United States also filed a Motion to Substitute and Dismiss, which was mooted by the parties' stipulation as recognized by the March 6, 2017 Order Permitting the Osman Plaintiffs to Amend Complaints.  Dkt. No. 83.  Pursuant to that order and by stipulation, Osman filed a Second Amended Complaint [Dkt. No. 84], which is thus the operative complaint subject to these Rule 12 motions.

at 924; *Varga v. U.S. Bank Nat'l Ass'n*, 764 F.3d 833, 838 (8th Cir. 2014). In assessing the motion, the court "may consider some materials that are part of the public record," as well as materials that are "necessarily embraced by the pleadings," including publicly available court documents. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (citations and internal quotation marks omitted); *see also Greenman*, 787 F.3d at 887.

### III. FACTUAL ALLEGATIONS

The Court briefly summarizes salient factual allegations in Osman's Second Amended Complaint and some relevant facts from the court record in the Tennessee Case.

Weyker, who is sued in her individual capacity, and Bandemer, who is sued in his individual and official capacities, were both officers of the St. Paul Police Department during all relevant times. SAC ¶¶ 5-6. Weyker was an officer in the vice unit of the police department, and Bandemer was lead sergeant of that unit and Weyker's supervisor. SAC ¶¶ 6, 25.

Weyker became the lead St. Paul Police Department investigator of a suspected sex-trafficking ring, in an investigation connected with an FBI Task Force on sex-trafficking. SAC ¶ 17. On October 20, 2010, an indictment was filed in the Middle District of Tennessee charging Osman with several counts of conspiracy to recruit and transport minors for sex trafficking. SAC ¶ 18. No such conspiracy ever existed, and Weyker and Bandemer knew it. *Id.*

A First Superseding Indictment was filed on November 3, 2010, naming 29 defendants.[2] It charged Osman with five counts: two counts of conspiracy to violate 18 U.S.C. § 1591(a), which criminalizes the sex trafficking of minors, sex trafficking by force, fraud, or coercion, and knowingly benefiting from participating in such a sex-trafficking venture (Counts 1 and 2);

---

[2] Osman's complaint does not refer to the First Superseding Indictment, but counsel has acknowledged it. *See* Dkt. No. 89. Because the indictment is a matter of public record, the Court appropriately takes judicial notice of it. *Porous*, 186 F.3d at 1079. A Second Superseding Indictment named a thirtieth defendant. *See* DOJ Br. Ex. B, Dkt. No. 62-1.

conspiring to tamper with a witness, victim, or evidence in violation of 18 U.S.C. § 1512 (Count 3); obstructing or attempting to obstruct the enforcement of § 1591 (Count 4); and attempting to recruit a minor (Jane Doe Three) for sex trafficking (Count 14).  *See* First Superseding Indictment ("FSI"), *United States v. Osman*, No. 3:10cr260, Dkt. No. 36 (M.D. Tenn. Nov. 3, 2010) (submitted as Ex. V in support of Weyker and Bandemer's Reply, Dkt. No. 86-1).  The dates alleged in the sex-trafficking conspiracy counts spanned January 2000 through July 2010; while the obstruction-of-justice counts focused on April 28, 2009 through May 2009; and the recruitment count alleged an overt act on February 2, 2008.

On November 8, 2010, Osman was arrested.  SAC ¶ 19.  Because the indictment charged Osman with the sex-trafficking-related offenses, she was subject to a rebuttable presumption of pretrial detention.  SAC ¶ 20.  She was ordered detained pending trial.  *Id.*  Weyker had falsely formulated probable cause for those charges.  *Id.*; *see also* SAC ¶ 1.  But for those charges, Osman would not have been detained.  SAC ¶ 20.

The charges of a widespread sex-trafficking conspiracy were baseless.  "In reality, there was no child prostitution happening, no conspiracy, and no real evidence of a criminal organization or 'gang,' as noted by the Sixth Circuit."  SAC ¶ 23.  The indictment itself hints at the falsity underlying its charges by alleging such a wide time range, from 2000 through 2010, yet failing to allege any overt acts before 2005.  SAC ¶ 21.  Moreover, Osman was a minor during many of those years.  *Id.*

The indictment alleged that Osman attempted to entice Jane Doe Three into engaging in commercial sex acts in February 2008 in Nashville.  SAC ¶ 24; FSI ¶¶ 52-57.  Actually, around that time, she received a call from Jane Doe Three, who said she had left her home in Minneapolis and was coming to stay with Osman, who had recently moved to Nashville.  SAC

¶¶ 9-11. Osman said Jane Doe Three could not stay with her long-term but could stay with her until Jane Doe Three's mother came to pick her up, which the mother did the next day. SAC ¶¶ 12-13. Jane Doe Three's visit to Nashville was not solicited by Osman, and it had nothing to do with engaging in commercial sex. SAC ¶¶ 14, 16.

Weyker was motivated to fabricate evidence by a quest for glory. *See* SAC ¶¶ 25-26. The investigation was very important to the St. Paul Police Department's vice unit. SAC ¶ 25. So Weyker fabricated "[t]he overwhelming majority of the material evidence supporting the indictments in this alleged conspiracy" and fed it to the federal prosecutors in Tennessee who were duped into bringing the charges despite the absence of real probable cause. *See* SAC ¶¶ 27, 37, 44. Throughout the investigation, Weyker "worked with almost no supervision" by Bandemer, Robert Roes 1-3, or anyone in the department. SAC ¶ 38.

Other examples of false evidence fabricated by Weyker are:

- Weyker and Bandemer knew or had reason to know that several of the alleged Jane Doe victims were not actually minors, but Weyker fabricated or endorsed documents falsifying their ages. SAC ¶ 28.

- Weyker kept rough notes throughout her investigation that "contained little or no reference to commercial sex." SAC ¶ 31. Yet in police reports and affidavits, she added references to commercial sex acts of minors. *Id.*

- Weyker "manipulated, pressured, defrauded, coerced, and threatened the Jane Does into lying about" key facts like their ages, whether they had sex consensually, and whether they were paid for sex. SAC ¶ 32; *see also* SAC ¶¶ 33-34. None of the Jane Does ever engaged in any commercial sex acts at the direction of Osman or the other Tennessee Case defendants. SAC ¶ 32.

- Weyker tried to coerce two other young women into "framing Osman as a pimp or madam," but they refused. She ignored this exculpatory evidence. SAC ¶ 35.

Nine of Osman's co-defendants in the Tennessee Case went to trial in April 2012, and all were acquitted—six by the jury when it returned its verdict in May 2012 and three by the court in an order filed in December 2012, which granted in part the three co-defendants' motions for acquittal on the basis of a fatal variance. *See* SAC ¶¶ 40-42; *United States v. Adan*, 913 F. Supp. 2d 555, 560 (M.D. Tenn. Dec. 19, 2012). Notably, the jury acquitted all nine defendants on Count 2, which alleged a "conspiracy/venture to exploit minor females for commercial sex trafficking" based on "the same facts as in" Count 1, but the jury convicted three defendants on Count 1. *See id.* at 578. Even after these acquittals, Osman remained in "various forms of federal custody." SAC ¶ 42. In August 2012, after that trial, a Third Superseding Indictment was filed, again primarily alleging that Osman was engaged in a conspiracy to recruit and transport minors for the purpose of engaging in commercial sex acts. SAC ¶ 49. The only specific charges against Osman related to Jane Doe Three's trip to Nashville, and they were still supported by Weyker's "fabricated material evidence." SAC ¶ 50.

The government appealed the bench acquittals,[3] and the Sixth Circuit affirmed in an opinion that singled out Weyker multiple times, picking up on rebukes that the district court had made about Weyker during the pretrial proceedings. SAC ¶ 43. Osman remained in some form of pretrial detention during the three years between the government's filing of its appeal notice and the Sixth Circuit's issuance of that opinion and another related opinion in March 2016, as further trials were put on hold pending the appellate mandates. *See Osman*, No. 3:10cr260, Dkt.

---

[3] "If a court grants a motion to acquit after the jury has convicted, there is no double jeopardy barrier to an appeal by the government from the court's acquittal, because reversal would result in reinstatement of the jury verdict of guilt, not a new trial." *Evans v. Michigan*, 133 S. Ct. 1069, 1081 n.9 (2013).

No. 3497 (Oct. 22, 2013 order continuing trial). On March 10, 2016, the government dismissed all remaining charges against all remaining co-defendants, including the charges against Osman. SAC ¶ 53. She was then permanently released from custody. SAC ¶ 55.

By February 12, 2012, because of a district court order that discussed Weyker, her supervisors "had actual notice of the falsity of the allegations put forth by Weyker and others." *See* SAC ¶¶ 39, 45, 46. Moreover, St. Paul "had previously disciplined Weyker numerous times, as well as—upon information and belief—failed to sustain numerous accusations of similar evidence fabrication practices in other Internal Affairs investigations." SAC ¶ 51. But they took no action against her in 2012. SAC ¶¶ 47, 51. Only after the Sixth Circuit issued its opinion in 2016 did St. Paul announce that Weyker was put on leave. SAC ¶ 52.

## IV.    SUMMARY OF ARGUMENTS

The Court summarizes many of the parties' arguments to provide context for its reasoning.

Defendants contend there are myriad reasons to dismiss this action. *See* DOJ Br., Dkt. No. 61. Weyker and Bandemer argue that all claims brought against them pursuant to 42 U.S.C. § 1983 must be dismissed as a matter of law because they were acting as federal agents at the time of Osman's indictment, arrest, and detention, and federal actors are not subject to § 1983 liability. They then contend that the federal analog to § 1983 under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), is not available to Osman or the other plaintiffs. Weyker and Bandemer further assert that even if Osman might theoretically be able to bring a § 1983 or *Bivens* cause of action, her complaint still fails. First, to the extent Osman's claims are based on Weyker's testimony in court, they are barred by absolute immunity. Second, the claims are otherwise barred by qualified immunity because the

facts alleged do not make out a violation of a constitutional right that was clearly established at the time of the alleged violation. Bandemer argues that Osman has not plausibly alleged that he, as Weyker's supervisor, violated Osman's rights. Bandemer and Weyker further argue that Osman cannot bring claims for violations of due process because, first, they are barred by *Parratt v. Taylor*, 451 U.S. 527 (1981), in that Osman had adequate post-deprivation process. Second, the recent Supreme Court decision in *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), and other binding precedent hold that Osman's allegations sound, if at all, in the Fourth Amendment. *See also* DOJ Reply, Dkt. No. 85. And she has not stated a claim for a Fourth Amendment violation because she has not plausibly alleged that there was not arguable probable cause to arrest her. Finally, they contend that because Osman was indicted for not just allegedly fabricated sex-trafficking-related crimes but also for separate crimes, and because her complaint does not plausibly allege a lack of probable cause for her indictment on those counts, qualified immunity bars the entire Fourth Amendment cause of action. Separately, St. Paul argues that Osman fails to state a claim against the City of St. Paul or the Robert Roes because she has not plausibly alleged supervisory liability or municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). *See* St. Paul Br., Dkt. No. 70. Additional arguments were mooted by stipulation. *See* Dkt. No. 83 ¶¶ 7-8.

Osman argues that she plausibly alleged that Weyker fabricated evidence to create the false pretense of probable cause for arrest, and her fabrications violated a clearly established constitutional right under either the Fourth or Fourteenth Amendment. Osman Opp. to DOJ Mot. to Dismiss ("Osman DOJ Opp."), Dkt. No. 79. In support of her Fourth Amendment argument, she states that without Weyker's fabricated evidence, there was no arguable probable cause to arrest her. Osman maintains that all of the charges on which she was indicted, including the non-

sex-trafficking-related charges, were fabricated and entirely without factual support. Moreover, these other charges have no bearing on the analysis to the extent that she alleges violation of the substantive due process rights under the Fourteenth or Fifth Amendment. *Id.* at 32. At oral argument, Osman maintained that she could still pursue a substantive due process claim even after *Manuel*, and that the two constitutional theories are not mutually exclusive. She further disputes that the *Parratt* doctrine applies to bar her due process claims. As for whether Osman's claims are properly brought under § 1983 or *Bivens*, she contends that because at least some of Weyker's alleged fabrication of evidence occurred before she was federally deputized, § 1983 is the proper vehicle, but that Osman can alternatively bring her claims under *Bivens*. She also argues that she alleged that Bandemer, acting in his capacity as Weyker's supervisor on the St. Paul force, knew that Weyker was fabricating evidence and deliberately did nothing to stop Weyker. Finally, Osman rejoins that Defendants are not entitled to absolute immunity because she alleges that Weyker and Bandemer fabricated evidence separate from and long before any false grand jury testimony. In response to St. Paul's arguments, Osman asserts that she has plausibly alleged that Bandemer intentionally assisted Weyker with her fabrication and that he and other department supervisory officers were deliberately indifferent to a pattern or custom of evidence fabrication by Weyker and her unit. *See* Osman Opp. to St. Paul Mot., Dkt. No. 73.

## V. LEGAL ANALYSIS

There are two threshold questions: whether Osman's claims should be brought pursuant to 42 U.S.C. § 1983 or *Bivens*, and whether Osman's claims sound in the Fourth Amendment or substantive due process or both. Because Defendants assert the affirmative defense of qualified immunity, the Court must decide whether the facts alleged "make out a violation of a constitutional right" and whether that right was clearly established at the time of the alleged

violation.  *See Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (citation omitted).

Determining which constitutional right is implicated by the allegations is therefore the first step

in the Court's analysis.

### a.  Osman's Claims Must Be Analyzed Under the Fourth Amendment

Osman alleges, in short, that Weyker repeatedly fabricated evidence throughout her

investigation into the suspected conspiracy to sex-traffic minors and that these fabrications

created the illusion of probable cause to arrest and indict Osman where, in fact, no probable

cause existed.  What constitutional rights such alleged misfeasance implicates was a complicated

question while the parties were preparing their opening briefs, but was clarified by the Supreme

Court decision in *Manuel v. City of Joliet*, 137 S. Ct. 911 (Mar. 21, 2017).  Under *Manuel*, such

claims must be analyzed under Fourth Amendment jurisprudence.

Before *Manuel* was decided, case law in the Eighth Circuit had applied the Fourteenth

Amendment substantive due process clause to fabrication-of-evidence claims, although a recent

case had injected some doubt into that application.  In one case in which the plaintiffs were

arrested and held in pretrial detention but released after the state dropped the charges, the Court

of Appeals for the Eighth Circuit held that "the Fourteenth Amendment's guarantee of due

process is violated by 'the manufacture of . . . false evidence' in order 'to falsely formulate a

pretense of probable cause'" and affirmed the denial of summary judgment on the plaintiffs'

Fourth and Fourteenth Amendment claims against the investigating officers.  *Livers v. Schenck*,

700 F.3d 340, 343-44, 354-55, 358 (8th Cir. 2012) (citing *Moran v. Clarke*, 296 F.3d 638, 647

(8th Cir. 2002) (*en banc*)).  More recently, however, the Eighth Circuit appears to have construed

its substantive due process case law narrowly and rejected the application of substantive due

process analysis where the Fourth Amendment analysis could instead apply.  In *Stewart v.*

*Wagner*, 836 F.3d 978 (8th Cir. 2016), the appellate court held that a "plaintiff's claim that he

was arrested or prosecuted without probable cause . . . 'must be judged' under the Fourth Amendment, not substantive due process." *Id.* at 983 (quoting *Albright v. Oliver*, 510 U.S. 266, 270-71 (1994)). The *Stewart* Court distinguished *Moran* as involving "additional considerations" like the impact of the criminal charges on a public employee's career or alleged racial motivations behind an investigation. *Id.* at 983. It did not discuss the line of cases following *Moran*, such as *Livers*.

Whatever the state of the Eighth Circuit precedent, the Supreme Court's *Manuel* decision now makes clear what constitutional analysis to apply. Manuel alleged that he was arrested by state police without probable cause, and that based solely on a fabricated police report and fabricated evidence-technician report, a judge found probable cause for a drug charge against him. 137 S. Ct. at 915. Based on similarly false testimony by an arresting officer, a grand jury indicted him on the charge. *Id.* at 915 n.2. After further drug testing produced negative results, the state dismissed the charge and released Manuel from custody. *Id.* at 915-16. Manuel sued the city where he was arrested and several of its officers, alleging violations of his Fourth Amendment rights. The district and appellate courts held that Manuel could not bring a Fourth Amendment claim. *See id.* at 916. The Supreme Court reversed. The Court held that under its longstanding precedent, *see id.* at 917-18, "the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process," *id.* at 920. And such a claim was thus not properly brought under the Due Process Clause. The Court's analysis makes clear that either the Fourth Amendment or the Due Process Clause applies—not both. In rejecting the appellate court's treatment of Manuel's claim as a due process violation rather than Fourth Amendment, the Court concluded, "[i]f the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then *the right* allegedly infringed lies in the Fourth

Amendment." *Id.* at 919 (emphasis added); *see also id.* at 918 ("[T]he Fourth Amendment remained *the 'relevan[t]' constitutional provision* to assess the 'deprivations of liberty'—most notably, pretrial detention—'that go hand in hand with criminal prosecutions.'") (quoting *Albright*, 510 U.S. at 274) (emphasis added).  Under this "constitutional division of labor," *id.* at 920 n.8, "once a trial has occurred, the Fourth Amendment drops out: A person challenging the sufficiency of the evidence to support both *a conviction* and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment," *id.* (emphasis added).  This binary approach is consistent with the rule that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."  *Albright*, 510 U.S. at 273 (plurality opinion) (citation and quotation marks omitted); *Stewart*, 836 F.3d at 983; *Greenman*, 787 F.3d at 890 (citation omitted).[4]

Here, because Osman challenges her pretrial detention, the Fourth Amendment is the relevant constitutional provision.  *See Manuel*, 137 S. Ct. at 918.  Osman was never convicted (nor, for that matter, were most of her co-defendants in the Tennessee Case), so the Fourth Amendment does not drop out, and the due process clause under the Fifth or Fourteenth Amendments is not applicable to her claims.  *See id.* at 920 n.8.

### b.  Applicability of *Bivens*

Because these are Fourth Amendment claims, given the context of this particular case, the Court need not decide whether the proper vehicle for Osman's claims is a § 1983 or *Bivens*

---

[4] In an Eighth Circuit opinion decided after *Manuel*, the appellate court affirmed the denial of summary judgment on a plaintiff's Fourteenth Amendment due process claim for fabrication of evidence.  *Manning v. Cotton*, No. 16-3076, 2017 WL 2856400, at *3-4 (8th Cir. July 5, 2017) (citing *Livers*, 700 F.3d at 354).  The opinion did not mention *Manuel* or address whether the Fourth Amendment should instead have applied to the plaintiff's claim that she was wrongly detained based on planted evidence, perhaps because the matter was briefed in 2016 before *Manuel* was decided.

cause of action.  It is well established that a *Bivens* cause of action exists for arrests that

allegedly violate the Fourth Amendment for lack of probable cause.  *See, e.g.*, *Ziglar v. Abassi*,

137 S. Ct. 1843, 1854 (U.S. June 19, 2017) (plurality opinion) (describing the *Bivens* holding as

"enforc[ing] a damages remedy to compensate persons injured by federal officers who violated

the prohibition against unreasonable search and seizures"); *Davis v. Passman*, 442 U.S. 228,

233-34 (1979) (describing *Bivens* as recognizing a federal cause of action for damages caused

when "federal agents had allegedly arrested and searched Bivens without probable cause" in

violation of the Fourth Amendment); *Keil v. Triveline*, 661 F.3d 981, 985 (8th Cir. 2011) (stating

without further comment that "Keil brought this action pursuant to *Bivens* . . . against the four

federal agents involved in his investigation and arrest, alleging that his arrest and detention

violated the Fourth and Fifth Amendments").  Several aspects of this case clearly weigh in favor

of allowing a *Bivens* claim: the right at issue—the Fourth Amendment—is the same as in *Bivens*,

and the defendants are individual investigating police officers, not high-level executive officers

or military officers or private employees of a private entity.  *See Ziglar*, 137 S. Ct. at 1860

(plurality opinion); *Minneci v. Pollard*, 565 U.S. 118, 125-26 (2012).

Defendants argue nevertheless that this case presents a new context for *Bivens*.  The

Court disagrees.  Defendants first argue that a *Bivens* remedy has never been recognized for

"alleged injustices arising from federal *prosecution*," as opposed to arrest.  DOJ Br. 20.  This

argument loses its force in the face of their other argument that after *Manuel*, Osman's claim

must be analyzed only as a Fourth Amendment violation for arrest without arguable probable

cause, which is the type of claim that the *Bivens* decision itself recognized.  Indeed, vindicating

the Fourth Amendment right to be free from arrest on federal charges without probable cause

was a concern central to its reasoning and holding.  *See Bivens*, 403 U.S. 388, 392-93 (1971)

(discussing *Gambino v. United States*, 275 U.S. 310 (1927)). The Court agrees with Defendants that, per *Manuel*, this is not a substantive due process case, in which a *Bivens* remedy might be novel. *Compare with Vennes v. An Unknown Number of Unidentified Agents of United States*, 26 F.3d 1448, 1451-52 (8th Cir. 1994) (analyzing whether there is a right to relief under *Bivens* as to an alleged substantive due process claim). Moreover, the fact that there was legal process in Osman's case, whereas *Bivens* involved only an arrest, is not a meaningful distinction. Per *Manuel*, the legal process, such as the grand jury's indictment, does not remove Osman's claim from the Fourth Amendment unreasonable seizure analysis. *See Manuel*, 137 S. Ct. at 919. If legal process is not fatal to a pretrial detainee's claim for arrest and detention without probable cause, the Court sees no compelling reason why it should thrust that claim into a new context for *Bivens* purposes. Other courts have applied *Bivens* on similar facts. *See, e.g.*, *Keil*, 661 F.3d at 985-86 (analyzing Fourth Amendment claim brought pursuant to *Bivens* where a federal criminal complaint had been issued against Keil allegedly without probable cause); *see also Meeks v. Larsen*, 611 F. App'x 277, 282-83 (6th Cir. 2015) (in a case in which plaintiffs, whom a grand jury indicted, alleged that they were arrested without probable cause based on a misleading warrant affidavit, recognizing as "well-established" the availability of a *Bivens* remedy for a Fourth Amendment violation based on a deliberately false warrant affidavit); *cf. Engel v. Buchan*, 710 F.3d 698, 708 (7th Cir. 2013) (finding that where "an FBI agent stands accused of violating the constitutional rights of a person targeted for a criminal investigation and prosecution," the claim "parallel[ed] *Bivens* itself" and was materially indistinguishable for *Bivens* purposes). Defendants suggest that *Bivens* should be limited to its facts as "a claim against FBI agents for handcuffing a man in his own home without a warrant." DOJ Ltr. 2, Dkt. No. 92 (quoting *Ziglar*, 137 S. Ct. at 1860 (plurality opinion)). The Court finds this

characterization of *Bivens* too narrow, as evidenced by some of these other cases in which *Bivens* has applied. It is true that an overly simplistic comparison between cases will not do; high-level similarities such as the right at issue and the mechanism of injury do not end the inquiry. *See Ziglar*, 137 S. Ct. at 1859 (plurality opinion). But at least on this record, the Court does not find this case to be meaningfully different from other *Bivens* cases for unconstitutional arrest without probable cause.

The Court has considered but is not persuaded by Defendants' other arguments for finding that this case and the related cases against Weyker *et al.* present a new context for *Bivens*. Defendants argue that the investigation of child sex-trafficking is a high-priority initiative. But the plaintiffs do not challenge any government policy of prioritizing child sex-trafficking investigations, so these cases are unlike *Ziglar*, in which pretrial detainees challenged a high-level executive policy reflecting sensitive national security concerns. 137 S. Ct. at 1860 (plurality opinion). Defendants construe the cases as, at bottom, challenging Weyker's interactions with the Jane Does, and argue that the claims thus "involve limited 'judicial guidance as to how an officer should respond to the problem or emergency' at hand (*i.e.*, how to interact with possible victims of child sex-trafficking)." DOJ Ltr. 2 (quoting *Ziglar*, 137 S. Ct. at 1860 (plurality opinion)). Although it might be that the rules for interviewing children thought to be victims of sexual abuse are hazy, Defendants' characterization of Osman's case appears overly simplistic in view of the allegations as a whole, and the same is true as to the other complaints. The differences identified by Defendants are not as meaningful as those that the Supreme Court has recognized as requiring a special factors analysis. For instance, these cases do not involve extraterritorial conduct, *see Meshal v. Higgenbotham*, 804 F.3d 417, 424 (D.C. Cir. 2015), *cert. denied*, No. 15-1461, 2017 WL 2742911 (U.S. June 27, 2017), or call for a

remedy to address the "death by a thousand cuts" caused by an alleged campaign of governmental abuse, *see Wilkie v. Robbins*, 551 U.S. 537, 555 (2007).[5] The Court finds that this case and the related cases do not present a new *Bivens* context.

Deciding whether the proper cause of action would be § 1983 or *Bivens* is unnecessary at this time. A *Bivens* remedy would be available, so the question is not dispositive of the case. And *Bivens* claims are analyzed like § 1983 claims. *Mendoza v. U.S. Immig'n & Customs Enf't*, 849 F.3d 408, 416 n.3 (8th Cir. 2017); *see also Iqbal*, 556 U.S. at 675-76.

### c. Legal Framework for Analyzing Osman's Fourth Amendment Claim

The Court must decide whether Osman plausibly alleges that the Defendants violated her right to be free from unreasonable seizure by arresting and detaining her based on fabricated evidence.

As an initial point, it is not fatal to Osman's Fourth Amendment claim that a grand jury indicted her. An arrest without probable cause still violates the defendant's Fourth Amendment rights even if her case moves forward through legal process. *Manuel*, 137 S. Ct. at 914, 918-19 & nn. 2 & 8. If that legal process "goes wrong" or is "tainted"—"when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements" or where

---

[5] Defendants read *Wilkie* as suggesting that *Bivens* actions are inappropriate in cases challenging criminal proceedings because the criminal justice system has many built-in procedural safeguards and tools. *See* DOJ Br. 21-22. *Wilkie* concerned whether to "devise a new *Bivens* damages action for retaliating against the exercise of ownership rights," 511 U.S. at 549, and its analyses of the various remedies available for the many alleged violations of the plaintiff's rights were non-binding *dicta* building up to the conclusion that he sought a novel remedy that could account for the sum of these violations, *see id.* at 554. Defendants read too much into these analyses. The *Wilkie* Court's discussion of the remedies available to the plaintiff for an allegedly baseless criminal prosecution actually recognized that he might not have had a remedy under state law and noted without comment that he had brought but abandoned a claim under the Fourth Amendment. *See* 551 U.S. at 552 & n.6. Moreover, the claims in *Bivens* relate to the criminal justice system, and "the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose" is beyond question. *Ziglar*, 2017 WL 2621317, at *11 (plurality opinion).

a grand jury indictment "was entirely based on false testimony"—then it does not extinguish the claim. *Id.* at 918, 920 n.8. "Legal process" does not "expunge [a] Fourth Amendment claim" where "the process [a criminal defendant] received failed to establish what that Amendment makes essential for pretrial detention—probable cause to believe he committed a crime." *Id.* at 919-20. Osman alleges that the prosecutors who brought the charges were fooled by Weyker's fabricated evidence into accepting the "phony case." SAC ¶¶ 28, 40, 44. She also implies that the federal grand jury indicted her based on "fabricated, knowingly false, misleading and/or exaggerated statements and evidence." SAC ¶ 30; *see also* SAC ¶¶ 27, 43(c), 46. The Court concludes that Osman has alleged the outline of a Fourth Amendment claim for unlawful arrest followed by tainted legal process.

Another threshold question is causation. Osman does not allege that Weyker or any other Defendants were involved in her arrest. But that point is not fatal to her claim: She alleges that Weyker, by marshalling fabricated evidence, fooled the prosecutor into bringing the charges, fooled the grand jury into indicting, and thereby caused Osman's arrest. An officer may be held liable for the submission of an objectively unreasonable warrant application that causes an ensuing arrest, even though a judge issued the warrant. *Malley v. Briggs*, 475 U.S. 335, 344 & n.7 (1986). By the same logic and principles, an officer could be held liable for soliciting or pressuring a prosecutor to press charges and seek an indictment leading to the defendant's arrest, when the officer knew that the "evidence" presented to the prosecutor and the grand jury was fabricated. *See Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 100 (1st Cir. 2013) (stating that police officers may be liable for Fourth Amendment violations for unlawful pretrial detention when they have lied to or misled the prosecutors, failed to disclose exculpatory evidence, or unduly pressured the prosecutors to seek indictment); *Evans v. Chalmers*, 703 F.3d 636, 647-48

(4th Cir. 2012) (same); *cf. Buckley v. Fitzsimmons*, 509 U.S. 259, 273 & n.5 (1993) (indicating that police officers may be liable for acts taken during the "search[] for the clues and corroboration" to support a probable cause finding or for investigative work after a probable cause determination); *Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir. 2004) ("[O]fficers who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions.") (citation omitted). As a "matter of elementary principles of legal causation that are as applicable to constitutional torts as to common law torts, . . . if [the plaintiff] would have been prosecuted even if the [police officer] defendants had behaved properly, then they did not cause his injury and are not liable." *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) (considering a Fourth Amendment claim). But causation could be sufficient if the jury "could find that the [police officer] defendants systematically concealed from the prosecutors, and misrepresented to them, facts highly material to . . . the decision whether to prosecute . . . and whether (that decision having been made) to continue prosecuting him right up to and into the trial." *Id.*; *cf. Manuel*, 137 S. Ct. at 920 n.8 (Fourth Amendment claim was not expunged where indictment "was entirely based on false testimony").

A court thus asks whether an officer who allegedly fabricated evidence tainted the grand jury process. A complicating factor for that analysis is witness immunity. A grand jury witness is entitled to absolute immunity from a § 1983 claim based on the witness' testimony. *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012). That immunity extends to a witness' "preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony," *id.* at 370, but it does not extend to all of a testifying witness' earlier activity outside

the courtroom, *id.* at 370 n.1.  For example, absolute immunity does not apply to officers "who falsify affidavits and fabricate evidence concerning an unsolved crime;" they are subject instead to qualified immunity.  *Id.* (citations and quotation marks omitted).  But the court may not use "evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution."  *Id.* at 369.  Thus, the court may not rely on what was actually said in testimony before the grand jury.  The focus must be on alleged wrongdoings in the investigation resulting in the allegedly unconstitutional seizure.  *See King v. Harwood*, 852 F.3d 568, 587-88 (6th Cir. 2017) (post-*Manuel*, holding that "where (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements . . . or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist *solely* of grand-jury testimony or preparation for that testimony . . . , the presumption that the grand-jury indictment is evidence of probable cause is rebuttable and not conclusive") (emphasis added); *cf. Buckley*, 509 U.S. at 275 & n.6 (explaining that qualified immunity, not absolute immunity, could apply to state actors who solicited allegedly fabricated testimony during investigative work).

    With those initial questions resolved, the Court turns to the applicable test.  To evaluate whether a person's Fourth Amendment right has been violated by an arrest pursuant to a warrant that lacked probable cause, the court applies the analysis set out in *Franks v. Delaware*, 438 U.S. 154 (1978).  *See Hawkins v. Gage Cty.*, 759 F.3d 951, 958-59 (8th Cir. 2014); *Hernandez-Cuevas*, 723 F.3d at 101-02, 105.  Thus, the court considers whether there were deliberately or recklessly false statements made in support of a finding of probable cause and whether those statements were necessary to the finding of probable cause.  *See Franks*, 438 U.S. at 156;

*Hernandez-Cuevas*, 723 F.3d at 101-02; *Williams v. City of Alexander*, 772 F.3d 1307, 1311 (8th Cir. 2014); *cf. Malley*, 475 U.S. at 345 (holding that in assessing the civil liability of an officer alleged to have obtained an arrest warrant despite the lack of probable cause, the question to ask is "whether a reasonably well-trained officer in [defendant's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant"). The court also considers whether material information was omitted with the intent to mislead or with reckless disregard as to whether the omission was misleading. *See Williams*, 772 F.3d at 1312; *Hawkins*, 759 F.3d at 959. If, setting aside the false statements (or adding in the omitted information), there was no probable cause to arrest, then the arrest violated the Fourth Amendment. *See Williams*, 772 F.3d at 1312-13; *Hawkins*, 759 F.3d at 959. But if on the other hand, after making the needed corrections there was still probable cause to arrest, then there was no Fourth Amendment violation.[6] Probable cause "exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Greenman*, 787 F.3d at 888 (citation omitted).

Where a plaintiff alleges that she was arrested without probable cause and the defendant asserts the qualified immunity defense, courts ask whether there was "*arguable* probable cause to arrest." *Stewart v. Wagner*, 836 F.3d 978, 984 (8th Cir. 2016) (citing *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015)) (applying this standard to a Fourth Amendment claim for detention

---

[6] In *dicta* in *Bagby v. Brondhaver*, 98 F.3d 1096, 1099 n.2 (8th Cir. 1996), the court suggested that it may not be appropriate to deny Fourth Amendment liability where probable cause remains after correcting the record if those corrections are necessary because an officer deliberately lied. A "more stringent rule may be appropriate" for "a liar." *Id.* This observation complements the general rule that qualified immunity does not protect "those who knowingly violate the law." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009) (citation omitted). The appeals court has declined to expand on this *dicta* in two cases where it was unnecessary to reach the question. *Block v. Dupic*, 758 F.3d 1062, 1064 n.2 (8th Cir. 2014); *Williams*, 772 F.3d at 1311 n.2. The Court need not reach the question here.

based on allegedly false and incomplete information in a probable cause statement). An arresting officer who had "a mistaken but objectively reasonable belief" that probable cause existed thus would be entitled to qualified immunity. *McCabe v. Parker*, 608 F.3d 1068, 1078 (8th Cir. 2010). Osman alleges, however, that there was no mistaken belief—rather, that Weyker knowingly fabricated the material evidence. The "arguable probable cause" standard arguably would not apply if Weyker intentionally misled, but Osman does not press the argument, *see* Osman DOJ Opp. 34-35. "[T]he issue for immunity purposes is not probable cause in fact but arguable probable cause, that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." *New*, 787 F.3d at 899. "It is clearly established that the Fourth Amendment requires a *truthful factual showing* sufficient to constitute probable cause before an arrest warrant can issue." *Peterson v. City of Plymouth*, 60 F.3d 469, 477 (8th Cir. 1995) (quoting *Moody v. St. Charles Cty.*, 23 F.3d 1410, 1412 (8th Cir. 1994)) (emphasis added).

In summary, the linchpin question before the Court is whether Osman has plausibly alleged that, absent any fabricated evidence, there would not have been arguable probable cause to indict, arrest, and detain her.

### d. Analysis of Osman's Claim Under the Fourth Amendment

The Court first considers whether Osman has plausibly alleged that Weyker fabricated material evidence. The Court disregards mere conclusory statements, focuses on well-pleaded factual allegations, and applies its judicial experience and common sense. *See Iqbal*, 556 U.S. at 678-79. The Court also properly considers the Tennessee Case court record in assessing the pleadings. *See, e.g.*, *Greenman*, 787 F.3d at 887. This case is unusual because the Court has access to the entire record of a lengthy, complex, hard-fought criminal case, including its appellate record. So unlike with the usual motion to dismiss, the Court has before it a trove of

facts that it could consider. The parties have attached certain documents from the Tennessee Case record to their motions, and they invite the Court to take judicial notice of facts in that record. *See, e.g.*, Osman DOJ Opp. 30. The Court is cautious, however, about delving too deeply without the benefit of all parties' full review of and comprehensive citations to that record as might be expected at the summary judgment stage. Therefore, the Court will take judicial notice of some documents in the Tennessee Case record but remains mindful that its familiarity with that record is relatively surface-level, as is appropriate at the Rule 12 motion stage. As this case progresses, the parties will need to guide the Court through a much deeper expedition into the Tennessee Case record.

Osman leans heavily on the nine acquittals and the Sixth Circuit's opinion affirming the district court's acquittal order to lend plausibility to her claims. A jury acquitted six defendants, and the court acquitted the other three.

As an aside, the Court notes that it uses the term "acquittal" to maintain consistency with the word choice of the Tennessee Case courts and the plaintiffs in these civil cases. The use of that word should not necessarily imply, however, a finding of innocence by the Tennessee Case district court or even a final judgment for double jeopardy purposes. It is blackletter law that an acquittal by a jury is not appealable and triggers double jeopardy protection. Whether a court's finding of a fatal variance is a final judgment "resolv[ing] the question of [a defendant's] guilt or innocence as a matter of sufficiency of the evidence," which would preclude retrial, *Evans v. Michigan*, 133 S. Ct. 1069, 1078 (2013), or rather a decision on "some procedural ground" that does not preclude retrial of that defendant, *id.* at 1075, is a more difficult question. Using the label "acquittal" is not determinative to the question of finality. *Id.* at 1078; *United States v. Szpyt*, 785 F.3d 31, 38 (1st Cir. 2015). It appears possible that a defendant who was "acquitted"

on the basis of a fatal variance could be retried. *See Szpyt*, 785 F.3d at 36 ("[W]here reversal is based upon a variance between the crime charged in the indictment and the crime proved at trial, the Double Jeopardy Clause is no bar to retrial.") (citation omitted); *United States v. Hughes*, 505 F.3d 578, 589 (6th Cir. 2007) (stating that "even though a variance occurred," the defendants "did not suffer substantial prejudice *so as to justify a new trial*") (emphasis added). *But cf. United States v. Camiel*, 689 F.2d 31, 35, 38 (3d Cir. 1982). Here, in granting in part the oral motions for judgment of acquittal made pursuant to Federal Rule of Criminal Procedure 29 by the three defendants whom the jury found guilty on Count 1, the district court rejected two arguments for acquittal based on sufficiency of the evidence, but granted on the ground of fatal variance because the government had proved five conspiracies at that trial rather than one as alleged. *See United States v. Adan*, 913 F. Supp. 2d 555, 579 (M.D. Tenn. Dec. 19, 2012). The district court found that the government's proof at the April 2012 trial had neither "establish[ed] any characteristics of a vertical distribution scheme" (*i.e.*, "chain conspiracy"), *id.* at 577, nor offered "any evidence of [a] discernible 'hub'" to establish a "wheel conspiracy," *id.* at 578. The appellate court reviewing that decision and some related orders characterized the disposition as "full acquittals." *United States v. Afyare*, 632 Fed. Appx. 272, 274 (6th Cir. 2016). Contrary to this characterization, it is not entirely clear from the district court's memorandum whether its grant of the Rule 29 motions was a true "acquittal" for double jeopardy purposes or if it contemplated that the three defendants could be retried. *See Adan*, 913 F. Supp. 2d at 575 ("the Defendants' convictions must be set aside"), 579 ("the Defendants' motions for a dismissal on grounds of" variance "should be granted," and "[i]f the [c]ourt is in error on the issue of multiple conspiracies, the Defendants *remain entitled to a new trial*") (emphasis added); *see also United States v. Fahra*, No. 13-5296, Dkt. No. 61-1, at 10 (6th Cir. Dec. 18, 2013) (submitted in this

case at DOJ Reply Ex. BB) ("The district court granted a new trial as to the convicted conspirators."). The Court makes no findings on double jeopardy, but merely cautions that its use of the word "acquittal" should not necessarily be equated with a finding of innocence or a finding that there was actually no conspiracy as charged in the indictment. It should be noted that even after the April 2012 trial, other co-defendants were still expected to go to trial on Counts 1 and 2, among other counts. *See Afyare*, 632 Fed. Appx. at 275-286 (interpreting 18 U.S.C. § 1591(a) because it would affect pretrial rulings in upcoming trials).

In its order granting the post-trial motions for acquittal, which Osman characterizes as "scathing," SAC ¶ 42, the district court injected two footnotes specifically discussing Weyker. It first noted that "Weyker did not testify at trial and after prior hearings in this action, the Court expressed serious concerns about the truthfulness of Weyker's testimony to the grand jury." *Adan*, 913 F. Supp. 2d at 568 n.9 (referring to Dkt. Nos. 1392, 2664, and 2673 of the Tennessee Case and to a hearing it held on July 31, 2012, a transcript of which was later produced at Dkt. No. 3731).[7] The second footnote related to discussion of the prosecution's late production of Jencks materials, including Weyker's rough notes. *See id.* at 589. Referring again to Dkt. No. 1392 and the July 31, 2012 detention hearing, the district court reiterated that it had "found serious issues about the testimony of [the] Government's lead agent in this action" and that its "concern arose again" at the detention hearing "reflecting her misrepresentation of the facts about the Defendant Abdifatah Sharif Omar that resulted in his release." *Id.* at 589 n.10. The court added that "serious credibility issues arise from Jane Doe Two's testimony that involved the Government's lead agent." *Id.*

---

[7] The district court repeated this footnote in a later order. *See United States v. Mohamud*, 3:10cr260, 2013 WL 1935506, at *11 n.6 (M.D. Tenn. May 9, 2013).

The document at Dkt. No. 1392, to which the district court referred in these footnotes, is a pretrial memorandum. *United States v. Farah*, No. 3:10cr260, Dkt. No. 1392 (M.D. Tenn. Feb. 15, 2012). In it, the district court decided co-defendant Mohamed S. Omar's motion to reconsider his detention order and co-defendant Faduma M. Farah's motion to suppress identification of her by Jane Doe One. Both motions related to photographic show-ups conducted by Weyker. The district court noted that in Weyker's grand jury testimony about one of the show-ups, she testified inconsistently, first testifying that the witness Jane Doe One had identified a photograph with "80%" certainty, then testifying "that Jane Doe One was 100% sure." *Id.* at 2. The district court also found that Weyker had failed to include in the written report of one show-up that a witness had changed her identification from "Cash Money" to "Moe D." *Id.* at 2-3. The court also remarked that "[t]here are serious issues about Weyker's June 30, 2010 testimony before the Grand Jury" about a particular identification. *Id.* at 3.[8] And the court found that the show-up related to F. Farah was unduly suggestive. *Id.* at 4. Nonetheless, the court ordered continued detention of M. Omar and denied F. Farah's motion to suppress. *Id.* at 3, 5.

As for the July 31, 2012, detention hearing, which occurred after the trial of the nine co-defendants, but before the district court ruled on the motions for acquittal, the district court reconsidered whether another co-defendant, Abdifatah Sharif Omar, could be detained—and this time, ordered his release from custody. *See United States v. Adan*, No. 3:10cr260, Dkt. No. 2664 (M.D. Tenn. July 31, 2012). At the hearing, A. Omar's counsel argued that the overt act attributed to him in the indictment as occurring on June 8, 2009 was contradicted by the

---

[8] A trial court presiding over a criminal case may appropriately consider and make credibility determinations about witnesses before it in pretrial proceedings, but in quoting the Tennessee Case district court's analysis of a witness's grand jury testimony, the Court is mindful that in a civil case, that testimony is shielded by absolute immunity.

government's own witness Noreeldeen Abdulkarim's grand jury testimony about the date, but that Weyker nonetheless testified that the alleged activity occurred on June 8, 2009. *See* Det. Hrg. Tr. 17-19, No. 3:10cr260, Dkt. No. 3731 (M.D. Tenn. July 31, 2012). In deciding to order A. Omar's release, the district court stated on the record:

> The Court has had increasing concerns about this case and the exhibit that was offered by the defendant citing the grand jury testimony of the two witnesses cited by the defendant . . . . And based on what is charged and based upon what has been presented about that charge, I have serious questions about it. And I don't think that, given what has been presented about the underlying offense, that this defendant should be detained any longer.

*Id.* at 25-26. The court's release order thus relied in part on its concern about Weyker's testimony and arguably, by inference, her investigative work as to the contested date.

Although Osman does not quote from these record documents in her complaint, she in essence incorporates them by reference by citing the district court's acquittal order, SAC ¶ 42, and the Sixth Circuit's opinion affirming that order, SAC ¶ 43. The appellate opinion reflects, in a pause-worthy passage, some of these various comments about Weyker by the district court. In its recitation of the facts, the appellate court wrote:

> The district court opined that Officer Weyker likely exaggerated or fabricated important aspects of this story, noting (among other inconsistencies) that Weyker's final reports frequently referred to sex for money while that assertion was conspicuously absent from her handwritten notes, appearing only once in all of those rough notes. And Jane Doe 2 herself furthered the district court's suspicion when she testified on cross examination that Weyker had misstated facts in the reports, adding to and omitting things from her statements. Elsewhere, the district court caught Weyker lying to the grand jury and, later, lying during a detention hearing, and scolded her for it on the record. The defense has since pointed out that Weyker also lied on an application to get Jane Doe 2's family some $3,000 from the Tennessee victim's compensation fund, by claiming "abduction" (Jane Doe 2 flatly denied an abduction) and endorsing the validity of the forged birth certificate.

*United States v. Fahra*, 643 Fed. Appx. 480, 482 (6th Cir. 2016). It is not every day that an appellate court goes out of its way to note apparent instances of fabrication or giving of false

testimony by the government's lead investigator. The court also more subtly impugned Weyker's work when it described a chain of events in which Jane Doe Two visited Nashville, was detained by local police, told them one story, and then, "when the Nashville Police put her on the telephone with Officer Weyker, she changed her story to include acts of prostitution and sex trafficking." *Id.* at 482-83. In addition, the appellate court also took the unusual step of "acknowledg[ing] that we are proceeding, as we must, on the story the prosecution presented at trial, despite our acute concern, based on our painstaking review of the record, that this story of sex trafficking and prostitution may be fictitious and the prosecution's two primary witnesses, Jane Doe 2 and Jane Doe 5, unworthy of belief." *Id.* at 484. The appellate court did not mince words: "Given that all nine defendants were acquitted of all charges . . . , we merely recognize that we start our analysis from what is likely a fictitious story." *Id.*; *see also id.* at 492 ("[I]f the prosecution proved any sex trafficking at all (and we have serious doubts that it did), then at best it proved two separate, unrelated, and dissimilar sex-trafficking conspiracies . . . ."). These highly unusual statements by an appellate court add some plausibility to Osman's allegations, as do some of the district court's remarks when taken altogether.

The appellate court also found it "curious" that even though Weyker, Jane Doe 2, "and all but a few of the 30 defendants reside in Minnesota, and an overwhelming portion of the events at issue occurred in Minnesota, the federal prosecutor in Minnesota did not prosecute this case in Minnesota." *Id.* at 482. Osman alleges that after the Minnesotan prosecutors "correctly declined" the case, "Weyker added more fabricated evidence and took the case to the AUSA in Tennessee." SAC ¶ 44.

The acquittals and decisions do not fully support all the weight Osman places on them. Her claim is that there was not arguable probable cause to arrest her. With that test in mind, the

Court notes that before the bench acquittals of three of Osman's co-defendants, the jury was persuaded beyond a reasonable doubt that they were guilty of conspiring to sex-traffic minors on Count 1 of the indictment (a count in which Osman was charged too), and that one was also guilty of recruiting the minor Jane Doe Two to engage in a commercial sex act. *See Adan*, 913 F. Supp. 2d at 560. Moreover, the court's decision to acquit rested on the relatively narrow, technical ground of material variance: "Defendants' motions for a dismissal on grounds of the *Government's proof of multiple conspiracies* rather tha[n] the single conspiracy in the Second Superseding Indictment should be granted." *Id.* at 579 (emphasis added). Finding that the prosecution proved five conspiracies, *id.* at 579, consistent with the defendants' arguments, *see id.* at 570, is a far cry from finding that all material evidence was fabricated or that *no* conspiracies were proved. Notably, the district court rejected arguments for acquittal based on the age of Jane Doe Two (finding there was evidence that "could provide the jury a basis to find that at the times at issue, Jane Doe Two was under the age of 18") and based on alleged inconsistencies in Jane Doe Two's trial testimony (finding that "the Defendants have raised serious issues of credibility, but have not shown Jane Doe's testimony to be 'indisputably false'"). *Id.* at 564, 570. In the end, the district court alternatively ordered new trials of the three defendants who had been found guilty, *id.* at 590, and began preparing to try the next set of defendants, *see Afyare*, 632 Fed. Appx. at 274. Thus, Osman was still expected to stand trial even after the nine co-defendants' acquittals.

Similarly, although the Court is struck by the *Fahra* Court's deliberate and pointed discussion of Weyker, the Court also recognizes several limitations on the weight of those remarks. First, to say that a "panel" of judges called the case fictitious is wrong: Two of the three judges on the panel concurred in the judgment but not the opinion. *See Fahra*, 643 Fed.

Appx. at 494 (White and Cox, JJ., concurring). Second, the remarks by the one judge were in *dicta*, and were made *post hoc* with the benefit of a full pretrial and trial record.

In addition, Defendants point out a different Sixth Circuit panel opinion as more favorable to their position. After the district court issued its December 2012 order granting the three co-defendants' motions for acquittal and new trials, in the Spring of 2013, the court ordered some of Osman's co-defendants to be released from pretrial detention. *See United States v. Mohamud*, No. 3:10cr260, 2013 WL 1935506, at *1 (M.D. Tenn. May 9, 2013 memorandum); *id.* Dkt. No. 3049 (February 1, 2013 order reflecting on-the-record rulings).[9] The government filed an interlocutory appeal, and a Sixth Circuit panel reversed the district court, ordering continued detention pending trial or retrial. *United States v. Fahra*, No. 13-5296, Dkt. No. 61-1, at 10 (6th Cir. Dec. 18, 2013) (DOJ Reply Ex. BB). Even recognizing that nine co-defendants had been acquitted, and despite the credibility questions about Jane Doe Two that had come to light, this panel found that "[t]he indictments, the testimony and evidence presented at the defendants' detention hearings, and the testimony at trial" all "evidence that the defendants were engaged in a conspiracy [to] traffic minors for sex." *Id.* at 7. That the appellate court found adequate support for continuing pretrial detention of some of Osman's co-defendants may pose a challenge to Osman and the other civil plaintiffs' Fourth Amendment claims once they are considered on a fuller record. But on this Rule 12 motion, this order does not render Osman's allegations implausible given the totality of her pleadings, including the *Fahra* court's remarkable suggestions that Weyker had fabricated evidence or made false statements. *See* 643 Fed. Appx. at 482.

---

[9] The May 9, 2013 memorandum refers to Osman, *see* 2013 WL 1935506, at *3, even though the February 2013 order did not involve her. Osman had been released from pretrial detention in June 2012, after the district court granted her unopposed motion to reconsider her detention order. *See* No. 3:10cr260, Dkt. Nos. 2575, 2612.

Some of the Sixth Circuit court's characterizations in *Fahra*, made as they were in *dicta* not material to the appellate court's decision, might be illuminated by further examination of the record or by fact development. For example, the *Fahra* opinion stated "that Weyker's final reports frequently referred to sex for money while that assertion was conspicuously absent from her handwritten notes" as support for its proposition that "[t]he district court opined that Officer Weyker likely exaggerated or fabricated important aspects of this story." *Id.* at 482; *see also* SAC ¶¶ 31, 43(a). But the district court's discussion of Weyker's reports is actually more complex. Focusing on four pages of Weyker's rough notes out of thousands, the court found three references to sex for money. *Adan*, 913 F. Supp. 2d at 568-69 ("find guys to have sex for money;" "be on a money mission;" "mtg guys for sex & $"). Rather than questioning the accuracy of those notes, the district court concluded that "[t]he agent's abbreviated quotes of Jane Doe Two about sex for money lend some credence to Jane Doe Two's trial testimony." *Id.* at 570. The Court goes through this exercise to underscore why more factual development of the record is necessary and appropriate. The *Fahra* court's remarks imply that Weyker may have fabricated evidence and lend some plausibility to Osman's allegations, but those comments are not determinative of the merits of this civil case.

Similarly, Osman's reliance on the appellate court's statement about Jane Doe Two's application for victim compensation funding merits some discussion now that it is clear that the Fourth Amendment provides the structure for analyzing Osman's claims. She alleges that "[t]he defense has since pointed out that Weyker also lied on an application to get Jane Doe 2's family some $3,000 from the Tennessee victim's compensation fund, by claiming 'abduction' (Jane Doe 2 flatly denied an abduction) and endorsing the validity of [Jane Doe 2's] forged birth

certificate." SAC ¶ 43(d) (quoting *Fahra*, 643 Fed. Appx. at 482).[10] She further alleges that

"Weyker even went so far as to fabricate and/or endorse documents falsifying the ages of certain

alleged Jane Doe victims." SAC ¶ 28. There is no indication in any of the record documents

that have been brought to the Court's attention that Jane Doe Two's "forged birth certificate"

was created by Weyker or that Weyker knew it was false before the prosecution did. As for Jane

Doe Two's application to the Tennessee victim compensation fund, the parties dispute whether

Weyker was involved in the submission of that form. Weyker argues that Jane Doe Two

authenticated her own handwriting on the form. DOJ Br. 84. And the district court appeared to

attribute to Jane Doe Two's mother the submission of the false birth certificate with the funding

application. *Adan*, 913 F. Supp. 2d at 566. Setting aside these factual questions—which merely

serve to reinforce the Court's impression that dismissal of the claims against Weyker at the

pleadings stage is not merited—it bears remembering that Osman will eventually have to prove

that even if Weyker did know about and promote the use of the false birth certificate during the

pre-arrest phase, that birth certificate was material to her indictment and arrest. It is far from

clear at this stage of the civil case what information the grand jury had before it when it indicted

Osman. But at the trial of her nine co-defendants, the government offered more evidence of Jane

Doe Two's age, including her own testimony, testimony of lay witnesses and schoolmates, and

school photographs. *Adan*, 913 F. Supp. 2d at 563-64. And even after serious questions were

---

[10] Counsel at oral argument characterized such allegations as alleging that Weyker "bribed" Jane Doe Two. The Court finds little support in the complaint for this interpretation. The Court is also not persuaded that helping a potential minor victim of sex trafficking apply for benefits for which she may be eligible would, if true, rise to the level of improper manipulation of a witness. Federal policy for human trafficking investigations encourages investigators to help provide victims with resources. *See, e.g.*, FBI, "What We Investigate: Human Trafficking/Involuntary Servitude," https://www.fbi.gov/investigate/civil-rights/human-trafficking/ (last accessed July 11, 2017). Counsel did not object to the Court's taking judicial notice of this government website.

raised at trial about Jane Doe Two's age, the district court still did not grant acquittals based on the age element or for false testimony about her age. *Id.* at 564, 570. Indeed, the Sixth Circuit panel that reviewed the detention release order recognized that "Jane Doe Two testified at trial that she was unclear what her exact age was, and the government stipulated that her birth certificate was false." *Fahra*, No. 13-5296, Dkt. No. 61-1, at 7. "Therefore," it continued, "the jury was aware that Jane Doe Two's age, and whether she was a minor, had been called into question," and yet the jury convicted three co-defendants on charges relating to Jane Doe Two. *Id.* Without knowing what evidence of Jane Doe Two's age was presented to the grand jury, the Court cannot begin to determine whether the false birth certificate was material to the indictment of Osman, but if the evidence was as presented at trial, it could be a challenging argument for this plaintiff.

In addition to her allegations based on the *Fahra* appellate opinion and the district court acquittal order, Osman also alleges some facts more particular to her. She alleges, for instance, that the charge about Jane Doe Three's trip to Nashville was untrue and unsupported:

> Jane Doe Three was not a prostitute, did not travel to Nashville to engage in commercial sex, and her presence in Nashville was not solicited by Osman. Moreover, Osman had no intention, desire or expectation that Jane Doe Three engage in commercial sex anywhere at any time. There was no agreement or understanding, implicit or explicit, of any commercial exchange or sexual activity, and none in fact occurred.

SAC ¶ 14. Osman concludes that "Weyker knowingly and intentionally manipulated, defrauded, threatened, coerced and pressured Jane Doe Three into fabricating evidence and testimony that her visit to Nashville was solicited by Osman for the purpose of commercial sex." SAC ¶ 34. There is nothing specifically alleged to connect the dots to *Weyker's* liability, but added to the other factual allegations in the Second Amended Complaint, these allegations bolster the plausibility of the pleading. For example, although Osman does not specifically allege that

Weyker interviewed Jane Doe Three, one may reasonably infer it, especially given the allegations that Weyker was the lead investigator. *See also Adan*, 913 F. Supp. 2d at 589 (referring to Weyker as "the government's lead agent"). Osman also alleges that the true facts were that Jane Doe Three contacted her, that Osman said the girl could not stay with her for long but could stay with her until her mother came to retrieve her, and that the girl's mother picked up Jane Doe Three within a day of her arrival—a short, uninvited, and uncontroversial visit by Jane Doe Three. SAC ¶¶ 11-14. These alleged facts add some plausibility to Osman's theory that testimony against her was fabricated. The Court notes, however, that it appears that Osman's version of the events was disclosed to the grand jury and that she was nonetheless indicted. The First Superseding Indictment acknowledges that when Jane Doe Three's mother picked her up from Osman's residence, "Osman informed Jane Doe Three's mother that she had not invited Jane Doe Three to Nashville, Tennessee, and that Jane Doe Three had come to Nashville, Tennessee, without Osman's permission." FSI ¶ 57. This point may ultimately be relevant to a determination of whether Weyker misled the prosecution and grand jury, but the Court's role at this stage is not to evaluate the plausibility of each individual allegation. *See Haney*, 837 F.3d at 924 (citation omitted).[11]

In addition, Osman alleges that Weyker attempted to manipulate or coerce two other young women into framing Osman, and when they refused, she "ignored this and voluminous other exculpatory evidence." SAC ¶ 35. Though the complaint does not name the women or

---

[11] Furthermore, allegations that Weyker coerced or manipulated testimony by the Jane Does, *see, e.g.*, SAC ¶¶ 33-34, although only a part of the total allegations, raise a question about what rules apply when investigating child sex abuse cases. The Eighth Circuit has recognized that there is "uncertainty surrounding acceptable investigative techniques for suspected child sexual abuse," and that the uncertainty "derives in part from the unique reluctance of victims of this crime to acknowledge that it has occurred." *Myers v. Morris*, 810 F.2d 1437, 1459 (8th Cir. 1987), *abrogated on other grounds by Burns v. Reed*, 500 U.S. 478 (1991).

provide any information about them, the specific reference to these two individuals adds to the other allegations to nudge the complaint over *Iqbal*'s plausibility line.

Considering the allegations "as a whole," and assessing the "cumulative power" of the well-pleaded facts, the Court finds that Osman has alleged adequate facts about Weyker to survive the Rule 12 motion. *See Haney*, 837 F.3d at 924; *Hernandez-Cuevas*, 723 F.3d at 103. The remarks about Weyker in the Sixth Circuit court's *Fahra* opinion, along with several findings by the district court about her, add heft to the specific allegations by Osman about her innocence with respect to the charges against her in the Tennessee Case and other specific allegations as set forth above. The pleadings against Weyker as a whole meet the plausibility requirement even in view of the officer's qualified immunity defense. The Court's decision also is influenced by the strange posture of this case, in which a full trial court and appeals record for a complex criminal case is publically available, but only a tiny fraction of it has been analyzed and cited by the parties to this civil lawsuit. Particularly in light of the extremely unusual circumstance of an appellate court's specifically calling out apparent instances of "exaggerat[ion] or fabricat[ion]," "misstat[ing] facts in [police] reports," and "lying to the grand jury" by the government's lead investigator, *Fahra*, 643 Fed. Appx. at 482, Osman's allegations against Weyker suffice to survive Weyker's motion to dismiss. On these pleadings, the Court finds it appropriate to allow for more in-depth review of the criminal case record and some factual development through discovery.

### i. Implication of Additional Counts Charged Against Osman

Weyker and Bandemer argue that even if Osman plausibly alleges that Weyker fabricated evidence material to the indictment for sex-trafficking-related charges, the fact that Osman was also indicted on non-trafficking-related charges defeats her Fourth Amendment claim. They

assert that Osman does not plausibly allege a lack of arguable probable cause for her indictment on the obstruction-of-justice charges (Counts 3 and 4).  *See Greenman v. Jessen*, 787 F.3d 882, 887-88 (8th Cir. 2015); *cf. Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (no Fourth Amendment violation if there is probable cause to arrest based on any criminal offense, even if the officer's subjective reason for arresting was a different offense).

As explained above, Osman adequately alleges that no sex-trafficking conspiracy existed and that Weyker fabricated evidence as to the sex-trafficking-related charges, leading to Osman's unlawful arrest and continued detention.  The obstruction-of-justice counts are so intertwined with the sex-trafficking-conspiracy charges that the Court cannot find, on this record, that Defendants are entitled to qualified immunity because of Counts 3 and 4.

The Tennessee Case indictment's factual allegations as to Osman on Counts 3 and 4 are almost non-existent.  Count 3 alleged in part conspiring from April 28 through May 2009 to "prevent the communication to a law enforcement officer of information relating to the commission or possible commission of a Federal Offense . . . ," FSI ¶ 70, apparently relating to alleged efforts to interfere with Jane Doe Two's role as a sex-trafficking victim-witness in the case, *see* FSI ¶¶ 72, 74-77.  The indictment does not, under the "Overt Acts" section of Count 3, accuse Osman of taking any particular action.  *See* FSI ¶¶ 71-81.  There is merely a reference to a "Hamdi" in an allegation that in May 2009, one of the Tennessee Case co-defendants was told that "the number for Jane Doe Two's family had been provided to Hamdi and she would speak to the family."  FSI ¶ 77.  It is unclear whether this refers to Osman at all, and even if it does, a rumor does not suffice to establish probable cause.  *See Livers v. Schenck*, 700 F.3d 340, 358 (8th Cir. 2012).  Neither does Count 4, in charging Osman with knowingly attempting to obstruct

the enforcement of 18 U.S.C. § 1591(a)—that is, the enforcement of Counts 1 and 2—allege any specific facts. *See* FSI ¶ 82.

The Court does not mean to imply that the civil pleading standards apply to a charging instrument in a prosecution, but the lack of specificity in the Tennessee Case charges matters in Osman's case. The Court has already concluded that Osman adequately alleges a lack of probable or arguable probable cause to arrest her on Counts 1 and 2. Counts 3 and 4 charge Osman with interfering with the prosecution of those same sex-trafficking-conspiracy counts. That Counts 3 and 4 lack specificity as to Osman makes it difficult to conclude, on a motion to dismiss, that arguable probable cause existed as to these not-entirely-separate charges. Therefore, in this case, the factual allegations that Osman pleads with regard to the sex-trafficking-conspiracy, which meet the *Iqbal* standard, also lend plausibility to Osman's allegations that "[b]ut for the evidence Weyker fabricated, no probable cause existed to detain or otherwise restrict Osman's liberty" at all. SAC ¶ 1; *see also* SAC ¶ 54.

### e. Supervisory Liability

The supervisory liability allegations are a different matter. Osman sues Bandemer and Robert Roes 1-3 in their individual capacities as supervisors. She alleges that they were deliberately indifferent to but not direct participants in Weyker's alleged violations.

A supervisor sued in his or her individual capacity in a § 1983 or *Bivens* suit "is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *see also S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) ("Government officials are personally liable only for their own misconduct."). "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1)

received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Krigbaum*, 808 F.3d at 340 (citing *Livers*, 700 F.3d at 355). "This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient." *Id.* The notice prong requires that "[t]o impose supervisory liability, other misconduct [allegedly giving the supervisor notice] must be very similar to the conduct giving rise to liability." *Id.* (quoting *Livers*, 700 F.3d at 356).

The complaint contains barely any allegations—much less well-pleaded facts—regarding supervisory liability. Osman alleges that Bandemer was the lead sergeant for the St. Paul Police Department's vice unit and had supervisory responsibility over Weyker, and that the Robert Roes also were supervisors. She alleges that "Bandemer knew" that no conspiracy to sex traffic minors existed and "knew or had reason to know that several of the alleged Jane Doe victims were not actually minors," but that the conspiracy case was the vice unit's "largest case" and was of "paramount importance" to the unit. SAC ¶¶ 18, 25, 28. This conclusory allegation that Bandemer knew that the conspiracy was made up is contradicted by the allegations that Weyker "was given a free hand by her supervisors" and "worked with almost no supervision," as evidenced by the fact that "the vast majority of her reports were never reviewed or approved by her supervisors." SAC ¶ 38. She also alleges that "[b]y February 12, 2012, at the latest, Bandemer, the other supervisory Defendants, and the City had actual notice of the falsity of the allegations put forth by Weyker and others," based on an order by the district court in the Tennessee Case that was filed on that date, "in which the [district court] found 'serious issues about the testimony of the Government's lead agent [Weyker] in this action.'" SAC ¶¶ 39, 46 (citing Dkt. No. 1392 in the Tennessee Case). The other two opinions that Osman cites both

refer back to this same pretrial order at Docket No. 1392 and to the July 31, 2012 detention hearing for A. Omar. SAC ¶ 46; *see United States v. Mohamud*, No. 3:10cr260, 2013 WL 1935506, at *11 n. 6 (M.D. Tenn. May 9, 2013); *United States v. Adan*, 913 F. Supp. 2d 555, 568 n.9, 589 n.10 (M.D. Tenn. Dec. 19, 2012). She also alleges that the Defendants were on notice of Weyker's unconstitutional acts based on the nine co-defendants' acquittals and the "scathing post-trial order for acquittal by the District Court for the Middle District of Tennessee," and that other orders and subsequent news coverage put Defendants on notice. SAC ¶¶ 42, 45.

These allegations do not sufficiently plead supervisory liability based on notice. To take Osman's example of the February 12, 2012 pretrial order by the district court, that order alone would not have sufficed to put Bandemer or the Robert Roes on notice that Weyker had fabricated evidence material to Osman's indictment, even assuming it was brought to their attention. As discussed above, that pretrial order concerned two motions based on photographic show-ups conducted by Weyker. Notwithstanding some comments in *dicta* about Weyker's grand jury testimony, the district court denied both motions. *United States v. Farah*, No. 3:10cr260, Dkt. No. 1392, at 3, 5 (M.D. Tenn. Feb. 15, 2012). The district court found that continued detention of co-defendant M. Omar was appropriate because of testimony about Jane Doe One's "emotional reaction" to a photograph of him, *id.* at 3, and denied a motion to suppress because Jane Doe One's identification of co-defendant F. Farah had sufficient indicia of reliability, *id.* at 5. The court's rulings on these motions therefore gave no indication that Weyker or anyone had fabricated evidence material to the indictments of Osman and her 29 co-defendants. If anything, its denials of the motions could be seen as affirmation that the prosecution should proceed.

Similarly, the other examples provided in the complaint do not suffice to show that Weyker's supervisors would have been on notice of the alleged constitutional violations that Osman now alleges. A jury found three co-defendants guilty of the sex-trafficking conspiracy. And even after it granted their bench acquittals, the district court anticipated that these three might be retried. Other co-defendants, moreover, were readying for trial. Meanwhile, a panel of the Sixth Circuit found pretrial detention was still warranted as to some co-defendants, reversing the district court, and found that the "the testimony at trial evidence[d] that the defendants were engaged in a conspiracy [to] traffic minors for sex." *United States v. Fahra*, No. 13-5296, Dkt. No. 61-1, at 7 (6th Cir. Dec. 18, 2013). In light of the fact that the case was still moving forward, the several comments by the district court in a few pretrial documents among thousands on the case docket would not have put Weyker's supervisors on notice that she allegedly fabricated most of the evidence in the case—again, even assuming those several documents were brought to the supervisors' attention, which is not alleged and is not reasonably inferred given the complexity and length of the case. This is not a case in which supervisors allegedly failed to review *misconduct* reports about an officer or officers. *Compare with Johnson v. City of Ferguson*, No. 16-1697, 2017 WL 3139437, at *7 (8th Cir. July 25, 2017) (2-1 decision).

Moreover, Osman's allegations do not establish a pattern of unconstitutional acts by Weyker. Ignoring her conclusory or unsupported allegations, Osman does not allege any other similar acts by Weyker before her Tennessee Case investigation that could show a pattern about which Bandemer or the Robert Roes personally knew. The allegations fail to state a claim for supervisory liability, and the supervisory defendants are entitled to qualified immunity. *See Livers v. Schenck*, 700 F.3d 340, 357 (8th Cir. 2012) (finding supervisory liability allegations that were vague, speculative, and mere assertions were "not a basis for denying qualified

immunity"); *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 635 (8th Cir. 2010) (affirming the dismissal with prejudice of claims that were not adequately pleaded where the defendants asserted qualified immunity).

### f. Municipal Liability

Osman sues St. Paul as well as Bandemer and the Robert Roes in their official capacities for municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694. "Instead," a municipality is liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Id.*

A plaintiff therefore must show that there is an "official" policy or a "custom or usage with the force of law." *Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016). A plaintiff must plead "allegations, reference, or language by which one could begin to draw an inference that the conduct complained of . . . resulted from an unconstitutional policy or custom." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (citation omitted). "Misconduct among a municipality's employees must be 'continuing, widespread, [and] persistent' to establish such a custom." *Kelly*, 813 F.3d at 1075 (citation omitted). "In addition, the municipality will not be liable unless policymaking officials exhibit '[d]eliberate indifference to or tacit authorization of such conduct . . . after notice to the officials of that misconduct." *Id.* (citation omitted). To show deliberate indifference or authorization, even "the single act or decision" of a decisionmaker might suffice if that decisionmaker "possesses final authority to establish municipal policy over the subject matter in question." *Speer v. City of Wynne*, 276 F.3d 980, 987 (8th Cir. 2002) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112,

123 (1988)).  The question is whether a "governmental policy or custom was the 'moving force' that led to the deprivation of [the plaintiff's] constitutional rights."  *Id.* at 986.

Osman alleges that Weyker acted alone, with little supervision.  SAC ¶ 38.  She alleges no well-pleaded facts to support a theory that acts by multiple St. Paul Police Department members combined to violate her rights.  Nor does she allege facts that would demonstrate an official department *policy* that moved officers to fabricate evidence or coerce witnesses and mislead prosecutors and grand juries to secure indictments.  She also does not plausibly allege any such *custom* because, among other reasons, she has not adequately alleged notice, *see supra* Section V.e.  She has not plausibly alleged facts to support a reasonable conclusion that Weyker or other St. Paul officers had fabricated evidence before the Tennessee Case investigation and that St. Paul knew about it.  The mere conclusory allegation that St. Paul "had previously disciplined Weyker numerous times" and "upon information and belief" that St. Paul "failed to sustain numerous accusations of similar evidence fabrication practices in other Internal Affairs investigations" does not suffice.  *See* SAC ¶ 51.[12]  The supervisory defendants sued in their official capacities, and the City of St. Paul, are entitled to qualified immunity on these claims.

## VI.    Conclusion

Osman has adequately pleaded a constitutional violation against Weyker, but not against any of the other Defendants.  As to Defendants Bandemer, Robert Roes 1-3, and the City of St. Paul, the Court grants their motions and dismisses with prejudice.  *See Ulrich v. Pope Cty.*, 715 F.3d 1054, 1060-61 (8th Cir. 2013) (affirming dismissals with prejudice of Fourth Amendment claim and supervisory liability claim); *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591

---

[12] Unlike in *City of Ferguson*, No. 16-1697, 2017 WL 3139437, at *6, which analyzed supervisory liability, not municipal liability, this conclusory allegation is not supported with well-pleaded facts.

F.3d 624, 635 (8th Cir. 2010) (affirming dismissal of constitutional claims with prejudice for failure to state a claim under *Iqbal* standards, entitling defendants to qualified immunity).  The Court will not grant leave to amend based on a request made in passing at the end of a brief without complying with local rules or in any way indicating what changes might be made.  *See In re Baycol Prod. Litig.*, 732 F.3d 869, 880 n.8 (8th Cir. 2013).

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants Heather Weyker and John Bandemer's Motion to Dismiss [Dkt. No. 59] is GRANTED IN PART and DENIED IN PART consistent with the above opinion.

2. Defendant City of Saint Paul's Motion for Judgment on the Pleadings [Dkt. No. 68] is GRANTED.

3. Plaintiff Hamdi Ali Osman's Second Amended Complaint is DISMISSED WITH PREJUDICE as to Defendants John Bandemer, Robert Roes 1-3, and the City of St. Paul.

4. Counts I and II of Plaintiff Hamdi Ali Osman's Second Amended Complaint are DISMISSED WITH PREJUDICE to the extent they plead violations of the Fifth and Fourteenth Amendments.

Dated: August 9, 2017

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge