# United States Court of Appeals
## For the Eighth Circuit

___

No. 17-3207

___

Yasin Ahmed Farah

*Plaintiff - Appellee*

v.

Heather Weyker, in her individual capacity as a St. Paul Police Officer

*Defendant - Appellant*

The City of St. Paul; John Does 1–5, in their individual capacities as St. Paul Police Officers; Richard Roes 1–5, in their individual capacities as federal law enforcement officers

*Defendants*

------------------------------

The Human Trafficking Institute

*Amicus on Behalf of Appellant*

___

No. 17-3208

___

Ifrah Yassin

*Plaintiff - Appellee*

v.

Heather Weyker, individually and in her official capacity as a St. Paul Police Officer

*Defendant - Appellant*

The City of St. Paul; John Does 1–2, individually and in their official capacities as St. Paul Police Officers; John Does 3–4, individually and in their official capacities as supervisory members of the St. Paul Police Department

*Defendants*

------------------------------

The Human Trafficking Institute

*Amicus on Behalf of Appellant*

------------------------------

No. 17-3209

------------------------------

Hamdi Ali Osman

*Plaintiff - Appellee*

v.

Heather Weyker, in her individual capacity as a St. Paul Police Officer

*Defendant - Appellant*

The City of St. Paul; John Bandemer, in his individual and official capacities as a St. Paul Police Sergeant; Robert Roes 4–6, in their individual and official capacities as supervisory members of the St. Paul Police Department

*Defendants*

------------------------------

-2-

The Human Trafficking Institute

*Amicus on Behalf of Appellant*

---

No. 17-3210

---

Ahmad Abnulnasir Ahmad

*Plaintiff - Appellee*

v.

Heather Weyker, in her individual capacity as a St. Paul Police Officer

*Defendant - Appellant*

The City of St. Paul; John Bandemer, in his individual and official capacities as a St. Paul Police Sergeant; John Does 1–2, in their individual capacities as St. Paul Police Officers; John Does 3–4, in their individual and official capacities as supervisory members of the St. Paul Police Department

*Defendants*

------------------------------

The Human Trafficking Institute

*Amicus on Behalf of Appellant*

---

No. 17-3212

---

Bashir Yasin Mohamud

*Plaintiff - Appellee*

-3-

Appellate Case: 17-3207    Page: 3    Date Filed: 06/12/2019 Entry ID: 4796665

v.

Heather Weyker, in her individual capacity as a St. Paul Police Officer

*Defendant - Appellant*

The City of St. Paul; John Bandemer, in his individual and official capacities as a St. Paul Police Sergeant; John Does 1–2, in their individual capacities as St. Paul Police Officers; John Does 3–4, in their individual and official capacities as supervisory members of the St. Paul Police Department

*Defendants*

------------------------------

The Human Trafficking Institute

*Amicus on Behalf of Appellant*

------------------------------

No. 17-3213

------------------------------

Mohamed Amalle

*Plaintiff - Appellee*

v.

Heather Weyker, in her individual capacity as a St. Paul Police Officer

*Defendant - Appellant*

The City of St. Paul; John Bandemer, in his individual and official capacities as a St. Paul Police Sergeant; John Does 1–2, in their individual capacities as St. Paul Police Officers; John Does 3–4, in their individual and official capacities as supervisory members of the St. Paul Police Department

*Defendants*

------------------------------

The Human Trafficking Institute

*Amicus on Behalf of Appellant*

_____

Appeals from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: November 14, 2018
Filed: June 12, 2019

_____

Before COLLOTON, SHEPHERD, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

If a federal law-enforcement officer lies, manipulates witnesses, and falsifies evidence, should the officer be liable for damages? We hold that the Constitution does not imply a cause of action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), so the answer must come from Congress, not from us. And Congress has, so far, answered no.

I.

In 2008, police officers in St. Paul, Minnesota, were investigating a suspected sex-trafficking operation involving minors. After one alleged victim was reported missing in Minneapolis and then turned up in Nashville, federal investigators in Tennessee became involved too. The government eventually charged thirty people with a variety of crimes allegedly arising out of an extensive conspiracy that spanned ten years and four states.

-5-

Appellate Case: 17-3207     Page: 5     Date Filed: 06/12/2019 Entry ID: 4796665

The cases against nine of the defendants, including Ahmad Ahmad and Mohamed Amalle, proceeded to trial in the Middle District of Tennessee. The jury acquitted some, while the district court acquitted the others after the jury found them guilty. *See United States v. Adan*, 913 F. Supp. 2d 555, 579 (M.D. Tenn. 2012). In affirming, the Sixth Circuit expressed "acute concern, based on [a] painstaking review of the record, that this story of sex trafficking and prostitution may be fictitious." *United States v. Fahra*, 643 F. App'x 480, 484 (6th Cir. 2016) (unpublished). Prosecutors dropped the charges against the remaining defendants, including Yasin Farah, Hamdi Osman, and Bashir Mohamud.

Ahmad, Amalle, Farah, Osman, and Mohamud each sued Officer Heather Weyker, who had led the investigation for the St. Paul Police Department. They accused Weyker of exaggerating and inventing facts in reports, hiding evidence that would have exonerated them, and pressuring and manipulating the alleged victims into lying. She deceived prosecutors, the grand jury, and other investigators, according to the complaints filed in each case, about the ages of the alleged victims, whether the victims were coerced into sex, and the relationships among the supposed conspirators. By doing so, the plaintiffs claimed, Weyker caused them to be charged and detained for periods ranging from four months to over three years, all in violation of the Fourth Amendment's prohibition on unreasonable seizures. *See Manuel v. City of Joliet*, 137 S. Ct. 911, 919–20 (2017).

A sixth plaintiff, Ifrah Yassin, was not part of the alleged federal conspiracy. Rather, according to Yassin's complaint, she was arrested for witness intimidation based on false information from Weyker. The arrest arose out of a fight between a cooperating witness in the sex-trafficking investigation and one of Yassin's friends. After the fight started, Yassin called 911 and the witness called Weyker. Weyker then told the officer responding to the 911 call that, based on "information and documentation," Yassin and her friends were trying to intimidate the witness and prevent her from cooperating in a federal investigation. Relying on Weyker's tip,

-6-

Appellate Case: 17-3207     Page: 6     Date Filed: 06/12/2019 Entry ID: 4796665

the officer arrested Yassin, who was later charged with witness tampering and obstruction of justice. A jury acquitted her of both charges.

The crux of Yassin's case against Weyker is that no "information and documentation" ever existed. Rather, Weyker caused Yassin's unlawful arrest and detention by lying about the reason for the altercation.

All six, including Yassin, sought damages. Recognizing that Weyker had been deputized as a U.S. Marshal toward the conclusion of the joint investigation, they pleaded causes of action under both 42 U.S.C. § 1983, which authorizes constitutional claims against state officials; and *Bivens*, which operates similarly against federal officials, notwithstanding the absence of a statutory cause of action, *see* 403 U.S. at 397. Weyker moved to dismiss, arguing that neither theory was viable. She reasoned that section 1983 did not apply to her because she was a deputized federal official. As for *Bivens*, she claimed that nothing she was accused of doing was actionable. And even assuming the plaintiffs could sue her, she added, she was entitled to qualified immunity because the facts they alleged did not show that she had violated their clearly established constitutional rights.

The district court disagreed. It concluded that even if Weyker was right that *Bivens* was the plaintiffs' only remedy, the claims against her could still proceed. Weyker immediately appealed, *see Wilkie v. Robbins*, 551 U.S. 537, 549 n.4 (2007) (holding that the courts of appeals have jurisdiction to hear interlocutory appeals challenging "the recognition of the entire [*Bivens*] cause of action" in qualified-immunity cases), and we consolidated all six appeals in light of the overlapping facts and legal issues involved.

II.

We begin with the five plaintiffs charged in the original conspiracy prosecution. The threshold question is whether their cases are the type for which a

-7-

Appellate Case: 17-3207   Page: 7   Date Filed: 06/12/2019 Entry ID: 4796665

*Bivens* remedy is available. *See, e.g., Bush v. Lucas*, 462 U.S. 367, 390 (1983) (holding that a federal employee demoted for exercising his First Amendment rights did not have a *Bivens* claim). We address this "purely legal question" de novo. *Neb. Beef, Ltd. v. Greening*, 398 F.3d 1080, 1083 (8th Cir. 2005).

On only three occasions has the Supreme Court implied a cause of action under *Bivens*. *See Carlson v. Green*, 446 U.S. 14, 16–18 (1980); *Davis v. Passman*, 442 U.S. 228, 248 (1979); *Bivens*, 403 U.S. at 397. Since then, the Court has become "far more cautious" and has, in fact, "'consistently refused to extend *Bivens* to any new context or new category of defendants'" for almost forty years. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855, 1857 (2017) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). Recognizing that the *Bivens* inquiry is about "*who* should decide" whether to create a new cause of action, the Court has answered "most often . . . Congress." *Id.* at 1857 (emphasis added) (citation omitted).

Determining whether an implied cause of action is available under *Bivens* involves two steps. First, we must determine whether the cases before us present one of "the three *Bivens* claims the Court has approved in the past" or whether, instead, allowing the plaintiffs to sue would require us to extend *Bivens* to a "new context." *Id.* at 1859–60. If there is a previously recognized *Bivens* claim alleged, then the cases may proceed. If not, then we advance to the second step and ask whether any "special factors counsel[] hesitation" before implying a new cause of action "in the absence of affirmative action by Congress." *Id.* at 1857 (citation omitted). Only if we are confident that "the Judiciary is well suited . . . to consider and weigh the costs and benefits of allowing a damages action" will we take it upon ourselves to do so. *Id.* at 1858. Otherwise, we will leave the balancing to Congress.

A.

No Supreme Court case exactly mirrors the facts and legal issues presented here. *See id.* at 1859–60 (explaining that the comparison is to Supreme Court cases).

-8-

The one that comes closest is *Bivens* itself. *See Bivens*, 403 U.S. at 389–90; *cf. Carlson*, 446 U.S. at 16 n.1, 18–23 (allowing a claim against federal prison officials who failed to treat a prisoner's asthma); *Davis*, 442 U.S. at 230, 236–48 (permitting a congressman's administrative assistant to sue after he fired her). *Bivens* involved a claim against federal agents for an illegal arrest and warrantless search. *See* 403 U.S. at 389. Here, the allegations are that a federally deputized officer duped prosecutors and a grand jury into believing that the plaintiffs were part of a multi-state sex-trafficking conspiracy.

To determine whether the differences "are meaningful enough to make [this] context a new one," the Supreme Court has instructed us to consider several factors, including:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; [and] the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 137 S. Ct. at 1859–60 (emphasizing that this list is illustrative, not "exhaustive"). The cases before us are meaningfully different from *Bivens* in three ways.

First, Weyker's alleged misdeeds are different from those in *Bivens*, even if the "constitutional right at issue" is the same. *Id.* at 1860. The agents in *Bivens* handcuffed and strip-searched the plaintiff and combed through his apartment, all without a warrant. *See* 403 U.S. at 389. Weyker did none of these things, nor anything similar. She spoke to witnesses, drafted reports, and shared information with prosecutors and other investigators. These information-gathering and case-

-9-

Appellate Case: 17-3207     Page: 9     Date Filed: 06/12/2019 Entry ID: 4796665

building activities are a different part of police work than the apprehension, detention, and physical searches at issue in *Bivens*.

Second, the mechanism of injury is different. In *Bivens*, the plaintiff's injuries—"humiliation, embarrassment, and mental suffering"—were directly caused by the officers' conduct. *Id.* at 389–90. Here, by contrast, Weyker's actions injured the plaintiffs through a series of intervening steps. And those intervening steps involved decisions by independent legal actors—the prosecutors who chose to pursue charges against the plaintiffs, the grand jury that voted to indict them, and the judges and magistrates who approved their continued detention. This indirect mechanism of injury bears little resemblance to the straightforward claims from *Bivens*.

Third, recognizing an implied cause of action here would pose a greater risk of interference with the other branches of government than it did in *Bivens*. *See Abbasi*, 137 S. Ct. at 1860. Probing the causal chain in cases like these would involve delving into the evidence before numerous decisionmakers, including federal investigators, prosecutors, and the grand jury. The initial step would be to discover what Weyker said, to whom she said it, and when. The information Weyker provided to investigators, prosecutors, and the grand jury would then need to undergo examination for its truth or falsity. For any false information she provided, the question would be whether the evidence was material. The determination would center on whether other evidence available to investigators and prosecutors would have independently led them to charge or detain the plaintiffs. *Cf. Williams v. City of Alexander*, 772 F.3d 1307, 1311 (8th Cir. 2014) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). Only then, after probing executive charging decisions and peeking behind the curtain of customarily secret grand-jury proceedings, would the plaintiffs be able to prove their cases. Nothing so intrusive was required to prove the claims in *Bivens*.

-10-

To be sure, similarities exist. *Bivens* involved alleged violations of the Fourth Amendment's prohibition on "unreasonable searches and seizures," and so do these cases. 403 U.S. at 389 (quoting U.S. Const. amend. IV); *see also Abbasi*, 137 S. Ct. at 1856 (stressing "the continued force . . . of *Bivens* in the search-and-seizure context in which it arose"). But treating all search-and-seizure cases the same would contradict the Supreme Court's direction that a context can be new even if it involves the same constitutional right as an existing case. *See Abbasi*, 137 S. Ct. at 1859.

Nor is the context the same just because Weyker and the agents in *Bivens* were "street-level" investigators whose alleged misconduct only impacted a single investigation, rather than senior officers engaged in policymaking activities. It is true, as Osman and Farah point out, that the Supreme Court emphasized "the rank of the officers involved" and "the generality or specificity of the official action" in its most recent refusal to extend *Bivens*. *See id.* at 1860–61 (addressing claims against Justice Department officials and prison wardens based on post-9/11 detention policies and conditions). Even so, the Court left no doubt that these were just two features among many that could meaningfully differentiate potential causes of action. *See id.* at 1859–60.

The three differences we have identified—the sorts of actions being challenged, the mechanism of injury, and the kinds of proof those injuries would require—are "meaningful enough" that we cannot simply assume that the same reasons that justified permitting the plaintiff to recover damages in *Bivens* apply equally here. *Id.* at 1859. Allowing the plaintiffs to pursue damages claims in this context would mean extending *Bivens*, no matter how "modest" the extension may be, *id.* at 1864, so we must decide whether this is one of the unusual situations in which we are "well suited . . . to consider and weigh the costs and benefits of allowing a damages action to proceed," *id.* at 1858.

-11-

Appellate Case: 17-3207     Page: 11     Date Filed: 06/12/2019 Entry ID: 4796665

B.

According to the Supreme Court, we must now determine at the second step whether anything about these cases "causes [us] to pause before acting without express congressional authorization." *Id.* It does not take much to make us pause, because "[i]n most instances, . . . [Congress] is in the better position to consider if the public interest would be served by imposing a new substantive legal liability." *Id.* at 1857 (internal quotation marks and citation omitted). Indeed, recognizing the Court's "caution" in this regard, we have adopted a "presumption against judicial recognition of direct actions for violations of the Constitution by federal officials." *Neb. Beef*, 398 F.3d at 1084 (citation omitted).

Among the "special factors" that have been decisive in the past, *Abbasi*, 137 S. Ct. at 1857–58, the most relevant here are whether a *Bivens* action "would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch," *id.* at 1861; whether Congress has taken other action in the area without authorizing a damages remedy, *see id.* at 1862; and whether a "remedial structure" is already in place to address constitutional violations, even if it does not go as far as a *Bivens* remedy would, *id.* at 1858, 1862–63. *See also id.* at 1858, 1861 (identifying additional "special factors"). When factors like these are present, the Supreme Court has explained, it is "less probable that Congress would want the Judiciary to entertain a damages suit." *Id.* at 1858.

1.

The first special factor present here is a variation on one the Supreme Court has already identified: the risk of burdening and interfering with the executive branch's investigative and prosecutorial functions. *Cf. id.* at 1861; *see also id.* at 1858 (recognizing that other special factors will appear in future cases, but that they are "difficult to predict in advance"). As we explain above, for these plaintiffs to prevail, they would need to show that Weyker's allegedly false information was

-12-

what established probable cause for their arrests and detention. *Cf. Williams*, 772 F.3d at 1311 (explaining that to succeed on a false-arrest claim against an officer who has lied in a warrant application, a plaintiff must prove that "[o]nce the purportedly false statements are removed, the affidavit's remaining content does not support a finding of probable cause").

This type of showing would invite a wide-ranging inquiry into the evidence available to investigators, prosecutors, and the grand jury. It would not just be limited to the theories *actually* pursued by the prosecutors, because the question is not whether their theories had support. Rather, it would focus on whether there was probable cause to charge the plaintiffs with a crime that would have justified their detention pending trial. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("The Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent [of the officials involved]." (brackets omitted) (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996))); *Keil v. Triveline*, 661 F.3d 981, 986 (8th Cir. 2011). Reconstructing the record before the grand jury, contemplating a panoply of federal crimes, and determining whether it would have been reasonable to think that the plaintiffs committed any of them would be among the likely steps in the analysis.

Take Farah's case, for example. He assures us that there would be no need to look at "the great bulk" of the grand-jury evidence, because Weyker was his only point of contact with investigators, so any possible support for the charges must have come from her. But to verify this assertion, the factfinder still has to know what was in the grand-jury record. Only if there really is nothing implicating Farah—or at least nothing that could have supported probable cause—in the police reports, witness statements, transcripts, and other materials will the factfinder be able to determine that Weyker's alleged misdeeds caused his injuries.

To be sure, sometimes courts must undertake this sort of review. Indeed, if the plaintiffs' section 1983 claims turn out to be viable, *see infra* Part II.C, the

-13-

district court may have to do so in these cases. But such after-the-fact inquiries still pose a risk of intrusion on executive-branch authority to enforce the law and prosecute crimes, not to mention encroach on the usual secrecy of charging decisions and grand-jury proceedings. That some section 1983 cases pose similar risks just reflects that *Congress* has balanced the costs and benefits and decided that the potential encroachment is worth it. The fact that recognizing the plaintiffs' claims in these cases would require us to make this determination on our own, without any congressional guidance, is reason enough "to pause before acting." *Abbasi*, 137 S. Ct. at 1858.

2.

Another "special factor counselling hesitation" is what Congress has already done to address injuries of the sort the plaintiffs have allegedly suffered. *Id.* The so-called Hyde Amendment allows courts to award attorney fees to criminal defendants who prevail against "vexatious, frivolous, or . . . bad[-]faith" positions taken by the government. Act of Nov. 26, 1997, Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (codified at 18 U.S.C. § 3006A note). And those who are wrongly convicted and sentenced may seek release under 28 U.S.C. § 2255 or sue the government for damages, *see* 28 U.S.C. § 1495 (creating a cause of action for damages "by any person unjustly convicted of an offense against the United States and imprisoned"); *see also id.* § 2513(e) (capping the damages available for wrongful imprisonment).

Understandably, the plaintiffs are not satisfied with these options, which are unavailable to them. They cannot recover attorney fees, for example, because they were represented by appointed counsel. *See* § 617, 111 Stat. at 2519 (excepting "case[s] in which the defendant [was] represented by assigned counsel paid for by the public"). Nor can they seek release or damages because they were never convicted. *See* 28 U.S.C. § 2255(a) (limiting relief to "prisoner[s] in custody under sentence of a [federal] court"); *id.* § 1495 (requiring "convict[ion]" and
-14-

"imprison[ment]"). But far from supporting their position, the plaintiffs' ineligibility for these remedies actually cuts against recognizing a new cause of action.

The reason is that it would upset the existing "remedial structure." *Abbasi*, 137 S. Ct. at 1858. These plaintiffs are ineligible for relief under the unjust-conviction statute precisely because they were acquitted or had their charges dropped before trial. But had they been convicted and imprisoned, they would be eligible to seek damages under the unjust-conviction statute. The fact that Congress has expressly provided a damages remedy for some victims of this particular type of injury, but not for others, suggests that it considered the issue and made a deliberate choice. This is a "convincing reason" not to imply a second, distinct "freestanding remedy in damages." *Id.* (citation omitted).

The plaintiffs complain that these alternatives would not have offered them "roughly similar compensation" or provided "roughly similar incentives" to deter officers from violating the law. *Minneci v. Pollard*, 565 U.S. 118, 130 (2012). They forget, however, that *Bivens* remedies are the exception, and if they were available every time "roughly similar" remedies are not, then *Bivens* would become the rule, available in all but the most unusual constitutional cases. To be sure, the availability of "roughly similar" remedies was discussed in one Supreme Court decision, *see id.*, but since then, no case has mentioned it, much less relied on it. *See Abbasi*, 137 S. Ct. at 1858, 1862–63 (saying nothing about similarity or comparability, despite addressing alternative remedies in depth). To the contrary, the Court has since made clear that even remedies that provide *no* compensation for victims and little deterrence for violators, such as injunctions and writs of habeas corpus, trigger the general rule that, "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Id.* at 1863 (citing several cases, including *Minneci*, 565 U.S. at 124–26).

\* \* \*

Appellate Case: 17-3207  Page: 15  Date Filed: 06/12/2019 Entry ID: 4796665

The bottom line is that a balance must be struck between the costs and benefits of allowing plaintiffs who have been wrongfully charged and detained based on allegedly fabricated evidence to sue for damages. The costs of implying a cause of action include exposing federal officials to "the complex sphere of litigation," *id.* at 1858, and intruding on prosecutorial functions. Among the benefits, however, are deterring misconduct, protecting the integrity of the criminal adjudicatory process, and preventing innocent people from being illegally detained. It is not our place to weigh these competing policy concerns. Rather, having identified "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," we "must refrain from creating [one]" ourselves. *Id.*

C.

Declining to extend *Bivens* does not necessarily end these five cases, however, because the plaintiffs also brought section 1983 claims against Weyker. Before the district court, Weyker argued that she was not acting under color of state law when she committed her alleged misdeeds, because she had been deputized as a federal officer by the time the plaintiffs were indicted. *See Magee v. Trs. of Hamline Univ.*, 747 F.3d 532, 535 (8th Cir. 2014). This argument, which the district court did not address, potentially requires a fact-intensive analysis of "the nature and circumstances" of Weyker's alleged misconduct and its "relationship . . . to the performance of [her] official [state] duties." *Id.* (citation omitted); *see also West v. Atkins*, 487 U.S. 42, 49 (1988) ("The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941))). For this reason, and because the parties have not fully briefed

-16-

this question on appeal, we remand for the district court to consider the applicability of section 1983 in the first instance.[1]

### III.

Yassin's case is different. Her primary theory is that she was unlawfully arrested because Weyker falsely told another police officer that she was trying to intimidate a federal witness. We need not decide whether this theory of liability would require us to extend *Bivens*, because Weyker has not meaningfully briefed the point on appeal. *See White v. Jackson*, 865 F.3d 1064, 1075 (8th Cir. 2017).

Even if we assume that Yassin's unlawful-arrest claim is viable under *Bivens*,[2] however, Weyker still claims that she is entitled to qualified immunity for every action she took during the investigation. So we must address the two familiar qualified-immunity questions: assuming Yassin's allegations are true, did Weyker violate her constitutional rights? And if so, were those rights clearly established? *See Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). On both points, our review is de novo, *see id.*, and our answer is yes.

First, Yassin alleged a constitutional violation. According to her complaint, the officer who arrested her had no reason to suspect her of a crime until Weyker lied to him. In fact, the complaint suggests that the facts known to the officer led him to treat her as a victim, at least until he heard from Weyker. These allegations, if true, would establish an unlawful-arrest claim under the Fourth Amendment. *See Williams*, 772 F.3d at 1310; *cf. Small v. McCrystal*, 708 F.3d 997, 1006 (8th Cir.

---

[1]We decline Weyker's invitation to skip over the under-color-of-state-law element to decide her claim to qualified immunity.

[2]To the extent Yassin is also suing for damages arising out of her post-arrest indictment, the claim must proceed, if at all, under section 1983. *See supra* Part II.C.

-17-

Appellate Case: 17-3207   Page: 17   Date Filed: 06/12/2019 Entry ID: 4796665

2013) ("Officers remain liable . . . for the reasonably foreseeable acts of actors they deceive.").

Second, the right Weyker allegedly violated was clearly established. It is true, as Weyker explains, that sexual-abuse and sex-trafficking cases often put investigators in difficult positions, particularly when there are minors involved. *Cf. Myers v. Morris*, 810 F.2d 1437, 1459 (8th Cir. 1987) (noting "[t]he uncertainty surrounding acceptable investigative techniques for suspected child sexual abuse"). But even so, a reasonable officer would know that deliberately misleading another officer into arresting an innocent individual to protect a sham investigation is unlawful, regardless of the difficulties presented by the case. *See, e.g., Williams*, 772 F.3d at 1313; *Small*, 708 F.3d at 1006.

## IV.

We accordingly vacate the denial of Weyker's motions to dismiss Ahmad's, Amalle's, Farah's, Osman's, and Mohamud's complaints. We instruct the district court on remand to dismiss their *Bivens* claims and determine whether their cases may proceed under section 1983. We also affirm the denial of Weyker's motion to dismiss Yassin's unlawful-arrest claim and remand her case for further proceedings consistent with this opinion.

———————————

Appellate Case: 17-3207    Page: 18    Date Filed: 06/12/2019 Entry ID: 4796665